1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF DEREK VALENTINE, et al., | Case No. 1:23-cv-01697-JLT-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANTS COUNTY OF MERCED, MERCED COUNTY SHERIFF'S OFFICE, VERNON WARNKE, JOEL PENA, EMANUEL GUTIERREZ, BIANCA GUZMAN, DIANE RENTFROW, AND GEORGE SZIRAKI'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT |
| v. | |
| COUNTY OF MERCED, et al., | |
| Defendants. | |
| | (ECF Nos. 43, 46, 47) |
| | **OBJECTIONS DUE WITHIN FOURTEEN (14) DAYS** |

Currently pending before the Court is a motion to dismiss brought by the County of Merced, Merced County Sheriff's Office, Vernon Warnke, Joel Pena, Emanuel Gutierrez, Bianca Guzman, Diane Rentfrow and George Sziraki (collectively "County Defendants").

Having considered the moving, opposition and reply papers, as well as the Court's file, the Court issues the following findings and recommendations.

## I.

## BACKGROUND

### A.    Procedural History

On December 8, 2023, the Estate of Derek Valentine, Araceli Sanchez; minors L.V., C.V, and M.V, Ruth Ramirez, and Albert Valentine (collectively "Plaintiffs") filed the complaint in

1

1  this civil rights action pursuant to 42 U.S.C. § 1983 against the County of Merced, Merced

2  County Sheriff's Office, Vernon Warnke, and California Forensic Medical Group ("CFMG"),

3  along with a notice of adequate representation for the minor plaintiffs.  (ECF Nos. 1, 4.)  On

4  February 9, 2024, Defendant CFMG filed a motion to dismiss.  (ECF No. 14.)  While the motion

5  was still pending, on June 25, 2024, the parties stipulated to the filing of a first amended

6  complaint and the first amended complaint was filed which added claims against Defendants

7  Christopher Caughell, Emanuel Gutierrez, Bianca Guzman, Joel Pena, Diane Rentfrow,

8  Alexandrea Reyes, and George Sziraki.  (ECF No. 35.)  On July 1, 2024, Defendant CFMG

9  withdrew their motion to dismiss; on July 2, 2024, County Defendants withdrew their motion to

10  dismiss; and the motions were ordered to be disregarded.  (ECF Nos. 38, 39, 40.)  On August 1,

11  2024, Defendant CFMG filed an answer to the first amended complaint.  (ECF No. 42.)

12      On August 6, 2024, County Defendants filed the instant motion to dismiss Plaintiffs' first

13  amended complaint.  (ECF No. 43.)  On August 7, 2024, the motion was referred to the

14  undersigned for the preparation of findings and recommendations.  (ECF No. 45.)  On August

15  13, 2024, Plaintiffs filed an opposition to the motion to dismiss.  (ECF No. 46.)  On August 23,

16  2024, County Defendants filed a reply.  (ECF No. 47.)

17          **B.      First Amended Complaint Allegations**

18      On February 7, 2023, Derek Valentine ("Decedent") was transferred from the custody of

19  the California Department of Corrections and Rehabilitation ("CDCR") into the custody of

20  County Defendants at the John Latorraca Correctional Center ("the Correctional Center").  (First

21  Am. Compl. ("FAC") at ¶ 47, ECF No. 35.)  Decedent was a pretrial detainee and was classified

22  as "Booked-Awaiting Trial" on a new arrest.  (Id. at 48.)  Upon intake, several issues were

23  documented which included moderate persistent asthma; nicotine dependence; other stimulate

24  abuse including methamphetamine; opioid abuse; essential primary hypertension; and major

25  depressive disorder, recurrent.  (Id. at ¶ 49.)  It was also recorded that Decedent used 1 pack of

26  tobacco a week since the age of 18; smoked 1 gram of methamphetamine since the age of 19 and

27  last used a year prior; used 1 gram of cocaine a week since the age of 19 and last used 3 years

28  prior; used 1 gram a week of heroin since the age of 29 and last used a year prior; drank 3 packs

of beer a day since the age of 17 and last drank prior to incarceration.  (Id.)  From February 7, 2023, until February 12, 2023, medical staff ordered and implemented increased monitoring and testing of Decedent using the Clinical Opiate Withdrawal Scale ("COWS").  (Id. at ¶ 50.)  On February 12, 2023, medical staff discontinued increased monitoring and testing of Decedent using COWS.  (Id. at ¶ 51.)

On March 20, 2023, Decedent was evaluated during a sick call informing medical staff that he had been injured.  He was transported to an outside hospital for evaluation, returning later that same day.  The jail records note that he said he hurt his back while working in the kitchen Sunday afternoon and denied any fall stating the pain was 8/10 in his lower back.  He was prescribed 400 mg of Ibuprofen to be taken twice a day as needed for five days.  (Id. at ¶ 53.)

The jail facilities, including the Correctional Center, are overrun with drugs which are readily available to inmates, including fentanyl.  Drugs are available to inmates on the yard at the Correctional Center.  (Id. at ¶ 54.)  Drugs arrive at the jail facilities by way of inmates, jail employees, and/or jail contractors who smuggle contraband into the facilities.  The county detention facility policies do not require jail employees or contractors to be thoroughly searched prior to entering which contributes to the risk of drugs entering the jail.  (Id. at ¶ 55.)  Defendants County of Merced, Merced County Sheriff's Office, and Warnke were responsible for supervising the Correctional Center and were aware that drugs were routinely smuggled into the jail and that inmates were overdosing from obtaining drugs within the jail.  (Id. at ¶ 56.)

One week prior to April 20, 2023, an inmate at the jail overdosed on fentanyl; on April 20, 2023, Decedent overdosed on fentanyl, and at least one additional inmate overdosed on fentanyl after April 20, 2023.  (Id. at ¶¶ 51, 58.)  Despite the known presence and availability of drugs and resulting risk of overdose, Defendants County of Merced, Merced County Sheriff's Office, Warnke and CFMG maintained deficient policies and customs related to treating overdoses occurring in jail facilities, such as jail staff was insufficiently trained concerning care and treatment of suspected or known to be overdosing, including how often and how much Narcan to administer.  (Id. at ¶ 59.)

On April 20, 2023, Decedent had access to drugs, including fentanyl which was readily

available at the jail.  (Id. at ¶ 60.)  Decedent was housed in dorm 607 which was a communal cell with at least seven two-bed bunks and at least five mattresses located on the floor of the dorm. The dorm was overcrowded and occupied by at least 16 inmates, including Decedent.  (Id. at ¶ 61.)  Defendants County of Merced, Merced County Sheriff's Office, and Warnke accepted more inmates than the facilities were built and designed to accommodate, and the jails were overcrowded with an inadequate amount of staff, resulting in inadequate supervision and monitoring of inmates and contraband located in overcrowded cells.  (Id. at ¶ 62.)

Decedent occupied a mattress near the corner of the dorm within direct sight of a closed-circuit television surveillance camera which monitored the dorm and its occupants.  Decedent was clearly visible on the video feed of the dorm.  (Id. at ¶ 63.)  Jail staff did not monitor Decedent despite his visibility in the dorm on the surveillance system at the time he ingested drugs and was experiencing an obvious medical emergency.  (Id. at ¶ 64.)

Defendants Pena and Gutierrez were correctional officers responsible for monitoring and supervising the inmates in the dorm and Defendant Guzman was the security systems operator responsible for monitoring and supervising the video feed in the dorm.  (Id. at ¶ 65.)  Around 8:23 p.m., Decedent was visible on the video feed rummaging through items on the top level of a bunk bed, removing an item from the bunk bed, and orally ingesting drugs.  (Id. at ¶ 66.) Around 8:29 p.m., Decedent was visible on the video feed returning to the bunk bed, rummaging through items on the top level of the bunk bed, removing an item from the bunk and orally ingesting drugs.  (Id. at ¶ 68.)  Around 8:33 p.m., Decedent was visible on the video feed conversing with another inmate who handed him drugs.  (Id. at ¶ 69.)  Around 8:59 p.m., Defendant Pena entered the dorm to conduct a safety check and walked about halfway into the dorm, turned around, and exited the dorm.  (Id. at ¶ 67.)

From around 9:30 to 9:35 p.m., Decedent was visible on the video feed, orally ingesting drugs, sitting on the mattress of the cell floor cutting and ingesting lines of drugs through his nose, and orally ingesting more drugs.  (Id. at ¶¶ 70-73.)  From 9:35 p.m. onward, Decedent was visible on the video feed lying on his back on his mattress on the cell floor.  (Id. at ¶ 74.)  At around 9:45 p.m. Decedent was visible on the video feed holding both his arms up in the air, bent

at the elbow, before his arms slowly fell limp at his sides.  He was then visible on the feed, unconscious and lying in an abnormal position on the mattress.  (Id. at ¶ 75.)  Decedent was severely ill and suffering from a medical emergency.  (Id. at ¶ 76.)

From 9:47 to 9:48 p.m., Decedent was visible on the video feed with his hands and later his arms twitching and shaking as if he was experiencing a seizure, and with occasional entire body spasms.  (Id. at ¶¶ 77-78.)  Around 9:49 p.m., an inmate discovered Decedent nonresponsive and suffering a medical emergency and alerted Defendant Guzman using the intercom located in the dorm.  (Id. at ¶¶ 80-81.)  Around 9:50 p.m., Defendant Guzman radioed "man down" in dorm 607 which alerted jail staff of the medical emergency.  (Id. at ¶ 82.)  Around 9:51, Defendants Pena and Gutierrez entered the dorm and walked toward the back of the cell where Decedent was located.  (Id. at ¶ 83.)  Defendant Pena reported that Decedent was "sweating, unresponsive, and had quick shallow breathing."  Defendant Gutierrez reported that Decedent was "non-responsive and sweating profusely" and he believed that Decedent was experiencing a medical related emergency due to consumption of an unknown controlled substance.  (Id. at ¶ 84.)  Defendant Pena used his radio to request that medical staff report to dorm 607 with a medical supplies bag.  (Id. at ¶ 85.)  Defendants Caughell, a registered nurse, and Defendant Reyes, a licensed vocational nurse received the call and walked to dorm 607 together.  (Id. at ¶ 86.)

Defendant Gutierrez ordered that all inmates present in the dorm be removed from the area to the yard, and Defendant Pena escorted the inmates into the yard.  (Id. at ¶ 87.)  Defendant Gutierrez rolled Plaintiff onto his right side in a "recovery position," and at approximately 9:52 p.m., administered a dose of Narcan to Decedent and began rubbing Decedent's chest.  (Id. at ¶¶ 88-90.)  Around 9:53 p.m., Defendant Gutierrez observed liquid coming out of Decedent's nose and Decedent vomited.  (Id. at ¶ 91.)  Defendants Caughell and Reyes arrived on the scene but failed to take over care and left Defendant Gutierrez in charge of administering aid to Decedent.  (Id. at ¶¶ 92-93.)  Defendant Gutierrez was not trained in relevant medical response topics, such as "Fire and Line Safety," "Crisis Intervention," and "Narcan."  (Id. at ¶ 94.)  Defendant Gutierrez' supervisors, Defendants Rentfrow and Sziraki, were on the scene and did not take

1   over Decedent's care or instruct Defendants Caughell or Reyes to do so.  (Id. at ¶ 95.)

2          Around 9:55 p.m., Defendant Gutierrez obtained a second Narcan nasal spray from

3   Defendant Rentfrow's equipment bag and administered a second dose of Narcan to Decedent.

4   (Id. at ¶ 98.)  Around 9:56 p.m., Defendant Caughell asked custody staff if they could a bag

5   valve mask on Decedent which is used to provide respiratory support.  (Id. at ¶ 99.)  Defendant

6   Reyes got the ambu-bag from the medical supply bag and gave it to Defendant Gutierrez who

7   lifted Decedent from the mattress and placed him on the floor.  (Id. at ¶¶ 100-01.)  Around 9:57

8   p.m., Defendant Gutierrez applied the ambu-bag to Decedent's face and began manually

9   squeezing the bag's valve.  (Id. at ¶ 102.)

10          Around 9:58 p.m., Defendant Caughell checked for a pulse stating, "He's still got a pulse.

11   How long has it been since his last Narcan?  Can we give him another one?"  (Id. at ¶ 104.)

12   Defendant Rentfrow asked if any other correctional officer on the scene had any Narcan and the

13   other correctional officers responded that they did not have any available.  (Id. at ¶ 105.)

14   Defendant Sziraki returned after speaking to inmates in the yard and was asked if he had any

15   Narcan.  He removed a Narcan nasal spray from his equipment bag and handed it to Defendant

16   Caughell. (Id. at ¶ 106.)  Decedent continued vomiting.  (Id. at ¶ 107.)

17          Around 9:59 p.m. Defendant Caughell handed the Narcan to Defendant Gutierrez who

18   administered a third dose.  (Id. at ¶ 108.)   Around 10:00 p.m., Defendant Sziraki asked

19   correctional officers immediately outside the dorm if they had Narcan and obtained two

20   additional Narcan nasal sprays which he handed to Defendant Caughell.  (Id. at ¶ 109.)  At 10:01

21   p.m., Decedent continued vomiting.  (Id. at ¶ 111.)  Defendant Gutierrez pressed Decedent's

22   chest with his hands before reapplying the Ambu-bag mask on Decedent's face.  (Id. at ¶ 112.)

23   Around 10:03 p.m., Defendant Caughell stated there was "no pulse, CPR," and began CPR chest

24   compressions.  (Id. at ¶¶ 113-14.)  Around 10:04 p.m., Decedent continued vomiting.  (Id. at ¶

25   115.)   A correctional officer reapplied the ambu-bag to Decedent's face while Defendant

26   Caughell resumed CPR.  (Id. at ¶ 116.)  Defendant Reyes took over administering the ambu-bag

27   so the correctional officers could hold the mask against Decedent's face to ensure that air was

28   entering his mouth and nose.  (Id. at ¶ 117.)

Around 10:05 p.m., Defendant Sziraki stepped outside the dorm and had a hushed conversation with other correctional officers stating, "That's bad medical. . . . He's fucking turning grey!"  Defendant Sziraki abruptly deactivated his body camera.  Shortly thereafter Defendant Sziraki reactivated his body camera and reentered the dorm.  (Id. at ¶ 118.)  Around this same time, Defendant Caughell requested an automated external defibrillator ("AED") and Defendant Reyes informed him that it was packed in the equipment bag.  (Id. at ¶¶ 119-20.) Defendant Caughell removed the AED from the bag and attached the pads to Decedent's chest around 10:07 p.m.  (Id. at ¶¶ 121-22.)  The machine stated, "No shock advised.  Start CPR."  (Id. at ¶ 123.)  From 10:04 to 10:10 p.m., staff continued CPR on Decedent.  (Id. at ¶ 124.)  The fire department arrived around 10:13 p.m., and continued CPR on Decedent.  (Id. at ¶ 125.)  An ambulance arrived at around 10:16 p.m., and around 10:18 p.m. the fire department and ambulance took over care of Decedent.  (Id. at ¶¶ 126-27.)

Around 10:26 p.m., Decedent was pronounced dead at the scene.  (Id. at ¶ 128.)  At 11:08 p.m., Defendant Reyes documented that Decedent received several medications, including paroxetine 40 mg tablet, Prazosin 1 mg capsule, Alvesco 60 inhalations 160 mcg 6.1 gm, Hydroxyzine Hcl 50 mg 1 tablet, Albuterol HFA 6.7 gm, melatonin 3 mg 1 tablet and Lisinopril 20 mg 1 tablet.  (Id. at ¶ 129.)   On May 22, 2023, the coroner reported that Decedent's cause of death was "Acute combined fentanyl, paroxetine and hydroxyzine toxicity."  (Id. at ¶ 132.)

During post incident interviews, Detective Goins reported that an inmate housed in dorm 607 acknowledged that there was fentanyl in the dorm.  (Id. at ¶ 139.)  On January 24, 2024, Lieutenant Thomas issued an "In-Custody Death Review" report finding that Defendant Reyes did not appear to take many measures to assist for several minutes until taking over the bag valve aside from attempting to check Decedent's pulse and placing an oxygen monitor on his left hand, Defendant Caughell began CPR but did not ask for an AED until several minutes after compressions were started, and Wellpath staff did not attempt to clear Decedent's airway at any time other than what the officers were already doing prior to their arrival and continued to do during the incident.  (Id. at ¶ 140.)

Plaintiffs bring the following claims: 1) deliberate indifference/special relationship in

violation of the Fourteenth Amendment; 2) unwarranted interference with familial association in violation of the Fourteenth Amendment; 3) unwarranted interference with familial association in violation of the First Amendment; and state law claims for 4) failure to summon medical care in violation of Cal. Gov. Code § 845.6; 5) failure to produce patient records in violation of Cal. Evid. Code § 1158; 6) Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1; 7) intentional infliction of emotional distress; 8) negligence; and 9) wrongful death pursuant to Cal. Code Civ. Proc. § 377.60.  (FAC pp. 31-46.[1])

## II.

## LEGAL STANDARDS

### A.    Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  In deciding a motion to dismiss, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party."  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).  The pleading standard under Rule 8 of the Federal Rules of Civil Procedure does not require " 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true.  Iqbal, 556 U.S. at 678-79.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  To avoid a dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Hyde v. City of Willcox, 23 F.4th 863, 869 (9th Cir. 2022); Twombly, 550 U.S. at 570.  The claims in a complaint are plausible when the pleaded facts "allow[ ] the court to draw the reasonable

---

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

1   inference that the defendant is liable for the misconduct alleged." Hyde, 23 F.4th at 869 (quoting

2   Iqbal, 556 R.S. at 678).

3         In deciding whether a complaint states a claim, the Ninth Circuit has found that two

4   principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint

5   "may not simply recite the elements of a cause of action, but must contain sufficient allegations

6   of underlying facts to give fair notice and to enable the opposing party to defend itself

7   effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair

8   to require the defendant to be subjected to the expenses associated with discovery and continued

9   litigation, the factual allegations of the complaint, which are taken as true, must plausibly

10  suggest an entitlement to relief. Starr, 652 F.3d at 1216.  "Dismissal is proper only where there

11  is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable

12  legal theory." Navarro, 250 F.3d at 732 (citing Balistreri v. Pacifica Police Dept., 901 F.2d 696,

13  699 (9th Cir.1988)).

14      **B.      Section 1983**

15        Section 1983 provides a private right of action for the violation of a plaintiff's

16  constitutional or other federal rights by persons acting under color of state law.  Russell v.

17  Lumitap, 31 F.4th 729, 737 (9th Cir. 2022); Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th Cir

18  2009); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); Jones v. Williams,

19  297 F.3d 930, 934 (9th Cir. 2002).   To state a claim under section 1983, Plaintiff must

20  demonstrate that each defendant personally participated in the deprivation of his rights.  Iqbal,

21  556 U.S. at 677; Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1020-21 (9th Cir. 2010);

22  Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones, 297 F.3d at 934.  In a

23  section 1983 action, the complaint must allege that every defendant acted with the requisite state

24  of mind to violate underlying constitutional provision. OSU Student Alliance v. Ray, 699 F.3d

25  1053, 1070 (9th Cir. 2012).

26      **C.      Leave to Amend**

27        Courts freely grant leave to amend a complaint which has been dismissed.  See Fed. R.

28  Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); Schreiber

1  Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is

2  dismissed for failure to state a claim, leave to amend should be granted unless the court

3  determines that the allegation of other facts consistent with the challenged pleading could not

4  possibly cure the deficiency."); Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (same).

**III.**

**DISCUSSION**

7  County Defendants move to dismiss all claims against all County Defendants.  (Notice of

8  Mot. and Defs. County of Merced, Merced County Sheriff's Office, Vernon Warnke, Joel Pena,

9  Emanuel Gutierrez, Bianca Guzman, Diane Rentfrow, and George Sziraki's Mot. to Dismiss

10  Pls.' FAC  2, ECF No. 43.)

**A.    Deliberate Indifference**

12  The Court first addresses Defendants' motion to dismiss the first claim for deliberate

13  indifference against all County Defendants.

1.    Parties' arguments

**a.    Defendant Warnke**

16  Defendant Warnke contends that he was not personally involved in the matter, was not

17  present at the scene of the incident, and therefore Plaintiffs must prove a sufficient causal

18  connection between Sheriff Warnke's conduct and a constitutional violation.  Defendant Warnke

19  argues that Plaintiffs have made no factual allegations in the FAC that would demonstrate a

20  causal connection and that he did not take any action with respect to Decedent.  Defendant

21  Warnke asserts that the FAC is premised solely on his role as a supervisor and Sheriff of Merced

22  County, but what is missing is any allegation of what Defendant Warnke did or failed to do and

23  therefore he must be dismissed from the action.  ((Memo. of Points and Authorities in Support of

24  Defs.' Mot. to Dismiss Pls.' FAC ("Mot.") 12, ECF No. 43-1.)

25  Defendant Warnke asserts that he cannot be held liable in his individual capacity as

26  Plaintiffs have not alleged that he ignored or recklessly disregarded Decedent's medical needs or

27  refused to provide him with necessary medical care or treatment that rises to the level of

28  deliberate indifference under the objectively reasonable standard.  Defendant Warnke argues that

1   no facts exist to show that he had actual knowledge that Decedent faced a risk of injury, let alone
2   that he inferred a substantial risk of harm might exist and then ignored such risk.  Further, the
3   FAC details that Decedent was medically screened at the jail and placed on opiate withdrawal for
4   six days.  There are no facts alleged that Decedent was at risk of consuming Fentanyl inside the
5   jail prior to staff being notified by inmates that he was unresponsive on April 20, 2023.
6   Defendant Warnke states that there are no facts alleged in the FAC that he ignored any medical
7   request or refused to treat Decedent when his medical need was brought to staff's attention and
8   there are no allegations that Defendant Warnke knew or should have known that Decedent was at
9   risk of overdosing.  (Id. at 20.)  Further, Defendant Warnke contends that Plaintiffs cannot
10  establish that a special relationship existed between him and Decedent nor can they establish a
11  deliberate indifference claim for the reasons addressed above.  (Id. at 21.)

12      Plaintiffs counter that Defendant Warnke does not need to be personally present at the
13  scene of the incident because he is required by statute to keep charge of and keep the prisoners in
14  the jail, and is answerable for their safekeeping.  Plaintiffs assert that their allegations that
15  Defendant Warnke's actions or inactions caused Decedent's injury is sufficient to state a claim
16  against him.  (Pls.' Opp. to County Defs.' Mot. to Dismiss ("Opp.") 17, ECF No. 46.)  Plaintiffs
17  contend that the allegations that the jail facilities were overrun with drugs that were readily
18  available to inmates, the facilities were understaffed, and the jail was overcrowded, along with
19  allegations that Defendant Warnke was aware of the inadequate monitoring and medical care
20  provided at the jail facilities are sufficient to state a claim.  Plaintiffs state that since they state a
21  sufficient municipal liability claim, they have also stated a supervisory liability claim against
22  Defendant Warnke.  (Id. at 18.)

23      Defendant Warnke replies that Plaintiffs opposition purposely conflates and confuses
24  principles of individual and official capacity claims.  Defendant asserts that the Court must look
25  at the actual allegations made.  Here Defendants argue that the allegations are all directed at the
26  Sheriff's "official policy making" acts and the claims are therefore redundant of those against the
27  County of Merced and Merced County Sheriff's Department.  Defendant Warnke contends that
28  the allegations in the complaint do not state any facts to plausibly state a claim against Defendant

1  Warnke in his individual capacity.  (Reply to Pls.' Opp. to Defs.' Mot. to Dismiss Pls.' FAC

2  ("Reply"), 3, ECF No. 47.)

3       Defendant Warnke argues that Plaintiffs make legal conclusions that the jail was overrun

4  with drugs, the facilities were habitually understaffed, correctional officers were overworked,

5  and the jail was overcrowded without attributing any facts to support this claim.  Further,

6  Defendant Warnke contends that there are no allegations in the complaint as to how his claims

7  regarding hiring additional correctional officers contributed to Decedent's death.  (Id. at 6.)

8  Defendant Warnke contends that the only factual allegation against him is that he is the Sheriff

9  of Merced County which is insufficient to state a claim in his individual capacity.  (Id. at 6-7.)

10 Defendant Warnke argues that the claims pled are really claims against the County and are

11 therefore duplicative.  Defendant Warnke asserts that there are no facts pled to allege a

12 supervisory liability claim against him because no such facts exist as there is no connection

13 between any "supervisory" act and Decedent's death.  Finally, Defendant Warnke argues that all

14 claims, including the state law claims, alleged against him are unsupported by facts and are

15 untethered to any specific claim or recognized legal theory.  (Id. at 7.)

16       **b.    Defendants Pena, Gutierrez, Guzman, Renfrow, and Sziraki**

17      Defendants Pena, Gutierrez, Guzman, Rentrow, and Sziraki contend that Plaintiffs do

18 not allege that any of them failed to conduct safety checks, missed safety checks by several

19 hours, or were deficient in their obligations as correctional officers.  Plaintiffs simply claim that

20 Defendants should have done more which is insufficient to rise to the level of deliberate

21 indifference.  Defendant Pena argues that the claim against him, that he conducted a safety check

22 by walking halfway into the dorm and then leaving, is a complaint about the thoroughness of the

23 safety check, not deliberate indifference to medical care.  (Id. at 22.)

24      Defendants Rentrow and Sziraki assert that Plaintiffs claim that they responded to the

25 medical emergency but did not take over Decedent's care or instruct medical personnel to do so

26 since they were the higher-trained medical responders at the scene.  To the extent that Plaintiffs

27 are arguing that Defendants Rentrow and Sziraki should have overridden the medical decisions

28 of the registered nurse or licensed vocational nurse on the scene, Defendants argue this would be

1    a violation of Title 15, section 1200, as medical decisions, once medical personnel respond, are

2    the sole responsibility of medical personnel.  Once medical personnel were on the scene, the

3    medical decisions should be deferred to Defendants Caughell and Reyes.  (Id. at 23.)

4         Defendants also argue that to the extent that Plaintiffs are contending that Defendants

5    Rentfrow or Sziraki should have taken over for Defendant Gutierrez, there are no allegations

6    about what medical care should have been provided and was not.  Defendants argue that

7    Plaintiffs allege that Defendant Gutierrez responded to the medical emergency, provided three

8    doses of Narcan, provided an ambu-bag for breathing, moved Decedent's body to permit better

9    breathing, and provided sternal rubs to Decedent's chest.  Defendants also contend that at the

10   same time, Defendant Sziraki was tasked with locating additional Narcan doses if they needed to

11   be administered.  Defendants Rentfrow and Sziraki assert they were not deliberately indifferent

12   because they were assisting by providing necessary medical equipment to Defendant Gutierrez.

13   (Id.)

14        Plaintiffs counter that Defendants Pena, Gutierrez, and Guzman argue that the allegations

15   related to them are insufficient because Plaintiffs are claiming they should have done more

16   which does not rise to the level of deliberate indifference.  However, Plaintiffs assert that the

17   allegations in the complaint are sufficient to state a claim where it is alleged Defendants failed to

18   adequately monitor and observe Decedent despite having the ability to do so; did not see

19   Decedent ingest the illicit substances; and because of the lack of adequate monitoring and

20   observation did not provide medical care to prevent or treat the overdose.  (Opp 8.)  Plaintiffs

21   assert that Defendant Pena argues that the thoroughness of the safety check is not deliberate

22   indifference, but pretrial detainees have a right to direct-view safety checks sufficient to

23   determine whether their presentation indicates the need for medical treatment.  (Id. at 10-11

24   (quoting Gordon v. County of Orange ("Gordon II"), 6 F.4th 961, 973 (9th Cir. 2021), and citing

25   Cal. Code Regs. tit. 15 § 1027.5(a).)

26        Plaintiff also contend that Defendants Rentfrow and Sziraki were deliberately indifferent

27   because they did not order that higher trained medical responders take over emergency medical

28   care from untrained custody staff.  (Opp. at 12.)  Plaintiffs argue that the allegations in the

complaint are sufficient to state a claim based on Defendant Rentfrow and Sziraki's status as ranking officers and their active participation in the incident and their culpable action or inaction in the supervision and control of their deputies.  (Id. at 13.)

Defendants reply that the FAC is vague as to what specific actions taken by Defendant Gutierrez amounted to deliberate indifference other than being on duty on the date of Decedent's passing.  (Reply at 5-6.)  Defendants argue that Plaintiffs are complaining of the thoroughness of the safety check which is not sufficient to allege deliberate indifference to medical care.  Further, Defendants state that while Plaintiffs claim that they are not arguing that Defendants Rentfrow and Sziraki should have overridden the medical decisions in violation of Title 15, section 1200, that is specifically the allegation in the complaint.  Defendants contend that Defendants Rentfrow and Sziraki were not objectively deliberately indifferent because they were assisting with providing the necessary medical equipment needed by Defendants Caughell and Reyes.  (Id. at 6.)

## 2. Deliberate indifference legal standard

Since pretrial detainees have not been convicted of a crime, they are not subject to punishment by the State and therefore, their claims arise under the Due Process Clause of the Fourteenth Amendment.  Sandoval v. Cnty. of San Diego, 985 F.3d 657, 667 (9th Cir. 2021).  To prove a claim of deliberate indifference, the plaintiff must show that he was at a substantial risk of serious harm and the defendant acted with objective indifference to the risk.  Russell, 31 F.4th at 739-40.  A pretrial detainee's claim for deliberate indifference is analyzed under an objective framework with the critical question being "whether the defendant failed to take reasonable measures to abate a serious risk of harm to an inmate 'even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious.' "  Sandoval, 985 F.3d at 669 (quoting Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir. 2016)).  "A defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference.  Under this objective reasonableness standard, a plaintiff must 'prove more than negligence but

less than subjective intent—something akin to reckless disregard.' " Russell, 31 F.4th at 739 (quoting Gordon v. Cnty. of Orange ("Gordon I"), 888 F.3d 1118, 1125 (9th Cir. 2018) and Castro, 833 F.3d at 1071).

"Individuals in state custody have a constitutional right to adequate medical treatment." Sandoval, 985 F.3d at 667; see also Hyde, 23 F.4th at 873 (pretrial detainees have a right to receive medical care while in custody).  That right hinges on the official being aware that the pretrial detainee suffers from a serious medical need.  Sandoval, 985 F.3d at 680; Hyde, 23 F.4th at 873.  The elements of a pretrial detainee's deliberate indifference claim "under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." Gordon I, 888 F.3d at 1125; Sandoval, 985 F.3d at 669.

Whether the defendant took reasonable measures to abate the risk requires the defendant's conduct to be objectively unreasonable and the test turns on the facts and circumstances of each particular case.  Gordon I, 888 F.3d at 1125 (quoting Castro, 833 F.3d at 1071); Hyde, 23 F.4th at 870.  The " 'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment."  Id.  By itself medical negligence is not unconstitutional, but "the care rendered can be so inadequate to the circumstances known to the medical staff as to amount to deliberate indifference."  Russell, 31 F.4th at 741.

3.   Analysis

The Court considers the allegations against each named defendant to determine if Plaintiffs have alleged a cognizable claim under the Fourteenth Amendment deliberate indifference standard.  Prior to be found unresponsive in his cell, the complaint alleges that Decedent was monitored during detox upon entrance into the Correctional Center; and received

medical treatment for his back injury.  While Plaintiffs state that Decedent had a history of substance abuse (FAC at ¶¶ 49, 52), the FAC alleges that Plaintiff had not used any illicit substances in the year prior to his incarceration (FAC at ¶ 49).  Further, after Decedent completed COWS monitoring and was placed in the general population on February 12, 2023, the FAC is devoid of any factual allegations that would have placed a reasonable prison official on notice that he was at a risk of relapsing or that he was using illicit drugs until the allegations that he ingested illicit drugs on April 20, 2023, (FAC at ¶¶ 66, 68-72).

Plaintiffs rely on Estate of Johnson v. County of Sacramento ("Johnson"), 2:23-cv-01304-KJM-JDP, 2024 WL 279137 (E.D. Cal. Jan. 24, 2024), and Inzunza v. Pima County, No. CV-22-00512-TUC-SHR, 2023 WL 7724881 (D. Ariz. Nov. 15, 2023), to argue that the allegations are sufficient to state a claim because the defendants failed to adequately monitor and observe Decedent, despite having the ability to do so, they did not see Decedent ingest the illicit substances, and due to the lack of adequate monitoring they did not provided timely medical care to prevent or treat the overdose.  (Opp. at 10.)  However, the cases on which Plaintiffs rely are distinguishable as the detainees in those cases alleged a risk of serious harm that is absent here.

In Johnson, Johnson was booked on a charge of murder and the seriousness of the charge warranted isolated and frequently supervised housing based on the risk of self-harm or suicide. Johnson was placed in a holding cell with other inmates and was inadequately monitored.  2024 WL 279137, at *1.  Johnson smuggled lethal quantities of illicit substances into the jail due to the defendants inadequate booking and processing.  He distributed the illicit substances to other inmates and ingested lethal quantities of the substance himself.  The day after being booked, he experienced a medical emergency and was pronounced dead.  Id. at *1.

In Inzunza, a pretrial detainee overdosed on fentanyl within 24 hours of being booked in the jail.  Nine containers of Narcan were administered after which the detainee regained consciousness and was transported to the hospital.  Correctional officers searched his cell and discovered a small blue pill recognized as resembling fentanyl which was in wide circulation in the community.  Inzunza, 2023 WL 7724881, at *1.  After being in the hospital for 24 hours, the detainee was returned to the jail where he was housed in the infirmary for a day until he was

considered stable enough to leave the infirmary.  He was housed in the designated detoxification unit in a cell without a cellmate.  The unit was on administrative lockdown so detainees were unable to leave their cells, could not easily communicate with correctional officers, and when housed alone are incapacitated in their cell.  (Id. at *1.)

No medical personnel entered the detainee's cell between 3:00 p.m. on February 1 and 6:00 a.m. on February 2.  Between 3:00 and 4:00 p.m. on February 1, a correctional officer noticed that the detainee was exhibiting signs traditionally associated with someone who is detoxing, and strongly suspected he was experiencing the effects of withdraw.  The correctional officer did not interact with the detainee after 4:00, but between 4:00 p.m. and 10:00 p.m. walked past the cell while conducting periodic cell rounds.  Inzunza, 2023 WL 7724881, at *2.  No other personnel entered the detainee's cell between 4:00 and 10:00 p.m.  The correctional officer left for an undetermined amount of time between 10:00 p.m. and 11:00 p.m. and there was no coverage or supervision in the pod.  A second correctional officer arrived at 11:00 p.m. to start his shift and his attention was diverted by a suspected drug overdose of another detainee in the pod.  During this suspected drug overdose, there was no supervision in the pod.  Several times between midnight and 5:00 a.m., the correctional officer observed the detainee lying on his bunk but made no efforts to determine if he was responsive or to check on his wellbeing.  The detainee had ingested fentanyl between 3:00 p.m. on February 1 and 3:00 a.m. on February 2.  He died in his cell, and it was determined his death was a result of a drug overdose.  Id.  The court found that the allegations support that the detainee's death was attributable to the individual correctional officer's actions or inactions.  Id. at *8.

Similarly, the other cases Plaintiffs cite demonstrate that the jail personnel were aware at the time of booking that the detainee had a serious need that was not addressed.  See Horton v. City of Santa Maria, 915 F.3d 592 (9th Cir. 2019) (officer told by detainee's mother that he was suicidal after which detainee was left alone in a holding cell for twenty-five minutes during which time he attempted to commit suicide); Wereb v. Maui Cnty., 727 F.Supp.2d 898, 903 (D. Haw. 2010), on reconsideration in part, 830 F.Supp.2d 1026 (D. Haw. 2011) (Detainee, observed to be intoxicated on arrest and on intake screening and during investigation made unusual

1 statements, was found dead in cell three days after booking.  No correctional officer had contact

2 with him during his incarceration other than video monitoring which showed he was not

3 moving.).

4       Objective unreasonableness turns on the facts and circumstances of the particular case.

5 Hyde, 23 F.4th at 870.  Here, on intake, Plaintiff was noted to have abstained from the use of

6 illicit drugs for a year and during his approximately three months in custody there are no factual

7 allegations in the FAC that would put a reasonable correctional officer on notice that Decedent

8 was at a serious risk of overdosing.  However, the FAC does allege that on April 20, 2023,

9 Plaintiff ingested illicit drugs and suffered a medical emergency.  Therefore, the Court considers

10 Defendants' conduct as of April 20, 2023, when there are sufficient allegations that a reasonable

11 prison official would have known that Decedent was suffering a serious medical need.

12      **a.**    **Defendant Pena**

13       Plaintiffs bring a deliberate indifference claim against Defendant Pena in his individual

14 capacity.  (FAC ¶ 17.)  Defendant Pena was a correctional officer who was responsible for

15 monitoring and supervising inmates in dorm 607.  (Id. at ¶ 65.)  At around 8:59 p.m., Defendant

16 Pena entered dorm 607 to conduct a safety check.  He walked about halfway into the dorm,

17 turned around and exited.  (Id. at ¶ 67.)  After it was reported that Decedent was non-responsive,

18 Defendants Pena and Gutierrez entered the dorm and walked back to where Decedent was

19 located and noted that Decedent was sweating, unresponsive, and had quick shallow breathing.

20 (Id. at ¶¶ 83, 84.)  Defendant Pena radioed a request for medical staff to report to dorm 607 with

21 a bag of medical supplies.  (Id. at ¶ 85.)  Defendant Gutierrez ordered all inmates in the dorm to

22 be escorted to the yard, and Defendant Pena escorted the inmates out of the dorm and into the

23 yard.  (Id. at ¶ 87.)

24       Relying on Gordon II, Plaintiffs argue that pre-trial detainees have a right to direct-view

25 safety checks sufficient to determine whether their presentation indicates the need for medical

26 treatment.  (Opp. at 11.)  In Gordon II, a pretrial detainee died within thirty hours after being

27 admitted as a pretrial detainee and his mother brought a claim for inadequate medical care.  6

28 F.4th at 965.  On booking on a heroin related charge, the decedent informed medical staff that he

had a three gram a day heroin habit.  Despite his report of daily heroin use, jail staff never instituted COWS protocol.  Id.  Instead, a consulting physician ordered that the decedent was to have an alcohol withdrawal protocol for four days; he was to be placed in the regular housing unit, rather than the medical unit where he would have been monitored more closely; and he was prescribed medication for pain, nausea, and anxiety.  Id. at 966.  During the ten hours while the decedent waited to enter the general population, another inmate observed the decedent vomiting and dry heaving for 45 minutes.  He was not assessed during this time period.  Id.

The following morning, the decedent was placed in the general population where he presented his identification card which stated, "Medical Attention Required."  He was administered detoxification medication three times over that first day, but no other evaluation occurred that day.  The last pill pass was completed at 8:30 p.m. that evening.  Gordon II, 6 F.4th at 966.  Deputies were to be conducting safety checks every 60 minutes, but the plaintiff alleged that some of the safety checks failed to comply with Section 1027 of Title 15 of the California Code of Regulations, which required that "[a] sufficient number of personnel shall be employed in each local detention facility to conduct at least hourly safety checks of inmates through direct visual observation of all inmates."  Id.  The County also had a policy that required correctional staff to conduct safety checks from a location that provides a clear direct view of each inmate; observe each inmate's presence and apparent condition; and investigate any unusual circumstance or situation.  Id. at 967.  The safety check was conducted from the tank floor and 12 to 15 feet away from the decedent's bunk and the deputy testified that from his vantage point he was unable to ascertain whether the decedent was breathing, alive, sweating profusely, drooling, or had any potential indicators of a physical problem.  Approximately 35 minutes later, an inmate yelled man down and upon arriving in the cell, the decedent was noted to be blue, unresponsive, and cold to the touch.  Id.  On appeal, the Ninth Circuit found that pretrial detainees have a right to direct view safety checks sufficient to determine whether their presentation indicates the need for medical treatment.  Gordon II, 6 F.4th at 972.

While Gordon II found that direct view safety checks are required, that does not absolve Plaintiffs of the need to plead sufficient facts to demonstrate that a reasonable officer in

Defendant Pena's position would have known of Decedent's serious medical risk in order to state a deliberate indifference claim.  Based on the allegations in the complaint, Decedent ingested drugs at 8:23 p.m. while in the dorm.  Defendant Pena entered the dorm at 8:59 p.m. to conduct a safety check, walked halfway into the dorm before turning around and walking out.  Plaintiffs allege that Defendant Pena did not conduct an adequate safety check in violation of the California Code of Regulations which requires that safety checks to determine the safety and well-being to "be conducted at least hourly through direct visual observation of all people held and housed in the facility."  Cal. Code Regs. tit. 15, § 1027.5(a).

While Plaintiffs allege that Defendant Pena did not conduct an adequate safety check, Defendant Pena walked halfway into the dorm and there are no facts alleged to plausibly suggest that the safety check was inadequate.  Further, the FAC alleges that it was not until approximately an hour later that Decedent orally ingested more drugs, cut lines of powder and ingested them through his nose, and orally ingested more drugs.  (FAC ¶¶ 70-73.)  See Cavanaugh v. County of San Diego, No. 3:18-cv-02557-BEN-LL, 2020 WL 6703592, at *12–13 (S.D. Cal. Nov. 12, 2020) (finding plaintiff failed to allege a deliberate indifference claim when his conclusory allegations that defendants "failed to properly conduct cell checks required to verify an inmate's safety and welfare" were insufficient to create a plausible claim that defendants intentionally chose the conditions of confinement and were not merely negligent).  There are no allegations by which the Court could reasonably infer that Decedent was in the dorm or that a reasonable officer would have suspected that Decedent would be suffering from a medical emergency at the time that Defendant Pena conducted his safety check.  Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).  A detainee's right to medical care depends on the officer being "aware that an inmate is suffering from a serious acute medical condition."  Hyde, 23 F.4th at 873 (quoting Sandoval, 985 F.3d at 680).

The Court finds that Plaintiffs have failed to state a plausible deliberate indifference claim against Defendant Pena and recommends that County Defendants' motion to dismiss the deliberate indifference claim against Defendant Pena be granted.

///

### b.      Defendant Gutierrez

The FAC brings claims against Defendant Gutierrez in his individual capacity.  (FAC at ¶ 18.)  Defendant Gutierrez was a correctional officer responsible for monitoring and supervising inmates in dorm 607.  (Id. at ¶ 65.)  After the "man down" call, Defendant Gutierrez entered the dorm and walked back to where Decedent was located and saw that Decedent was experiencing a medical emergency.   (Id. at ¶ 84.)  After ordering all inmates removed to the yard, Defendant Gutierrez rolled Decedent's body onto his right side into a "recovery position[,]" and began administering medical aid. (Id. at ¶¶ 88-91, 94, 98, 100, 102, 108, 112.)

Plaintiffs have not alleged any facts to state a plausible claim that Defendant Gutierrez was deliberately indifferent to Decedent's serious medical need.  While Plaintiffs argue that there was a failure to monitor and observe Decedent, for the reasons discussed supra, there are no allegations in the complaint to plausibly suggest that Defendant Gutierrez should have been aware that Decedent was at a serious risk of overdosing on an illicit substance prior to the other inmate finding Decedent unresponsive.  Once Defendant Gutierrez was aware that Decedent was suffering from a serious medical need, he immediately provided medical care, and continued to do so until Defendant Caughell stated there was no pulse and began CPR chest compressions.

The Court finds that Plaintiffs have failed to state a cognizable deliberate indifference claim against Defendant Gutierrez and recommends that County Defendants' motion to dismiss the deliberate indifference claim against Defendant Gutierrez be granted.

### c.      Defendant Guzman

Plaintiffs bring claims against Defendant Guzman in her individual capacity.  (FAC at ¶ 19.)  Defendant Guzman was the security systems operator responsible for monitoring and supervising the video feed in dorm 607.  (Id. at ¶ 65.)  An inmate alerted Defendant Guzman to Decedent's immediate medical need using the intercom in the dorm.  (Id. at ¶ 81.)  Around 9:50 p.m., Defendant Guzman radioed man down in dorm 607 which alerted jail staff of the medical emergency.  (Id. at ¶ 82.)

Here, Plaintiffs have alleged that the video feed showed Decedent ingesting drugs on multiple occasions and cutting a line of powder and ingesting it through his nose during the hour

1    and a half prior to being found unresponsive.  The video also showed that during the two minutes

2    prior to Defendant Guzman being alerted, Decedent was exhibiting seizure like behavior and

3    then was unconscious lying in an abnormal position.  Under the Fourteenth Amendments

4    objective standard, a reasonable officer would have appreciated the high degree of risk that

5    Decedent was using drugs by observing the video feed and that a substantial risk of serious harm

6    existed and would have taken reasonable measures to abate the risk.  Gordon I, 888 F.3d at 1125;

7    see also Coderre v. Burton, No. 2:21-CV-00965-TLN-DMC, 2024 WL 3951151, at *4 (E.D. Cal.

8    Aug. 27, 2024) (monitoring video feed which should have triggered intervention sufficient to

9    state a deliberate indifference claim).  Accordingly, the Court finds that Plaintiffs have stated a

10   cognizable claim that Defendant Guzman was deliberately indifferent to Decedent's serious

11   medical need and recommends that County Defendants' motion to dismiss the deliberate

12   indifference claim against Defendant Guzman be denied.

13           **d.      Defendant Rentfrow and Sziraki**

14           Plaintiffs bring claims against Defendants Rentfrow and Sziraki in their individual

15   capacity.  (FAC ¶¶ 20, 21.)  Defendants Rentfrow and Sziraki were sergeants and supervisors of

16   Defendant Gutierrez who were present on the scene and did not take over Decedent's medical

17   care or instruct Defendants Caughell and Reyes to do so as the higher trained medical responders

18   on scene.  (Id. at ¶ 95.)  Plaintiffs allege that Defendants Rentfrow and Sziraki exhibited

19   deliberate indifference by not ordering that higher trained medical responders take over the

20   emergency medical care.  (Id. at ¶ 96.)

21           Given the allegations in the complaint, the Court finds that Defendants Rentfrow and

22   Sziraki were not deliberately indifferent to Decedent's serious medical need.  Plaintiffs allege

23   that around 9:55 p.m., Defendant Gutierrez got a Narcan nasal spray from Defendant Rentfrow's

24   equipment bag which Defendant Gutierrez administered to Decedent.  (Id. at ¶ 98.)  When

25   Defendant Gutierrez asked for another Narcan nasal spray, Defendant Rentfrow asked other

26   correctional officers at the scene if they had any, but no other correctional officer had Narcan

27   nasal spray available.  (Id. at ¶ 105.)  Defendant Sziraki returned to the scene after stepping away

28   to speak to inmates to the yard and he gave Defendant Caughell a Narcan nasal spray from his

equipment bag which was handed to Defendant Gutierrez who administered the nasal spray to Decedent.  (Id. at ¶¶ 105, 108.)  Defendant Sziraki stepped outside to ask if any other correctional officers had Narcan nasal spray and obtained two more Narcan nasal sprays which were given to Defendant Caughell.  (Id. at ¶ 109.)

While Plaintiffs argue that they are not contending that Defendants Rentfrow and Sziraki should have overridden the medical decisions of Defendants Caughell and Reyes (Opp. at 11), the FAC does allege that Defendants Rentfrow and Sziraki did not take over Decedent's medical care or instruct Defendants Caughell and Reyes to do so as the higher trained medical responders on scene (FAC at ¶ 95).  The allegations in the complaint demonstrate that while Defendants Rentfrow and Sziraki were present, Defendant Gutierrez was administering medical care to Decedent as the first responder on the scene.  Defendants Caughell and Reyes arrived after Defendant Gutierrez had already began administering medical care.  (Id. at ¶ 92.)  Defendant Caughell was monitoring Decedent's vitals and had Defendant Gutierrez place an ambu-bag on Decedent.  (Id. at ¶¶ 99, 103, 104.)  Defendant Caughell requested more Narcan nasal spray to be administered to Decedent.  (Id. at ¶ 104.)  Defendant Caughell received the Narcan nasal spray and handed it to Defendant Gutierrez who administered it to Decedent.  (Id. at ¶ 108.)  Defendant Sziraki obtained two additional Narcan nasal sprays which he gave to Defendant Caughell.  (Id. at ¶ 110.)  Defendant Caughell was monitoring Decedent's pulse and at 10:03 p.m. stated, "No pulse. CPR."  (Id. at ¶ 113.)  Defendant Caughell began administering CPR, and Defendant Reyes took over administering the ambu-bag to Decedent.  (Id. at ¶¶ 114-15.)

While Plaintiffs argue that Defendants Caughell and Reyes should have been providing or directing who provided medical care, a disagreement regarding what medical care is appropriate does not amount to deliberate indifference.  Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012), overruled in part on other grounds by Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)); Wilhelm v. Rotman, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)).  Rather, a plaintiff is required to show that the course of treatment selected was "medically unacceptable under the circumstances" and that the defendant "chose this course in

1    conscious disregard of an excessive risk to plaintiff's health."  Snow, 681 F.3d at 988 (quoting
2    Jackson, 90 F.3d at 332).

3         Decedent was receiving medical care to treat his drug overdose and medical personnel
4    were on the scene monitoring the situation.  The cases Plaintiffs rely on to argue liability for the
5    supervisory defendants are distinguishable.  In Maxwell v. Cnty. of San Diego, 708 F.3d 1075
6    (9th Cir. 2013), an off-duty sheriff's deputy shot his wife in the jaw with his service pistol in
7    their bedroom and she called 911 for help.  It was determined that the wife needed to get to the
8    trauma center quickly and an air ambulance was requested.  Maxwell, 708 F.3d at 1080.  Two
9    supervisory defendants were present at the scene and stayed at the back of the driveway.  Id.
10   Ultimately there was a delay and the woman died in route to the air ambulance. The wife's
11   parents were present, had been separated, and told they could not leave to go with their daughter
12   to the hospital because they needed to be interviewed.  Id. at 1081.

13        The father was pacing on his driveway.  When he was told that his daughter had died, the
14   father told the officer monitoring him that he was going to tell his wife about their daughter.  The
15   officer told him to stay put, to which the father responded, "You are gonna have to shoot me, I'm
16   going to see my wife!" and he started walking toward where his wife was being held.  The
17   officer tried to stop him by blocking his path, and when the father continued walking the officer
18   pepper sprayed him three times, struck him on the leg, and handcuffed him.  The supervisory
19   officers were still at the back of the driveway and did not intervene.  Id.  The Maxwell court
20   found that the supervisory defendants were present on the scene and tacitly endorsed the actions
21   of the other officers by failing to intervene.  The supervisory defendants were aware of the
22   plaintiffs' detention and witnessed at least a part of the father's arrest and beating.  Id. at 1086.

23        In Green v. City & Cnty. of San Francisco, 751 F.3d 1039 (9th Cir. 2014), the
24   supervisory defendant was present and participated in an erroneous traffic stop.  He assumed that
25   the officer reporting a stolen license plate had verified the license number, and he conducted a
26   high-risk traffic stop.  Green, 751 F.3d at 1043-44.

27        Rodriguez v. Cnty. of Los Angeles, 891 F.3d 776, 784 (9th Cir. 2018) involved cell
28   extractions from two high-security units at the Los Angeles County Men's Central Jail after a

disturbance.  The supervisory defendants conceded that they were personally present and directed the deputies to use force against the inmates.  The Court found there was a sufficient causal connection to establish "the sergeants' supervisory liability for their 'own culpable action or inaction in the . . . supervision [and] control of' the deputies."  <u>Rodriguez</u>, 891 F.3d at 798.

In this instance, Plaintiffs are alleging that Defendants Rentfrow and Sziraki were deliberately indifferent by failing to direct the medical staff to take over care of Decedent.  However, Defendants Rentfrow and Sziraki observed that Decedent was receiving medical care from Defendant Gutierrez, the medical defendants were present and monitoring Decedent's condition, and once Defendant Caughell determined that CPR was needed, he stepped in and took over care.  Based on the allegations in the complaint, the Court finds that Plaintiffs have failed to state a cognizable deliberate indifference claim against Defendants Rentfrow and Sziraki and recommends that County Defendants' motion to dismiss the deliberate indifference claims against Defendants Rentfrow and Sziraki be granted.

### e.    Defendant Warnke

Plaintiffs bring a deliberate indifference claim against Defendant Warnke in his individual capacity.  (FAC at ¶ 16.)  While County Defendants argue that that the complaint does not allege that Defendant Warnke personally participated in violating Decedent's rights, "[a] supervisor can be liable in his individual capacity 'for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation . . .; or for conduct that showed a reckless or callous indifference to the rights of others.' "  <u>Watkins v. City of Oakland, Cal.</u>, 145 F.3d 1087, 1093 (9th Cir. 1998) (quoting <u>Larez v. City of Los Angeles</u>, 946 F.2d 630 645 (9th Cir. 1991)).  "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.' <u>Crowley v. Bannister</u>, 734 F.3d 967, 977 (9th Cir. 2013) (citation and internal quotation marks omitted); <u>Starr</u>, 652 F.3d at 1207.  "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving

1   force of a constitutional violation." Crowley, 734 F.3d at 977; Clement v. Gomez, 298 F.3d 898,

2   905 (9th Cir. 2002).

3       Plaintiffs contend that the allegations in the complaint are sufficient to impose personal

4   liability against Defendant Warnke because they have sufficiently stated a municipal liability

5   theory based on Defendant Warnke's knowledge of the unconstitutional conditions at the jail

6   facilities and his action or inaction in the training, supervision, or control of his subordinates.

7   (Opp. at 18.)   "[W]hen a supervisor is found liable based on deliberate indifference, the

8   supervisor is being held liable for his or her own culpable action or inaction, not held vicariously

9   liable for the culpable action or inaction of his or her subordinates." Starr, 652 F.3d at 1207.

10      The FAC generally alleges that Defendant Warnke, as the Sheriff for the County of

11  Merced, was a final decision maker and failed to implement policies related to access to illicit

12  drugs in the facilities, monitoring of inmates, and provision of medical care for inmates who

13  overdose on drugs.  Further, Plaintiffs allege that Defendant Warnke was aware of the need to

14  implement policies to correct the violations and failed to act.  At the pleading stage, this is

15  sufficient to allege individual liability against Defendant Warnke if the allegations in the

16  complaint also are sufficient to allege that a policy was "so deficient that the policy itself is a

17  repudiation of constitutional rights and is the moving force of a constitutional violation."

18  Crowley, 734 F.3d at 977; Clement, 298 F.3d at 905.

19      Where a subordinate has committed the constitutional violation, a supervisor's liability

20  "depends upon whether he set in motion a series of acts by others, or knowingly refused to

21  terminate a series of acts by others, which he knew or reasonably should have known, would

22  cause others to inflict the constitutional injury." Est. of Alejandro Sanchez ("Estate of Sanchez")

23  v. Cnty. of Stanislaus, No. 1:18-CV-00977-DAD-BAM, 2019 WL 1745868, at *6 (E.D. Cal.

24  Apr. 18, 2019) (quoting Blankenhorn v. City of Orange, 485 F.3d 463, 485 (9th Cir. 2007)).

25  Defendants rely on Estate of Sanchez to argue that the County sheriff is not liable simply

26  because of his position as sheriff.  However, Plaintiffs have alleged that Defendant Warnke had

27  knowledge of the inadequate monitoring which led to injury to inmates in the jail facilities.

28  (FAC at ¶ 148.)

1      A lawsuit was filed against Defendants County of Merced, Merced County Sheriff's
2  Office, and Warnke based on the October 19, 2022, death of Jacob Apodaca.  The Sheriff's
3  Office conducted an investigation into the death which found no violations of any procedure or
4  policy by correctional staff.  The action settled prior to trial.  (Id. at ¶ 148(d).)  An internal
5  investigation into the death of Rene Snider on March 23, 2019, found that the correctional officer
6  failed to conduct a cell check.  (Id. at 148(f).)  After the death of inmate Fabian Cardoza on June
7  17, 2018, Defendant Warnke declined to answer a reporter's questions, but the news report stated
8  that Defendant Warnke has blamed low staffing levels for jail violence.  (Id. at 148(h).)   A
9  lawsuit was filed against Defendants County of Merced and Warnke based on the death of Aaron
10 Bonilla on June 11, 2017.  (Id. at 148(i).)  These and the other prior incidents alleged in the FAC,
11 lead the Court to reasonably conclude that Defendant Warnke had notice of the inadequate
12 observation and monitoring in the jail facilities such that he reasonably should have known the
13 failure to institute better policies would cause constitutional injuries to other inmates.

14     Defendant Warnke also argues that the claims asserted against him should be dismissed
15 because they are duplicative of the claims against the County of Merced and Merced County
16 Sheriff's Office.  While Defendants argue that the claims asserted against Defendant Warnke are
17 actually official capacity claims, the Court has found that Plaintiffs have alleged sufficient facts
18 to state a claim against Defendant Warnke in his individual capacity based on his knowledge of
19 the inadequate monitoring and observation in the jail facilities and failure to take action to
20 correct the deficient custom.

21     The Supreme Court has recognized that a claim against public officials in their official
22 capacity is actually a suit against the state and is therefore duplicative of a claim against the state.
23 Kentucky v. Graham, 473 U.S. 159, 166 (1985);  Hultman v. Cnty. of Ventura, No.
24 CV216280DSFRAOX, 2021 WL 6618478, at *3 (C.D. Cal. Oct. 22, 2021).  A suit against an
25 official in his individual capacity is seeking to impose liability on the individual himself and
26 does not lead to the imposition of liability on the entity itself.  Graham, 473 U.S. at 166; see also
27 Poe v. Cnty. of Ventura, No. CV1606083RGKSKX, 2017 WL 5125748, at *3 (C.D. Cal. Feb. 3,
28 2017)  ("Unlike official capacity suits, individual capacity suits are not redundant or duplicative

1   of a claim against a municipal entity because the injured party seeks damages payable out of the

2   offending official's personal finances." ).  Accordingly, the Court finds that the claims against

3   Defendant Warnke are not duplicative of the claims against the County of Merced and Merced

4   County Sheriff's Department.

5       For these reasons, the Court finds that Plaintiffs have stated a claim based on a custom or

6   practice of inadequate observation and monitoring against Defendant Warnke in his individual

7   capacity. The Court recommends denying Defendants' motion to dismiss the individual liability

8   claim against Defendant Warnke.

9       **B.    Monell Claims**

10      The Court next addresses County Defendants argument that the FAC fails to plead any

11  facts to plausibly suggest there was a policy or custom that was the moving force behind a

12  constitutional violation.   County Defendants contend that, as what has become Plaintiffs'

13  counsels' custom, the complaint engages in shotgun type pleadings blasting forth a series of

14  conclusory allegations that are not tethered to this specific case.  (Mot. at 19.)

15      1.    Legal standard

16      Municipalities and local government units may be sued under § 1983 for violating an

17  individual's constitutional rights.  Monell v. Department of Social Services, 436 U.S. 658, 690

18  (1978) (stating that "[mu]nicipalities and other local government units ... [are] among those

19  persons to whom § 1983 applies").  A municipal entity or its departments is only liable under §

20  1983 if a plaintiff can show that the constitutional injury was caused by employees acting

21  pursuant to the municipality's policy or custom.  Waggy v. Spokane County Washington, 594

22  F.3d 707, 713 (9th Cir. 2010).  A municipality can only be held liable for injuries caused by the

23  execution of its policy or custom or by those whose edicts or acts may fairly be said to represent

24  official policy.  Monell, 436 U.S. at 694.

25      A plaintiff who sets forth a Monell claim against an entity defendant must show that the

26  entity acted with deliberate indifference to the constitutional rights of the plaintiff in adhering to

27  a policy or custom or by acts of omission.  See Castro, 833 F.3d at 1068-69 (quoting City of

28  Canton v. Harris, 489 U.S. 378, 392 (1989)); Clouthier v. Cty. of Contra Costa, 591 F.3d 1232,

1249 (9th Cir. 2010), overruled in part on other grounds by Castro, 833 F.3d at 1070.  The Ninth

Circuit has held that an objective standard of notice applies to Monell claims.  See Castro, 833

F.3d at 1076.  The objective deliberate indifference standard is met when a "plaintiff [ ]

establish[es] that the facts available to [entity] policymakers put them on actual *or constructive*

*notice* that the particular omission is substantially certain to result in the violation of the

constitutional rights of their citizens."  Id.  (quoting City of Canton, 489 U.S. at 396) (emphasis

added).  Municipal liability cannot be premised on *respondeat superior* and it is not sufficient for

a plaintiff to merely point to something that the city could have done to prevent the incident.

Clouthier, 591 F.3d at 1250 (citing City of Canton, 489 U.S. at 392.)

        Generally, to establish municipal liability, the plaintiff must show that a constitutional

right was violated, the municipality had a policy, that policy was deliberately indifferent to

plaintiff's constitutional rights, and the policy was "the moving force" behind the constitutional

violation.  Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown ("Brown"), 520 U.S. 397, 400

(1997); Burke v. County of Alameda, 586 F.3d 725, 734 (9th Cir. 2009); Gibson v. County of

Washoe, Nev., 290 F.3d 1175, 1185-86 (9th Cir. 2002.)  The Ninth Circuit has recognized four

situations in which a municipality can be held liable under section 1983 for constitutional

injuries: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train,

supervise, or discipline; or (4) a decision or act by a final policymaker."  Horton, 915 F.3d at

602–03.  A plaintiff seeking to impose liability upon a municipality is required to identify the

policy or custom that caused the constitutional injury.  Brown, 520 U.S. at 403.  A municipality

may only be held liable for those deprivations that result "from the decisions of its duly

constituted legislative body or of those officials whose acts may fairly be said to be those of the

municipality."  Id. at 403–04.  "Similarly, an act performed pursuant to a 'custom' that has not

been formally approved by an appropriate decisionmaker may fairly subject a municipality to

liability on the theory that the relevant practice is so widespread as to have the force of law."  Id.

at 404.

        Since Iqbal, courts have rejected conclusory Monell allegations that lack factual content

from which one could plausibly infer Monell liability.  See e.g., Rodriguez v. City of Modesto,

1    535 Fed. App'x 643, 646 (9th Cir. 2013) (unpublished) (affirming district court's dismissal of

2    <u>Monell</u> claim based only on conclusory allegations and lacking factual support); <u>Via v. City of</u>

3    <u>Fairfield</u>, 833 F.Supp.2d 1189, 1196 (E.D. Cal. 2011) (collecting cases).   In <u>AE ex rel.</u>

4    <u>Hernandez v. Cnty of Tulare</u>, 666 F.3d 631, 637 (9th Cir. 2012), the Ninth Circuit held that

5    pleadings in a case involving <u>Monell</u> claims are subject to the standard set forth in <u>Starr</u>.   In

6    <u>Starr</u>, the Ninth Circuit held that allegations in a complaint cannot simply recite the elements of a

7    cause of action, "but must contain sufficient allegations of underlying facts to give fair notice

8    and to enable the opposing party to defend itself effectively."   <u>Starr</u>, 652 F.3d at 1216.   The

9    allegations must also plausibly suggest an entitlement to relief, "such that it is not unfair to

10   require the opposing party to be subjected to the expense of discovery and continued litigation."

11   <u>Id.</u>

12          2.      <u>Monell Allegations in the FAC</u>

13          Defendant Warnke is and was Sheriff for Defendants County of Merced and Merced

14   County Sheriff's Office acting within the scope of employment and under color of law.   (FAC at

15   ¶ 16.)   Defendants County of Merced and Merced County Sheriff's Office operate and manage

16   jail facilities in the County of Merced, including the Correctional Center.   (<u>Id.</u> at ¶ 29.)

17   Defendants County of Merced, Merced County Sheriff's Office, and Warnke are responsible for

18   the actions and/or inactions and the policies and customs of their employees and agents,

19   including ensuring the provision of emergency and basic medical and mental health services to

20   all inmates in their custody and care.   (<u>Id.</u> at ¶ 30.)

21          Defendants County of Merced, Merced County Sheriff's Office, and Warnke have the

22   authority to make contracts, provide for jails and corrections, and to operate and/or be

23   responsible for county health facilities, including jails, through contracts, joint ventures, or

24   partnerships.   (<u>Id.</u> at ¶ 31.)   Defendants County of Merced, Merced County Sheriff's Office, and

25   Warnke contract with Defendant CFMG to provide medical care to inmates at jail facilities,

26   including the Correctional Center and are jointly responsible to develop policies and procedures

27   affecting inmates requiring medical care and treatment in custody and for providing continuity of

28   care from the time detainees are booked until they are released.   (<u>Id.</u> at ¶¶ 32, 34.)   Defendants

County of Merced, Merced County Sheriff's Office, and Warnke are responsible for overseeing that Defendant CFMG staff comply with their contractual responsibilities to provide inmate medical care.  (Id. at ¶ 35.)

Defendants County of Merced, Merced County Sheriff's Office, and Warnke's policies and customs do not require that jail employees or jail contractors be thoroughly searched prior to entering jail facilities which contributes to the risk of drugs entering the jail facilities.  (Id. at ¶ 55.)  Defendants County of Merced, Merced County Sheriff's Office, and Warnke were responsible for supervising all aspects of the Correctional Center and were aware that drugs were routinely smuggled into the jail and that inmates were overdosing from obtaining drugs within the jail.  (Id. at ¶ 56.)  Defendants County of Merced, Merced County Sheriff's Office, and Warnke maintained deficient policies and customs related to drug screening, detection, and searches necessary to ensure the safety of inmates, including adequately screening inmates and jail staff at the Correctional Center which caused the jail to be overrun with drugs, and they failed to adequately train staff to screen, detect, and search for drugs and prevent drugs from entering the facility.  (Id. at ¶ 57.)  Defendants County of Merced, Merced County Sheriff's Office, and Warnke were aware of the presence and availability of drugs in the jail facilities.  For example, one week prior to April 20, 2023, an inmate at the jail overdosed on fentanyl.  On April 20, 2023, Decedent overdosed on fentanyl and at least one additional inmate overdosed on fentanyl after April 20, 2023.  (Id. at ¶ 58.)  Despite knowing of the presence of drugs and resulting overdoses, Defendants County of Merced, Merced County Sheriff's Office, and Warnke maintained deficient policies and customs relating to treating overdoses occurring in jail facilities.  For example, jail staff was insufficiently trained concerning care and treatment for detainees suspected or known to be overdosing, including how often and how much Narcan to administer.  (Id. at ¶ 59.)

Defendants County of Merced, Merced County Sheriff's Office, and Warnke maintained deficient policies and customs related to overcrowded and understaffed jail facilities.  For example, the jail accepted more inmates than the facilities were built and designed to accommodate, and they operated overcrowded jails with an inadequate amount of staff resulting

in inadequate supervision and monitoring of inmates and contraband located in overcrowded cells.  (Id. at ¶ 62.)  Defendants County of Merced, Merced County Sheriff's Office, and Warnke maintained deficient policies and customs related to the monitoring and supervision of inmates, including where the ability to monitor inmates was available through the CCTV video feed.  For example, jail staff did not monitor Decedent despite his visibility in the dorm on the CCTV surveillance system at the time he was ingesting drugs and was experiencing a medical emergency.  (Id. at ¶ 64.)  Several inmates have overdosed at the Correctional Center, including both prior to and after Decedent's death, due to Defendants County of Merced, Merced County Sheriff's Office, and Warnke's failure to adequately staff jail facilities with adequate personnel and to monitor inmates at jail facilities.  (Id. at ¶ 133.)

Defendants County of Merced, Merced County Sheriff's Office, and Warnke policies and customs are inconsistent with state law and widely accepted standards.  (Id. at ¶ 146.) Defendants County of Merced, Merced County Sheriff's Office, and Warnke maintained a policy or custom of inadequate supervision, reporting and medical care and treatment in violation of the constitutional rights of individuals held in their jail facilities, including Decedent.  (Id. at ¶ 147.)

Plaintiffs allege that County Defendants have inadequate policies, customs, training, supervision, and discipline at the Correctional Center that have resulted in the following deficiencies:

(a) Failure to identify and to provide appropriate medical care for inmates;
(b) Failure to train, supervise, and/or promulgate appropriate policies and procedures in order to identify and to provide appropriate medical care for inmates;
(c) Failure to provide access to appropriate medical care and treatment, continuity of care, and access to a higher level of care not available at jail facilities;
(d) Failure to maintain sufficient, competent, required, and contracted staffing, including in compliance with California Code of Regulations title 15 § 1027;
(e) Failure to utilize appropriate nationally- and locally-accepted minimum standards, procedures, and practices to identify and to provide appropriate medical care for inmates;
(f) Failure to comply with, enforce, and implement self-imposed policies and procedures to identify and to provide appropriate medical care for inmates;
(g) Failure to maintain competent and adequate supervision and training of medical and custodial staff related to appropriate medical care for inmates;
(h) Failure to place inmates' safety and needs, including duties and responsibilities to provide sufficient and competent medical care staff to inmates, above financial interests and profits;
(i) Failure to conduct appropriate and complete safety checks for inmates,

including in compliance with California Code of Regulations title 15 § 1027.5;
(j) Failure to create and implement appropriate medical treatment plans;
(k) Failure to maintain an adequate supply of medicine to treat inmates, including Narcan; and/or
(l) Failure to acknowledge inmate grievances and misconduct, including failure to conduct timely or adequate investigations of inmate grievances, pro forma denials of inmate grievances, and failure to respond to, or to take adequate actions to respond to or rectify problems identified in, inmate grievances.

(FAC at ¶ 147.)

Defendants County of Merced, Merced County Sheriff's Office, and Warnke maintained a policy or custom of inadequate supervision and monitoring of inmates, resulting in violation of constitutional rights of persons held in their jail facilities, including Decedent.  (Id. at ¶ 148.)

Defendants County of Merced, Merced County Sheriff's Office, and Warnke were or should have been on notice regarding the need to discontinue, modify, or implement new and different versions of deficient policies or customs because the inadequacies constituted life-threatening decisions and were so obvious and likely to result in violations of the rights of inmates, including Decedent and did result in such violations.  (Id. at ¶¶ 151, 152.)

3.   Analysis

Although a court must accept as true all factual allegations contained in a complaint, a court need not accept a Plaintiff's legal conclusions as true.  Iqbal, 556 U.S. at 678.  "[A] complaint [that] pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557).  Therefore, the complaint must contain sufficient factual content for the court to draw the reasonable conclusion that the defendant is liable for the misconduct alleged.  Iqbal, 556 U.S. at 678.  Here, Plaintiffs have generally set forth conclusory allegations of inadequate policies and customs, the Court shall consider whether there are sufficient factual allegations set forth in the FAC to state a cognizable Monell claim.

a.   **Custom or Practice that Violates Constitutional Rights**

County Defendants argue that the complaint generally alleges that the County had an unconstitutional policy regarding inadequate supervision, reporting, and medical care and treatment, in violation of the constitutional rights of individuals held in Merced County's jail

facilities.  (Id. at 14.)  County Defendants argue that the policy or custom claim fails as a matter of law because the FAC does not describe or plead any facts regarding the specific contents within any Merced County Sheriff's Office policies, or how any of the policies were the moving force behind the constitutional violation.  Therefore, County Defendants contend that the only basis of liability must be under a theory of some custom, but there are no facts alleged to support a custom.  County Defendants argue that, while Plaintiffs may argue that they are not alleging a single incident theory because they cite prior Merced County cases, none of the cases cited involve a drug overdose and there are no facts alleged regarding the duration, frequency, or consistency of the alleged custom.  (Id. at 15.)  Further, while Plaintiffs allege that the inadequacy of the policies, procedures, and training constituted life threatening decisions and were so obvious, the complaint fails to describe what is so obvious that Defendants failed to do. (Id.at 16.)

County Defendants argue that similarly, Plaintiffs suggest that County Defendants failed to promulgate specific policies or customs regarding appropriate medical and mental health care for inmates, but do not identify a specific policy that was not promulgated.  Instead, Plaintiffs set forth vague conclusory allegations without any facts to establish that a policy that was not implemented was the cause of the constitutional violation.  County Defendants contend that there are no facts alleged connecting the lack of a certain policy to Decedent's incarceration and death due to Decedent's ingestion of fentanyl.  County Defendants argue that the facts alleged in the FAC fail to state a plausible claim that Decedent's overdose in the jail is so widespread and permanent that it has the force of law within the Sheriff's Department.  County Defendants contend that since the FAC does not identify the challenged practices, how those practices were deficient, and does not identify the obviousness of the risk involved, dismissal is appropriate. (Id. at 16.)

Plaintiffs respond that it is not necessary for them to cite to a specific Sheriff's Office policy to support their claim and they have alleged several deficiencies and incidents over an extended period of time to support their claims.  (Opp. 13.)  Further, Plaintiffs argue that other incidents where inmates overdosed at the jail should not be ignored because County Defendants'

1   argument is too granular at the pleading stage.   Plaintiffs assert that they only need to

2   demonstrate similar conduct or constitutional violations, not similar incidents or injuries

3   resulting from the conduct or violations.[2]  (Id. at 15.)

4         County Defendants reply that Plaintiffs rely entirely on legal conclusions.  To state a

5   claim for a written policy, County Defendants argue that Plaintiffs were required to identify the

6   specific policy they believe to be unlawful and then articulate why the adoption of the policy

7   amounted to deliberate indifference and Plaintiffs have not done so here.  (Reply at 3.)  County

8   Defendants contend that Plaintiffs are simply setting forth conclusions and arguing that these

9   conclusions trigger Monell liability.  County Defendants argue that Plaintiffs have vaguely stated

10  that two inmates overdosed on fentanyl, one prior to and one after the incident alleged in this

---

11  [2] Relying on Park v. Thompson, 851 F.3d 910, 928–29 (9th Cir. 2017), and OSU Student All. v. Ray, 699 F.3d 1053,
12  1078 (9th Cir. 2012), Plaintiffs also argue that where the relevant facts are known only to the defendant dismissal is
    not appropriate.  (Opp. at 16.)  In Park, in addressing whether a civil conspiracy claim existed based on a prosecutor
13  allegedly dissuading a witness who had agreed to testify for the defendant, the court found that the complaint alleged
    facts that were suggestive of an agreement to engage in illegal conduct.  851 F.3d at 928.  When the entire factual
14  context was considered, the plaintiff had nudged her claim that the prosecutor conspired to orchestrate the witness's
    unavailability across the line from conceivable to plausible.  Id.  The court found that because the facts were only
15  known to the defendant and based upon the additional facts alleged, the plaintiff had stated a claim for civil
    conspiracy.  Id. at 928-29.

16  Similarly, in OSU Student All., after finding that the allegations in the complaint were sufficient to allege a claim for
    supervisory liability, the Ninth Circuit concluded,
17
         To be sure, when a plaintiff presses an implausible claim, lack of access to evidence does not save the
18       complaint.  See Iqbal, 129 S.Ct. at 1950 ("Rule 8 ... does not unlock the doors of discovery for a plaintiff
         armed with nothing more than conclusions.").  But where the claim is plausible—meaning something more
19       than "a sheer possibility," but less than a probability—the plaintiff's failure to prove the case on the
         pleadings does not warrant dismissal.  Id. at 1949 ("The plausibility standard is not akin to a probability
20       requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (internal
         quotation marks omitted).  Discovery will reveal whether Martorello's stewardship of the policy in fact
21       called for confiscation without notice.  All that matters at this stage is that the allegations nudge this
         inference "across the line from conceivable to plausible."  Id. at 1951 (internal quotations omitted).
22       Martorello was responsible for the policy, Martorello's subordinates confiscated the bins without notice,
         and two people—including Martorello himself—said the subordinates had acted pursuant to the policy.
23       That is enough to get discovery.  See Starr, 652 F.3d at 1216 (holding that allegations must be sufficiently
         plausible "such that it is not unfair to require the opposing party to be subjected to the expense of discovery
24       and continued litigation"); Pinnacle Armor, 648 F.3d at 721("[A plaintiff] is not required to 'demonstrate'
         anything in order to survive a Rule 12(b)(6) motion to dismiss.  Rather, it only needs to allege sufficient
25       factual matter, accepted as true, to state a [plausible] claim to relief....") (some internal quotation marks
         omitted).

26  OSU Student All., 699 F.3d at 1078.

27  Neither Park nor OSU Student All. held that dismissal was premature where the plaintiff has failed to state a plausible
    claim.  Rather, in both cases, the court found that the allegations in the complaint were sufficient to state a plausible
28  claim and require the defendant to be subject to discovery.

1   action, without providing any other details.  Defendants argue that it is Plaintiffs burden to show

2   a custom or widespread practice and they cannot do so here.

3         Plaintiffs appear to concede that the <u>Monell</u> claims that are brought in the FAC are not

4   based on written policies but are based on a custom or practice within the Merced County

5   Sheriff's Department.  (Opp. at 13.)  The Ninth Circuit has held that the allegations in the

6   complaint, even for a <u>Monell</u> claim, may not simply recite the elements of a cause of action, but

7   must contain sufficient allegations of underlying facts to give fair notice and allow the defendant

8   to defend itself effectively.  <u>AE ex rel. Hernandez</u>, 666 F.3d at 637.

9         The Court does find some merit to Defendants argument that the FAC uses a shotgun

10  pleading method that is unsupported by factual allegations.  For example, the FAC alleges a

11  failure to acknowledge inmate grievances and misconduct, including failure to conduct timely or

12  adequate investigations of inmate grievances, pro forma denials of inmate grievances, and failure

13  to respond to, or to take adequate actions to respond to or rectify problems identified in, inmate

14  grievances.  (FAC at ¶ 147(l).)  However, the FAC is devoid of any facts regarding inmate

15  grievances.  There are no facts alleged that Decedent or anyone else filed an inmate grievance,

16  that any grievance was not timely or adequately investigated, that any grievance was denied or

17  there was a failure to respond to any grievance.  Therefore, the complaint fails to allege a causal

18  connection between Decedent in this action and any alleged policy regarding inmate grievances.

19  Similarly, the FAC alleges a failure to implement treatment plans for inmates and failure to

20  maintain an adequate supply of medication to treat inmates, including Narcan.  (FAC at ¶¶

21  147(j)(k)).  Yet again, the complaint is devoid of allegations to support such claims.

22        "The Supreme Court has made clear that policies can include written policies, unwritten

23  customs and practices, failure to train municipal employees on avoiding certain obvious

24  constitutional violations and, in rare instances, single constitutional violations are so inconsistent

25  with constitutional rights that even such a single instance indicates at least deliberate indifference

26  of the municipality."  <u>Benavidez v. Cnty. of San Diego</u>, 993 F.3d 1134, 1153 (9th Cir. 2021)

27  (citations omitted).  A <u>Monell</u> claim can be based on a "longstanding practice or custom which

28  constitutes the 'standard operating procedure' of the local governmental entity."  <u>Gillette v.</u>

1  Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992) (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S.

2  701, 737 (1989)).  To prevail on a theory based on a long-standing custom, Plaintiffs must show

3  "the existence of a widespread practice that . . . is so permanent and well settled as to constitute a

4  'custom or usage' with the force of law."  Gillette, 979 F.2d at 1349 (quoting City of St. Louis v.

5  Praprotnik, 485 U.S. 112, 127 (1988)).  "Liability for improper custom may not be predicated on

6  isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency

7  and consistency that the conduct has become a traditional method of carrying out policy."

8  Young v. City of Visalia, 687 F.Supp.2d 1141, 1148 (E.D. Cal. 2009) (quoting Trevino v. Gates,

9  99 F.3d 911, 918 (9th Cir. 1996)).   The Court considers the factual allegations in the FAC to

10  determine if Plaintiffs have sufficiently alleged a practice or custom of the County that is so

11  widespread as to have the force of law.  Brown, 520 U.S. at 404.

12       Plaintiffs have alleged that since 2017 and as recently as November 2023, Defendant

13  Warnke has made comments regarding understaffing at the jail.  (FAC at ¶¶ 148(a)(b)(g)(i).)

14  Further, Plaintiffs allege incidents in May 25, 2023, in which an inmate hung herself in the jail;

15  October 19, 2022, where an inmate was attacked for 10 minutes and died; January 9, 2021,

16  where six inmates escaped from the main jail and the escape was not discovered until the

17  following day; March 23, 2019, an inmate hung herself in her cell; June 17, 2018, an inmate was

18  choked to death and left in his cell where he was not discovered until the following day; June 11,

19  2017, an inmate was attacked and beaten to death over the course of 12 minutes and the death

20  was not discovered until staff were notified by another inmate; and September 19, 2015, in

21  which an inmate was beaten to death.  (Id. ¶¶ at 148(c)(d)(e)(f)(h)(i)(j).)

22       The Court considers the timing of these incidents to determine if they establish a

23  longstanding practice of sufficient "duration, frequency and consistency that the conduct has

24  become a traditional method of carrying out policy."  Young, 687 F.Supp.2d at 1148.

25       i.   Understaffing

26       Plaintiffs allege that the jail facilities had an inadequate amount of staff, resulting in

27  inadequate supervision and monitoring of inmates and contraband located in the overcrowded

28  cells.  (FAC ¶ 62.)   Plaintiffs rely on statements made by Defendant Warnke regarding

understaffing at the jail.  There are two statements made prior to Decedent overdose in April 2023.  On June 11, 2017, after an inmate was attacked and killed in the main jail, Defendant Warnke stated that the County was down 10 to 12 correctional officers and inmates were aware of the low staffing levels.  (Id. at ¶ 148(i).)  On August 14, 2018, Defendant Warnke stated that despite inadequate staffing at the jail facilities they would make room to house whoever needed to be housed.  (Id. at ¶ 148(g).)

There are no further statements regarding understaffing until four months after Decedent's overdose.  On August 30, 2023, a statement was made to the sheriff that of the 108 allotted positions for custodial staff there were 33 vacancies, with 10 correctional staff still in training and unable to work as a solo officer.  Correctional staff were working 16-hour days, 3 and 4 days per week.  (Id. at ¶ 148(b).)   On November 20, 2023, Defendant Warnke informed the Board of Supervisors that the jail facilities were habitually understaffed, being down 30 positions in corrections and putting in from other agencies.  Staffing was at 28% and two dormitories were closed due to lack of staffing.  Correctional officers were working three 16 hour shifts a week.  (Id. at ¶ 148(a).)  However, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the [municipality] and the opportunity to conform to constitutional dictates ...."  Gonzalez v. Cnty. of Merced, 289 F.Supp.3d 1094, 1099 (E.D. Cal. 2017) (quoting Connick v. Thompson, 563 U.S. 51, 63 n.7 (2011).  Therefore, these statements which were made months after Decedent's death are not considered as contributing to any pattern or practice affecting Decedent.

Given the five-year lapse in time between the statements in 2018 and the statements after Decedent's death, the court finds that Plaintiffs have failed to allege a long-standing practice that was of sufficient duration, frequency, and consistency as to have become a traditional method of carrying out policy.  Trevino, 99 F.3d at 918.  Rather, the complaint alleges that after the statements regarding understaffing in 2017 and 2018, Defendant Warnke acknowledged staffing issues again in 2023 four months after Decedent's death but stated that they were putting in from other agencies and had closed two dormitories to address the low staffing.  (FAC at ¶ 79(a).) The allegations are insufficient to allege "practices of sufficient duration, frequency and

1  consistency that the conduct has become a traditional method of carrying out policy."   Trevino,

2  99 F.3d at 918.  The Court finds that Plaintiffs have failed to plausibly allege a custom or policy

3  of understaffing at the County jail facilities and recommends that County Defendants' motion to

4  dismiss the Monell claim based on a custom or practice of understaffing the County jail facilities

5  be granted.

6        ii.    Overcrowding

7        Plaintiffs allege that Defendants County of Merced, Merced County Sheriff's Office, and

8  Warnke maintained deficient policies and customs related to overcrowded jail facilities.

9  Plaintiffs allege that Decedent was housed in dorm 607 which was a communal cell with at least

10 seven two-bed bunks and at least five mattresses located on the floor of the dorm which was

11 overcrowded and occupied by at least 16 inmates, including Decedent.  (Id. at ¶ 61.)  Defendants

12 County of Merced, Merced County Sheriff's Office, and Warnke accepted more inmates than the

13 facilities were built and designed to accommodate, and the jails were overcrowded with an

14 inadequate amount of staff, resulting in inadequate supervision and monitoring of inmates and

15 contraband located in overcrowded cells.  (Id. at ¶ 62.)

16       The only other factual allegation to support an overcrowding policy is the August 14,

17 2018, statement by Defendant Warnke that despite inadequate staffing at the jail facilities they

18 would make room to house whoever needed to be housed.  (FAC at ¶ 148(g)).  The passage of

19 five years between Defendant Warnke's statement regarding accepting inmates and the

20 circumstances under which Decedent was housed does not support a long standing and

21 widespread practice.  The Court finds that Plaintiffs have failed to allege factual allegations to

22 support a plausible claim of a practice or custom of overcrowding by the County that is so

23 widespread as to have the force of law.  Brown, 520 U.S. at 404.   The Court recommends that

24 County Defendants' motion to dismiss the Monell claim based on a custom or practice of

25 overcrowding at the County jail facilities be granted.

26       iii.   Lack of monitoring

27       County Defendants argue that Plaintiffs have failed to allege a widespread custom or

28 policy based on prior incidents because they only vaguely state that several inmates have

1  overdosed at the jail both before and after Decedent's death.  While County Defendants focus on

2  a policy allowing inmates to overdose in jail, Plaintiffs have alleged a lack of monitoring in the

3  jail and multiple incidents that they claim set forth a pattern or practice of lack of monitoring.

4  Plaintiffs allege that Defendants County of Merced, Merced County Sheriff's Office, and

5  Warnke maintained deficient policies and customs related to monitoring and supervision of

6  inmates, including where the ability to monitor inmates was available through the CCTV video

7  feed.  For example, jail staff did not monitor Decedent despite him being visible on the video

8  feed at the time he ingested the drugs and was experiencing an obvious medical emergency.

9  (FAC at ¶¶ 64, 148.)

10  The FAC alleges the following incidents.

11  On September 19, 2015, an inmate was beaten to death at the main jail and the attack was

12  not detected while it was in progress.  (FAC at ¶ 148(j).)

13  On June 11, 2017, an inmate at the main jail was attacked and beaten to death inside his

14  cell over the course of 12 minutes and was not discovered until other inmates alerted jail staff.

15  (Id. at ¶ 148(i).)

16  On June 17, 2018, an inmate was killed in the shower and carried back to his cell.  The

17  entire attack was video recorded on the jails surveillance system, but no jail staff was monitoring

18  or detected the attack while it was in progress.  His body was not discovered for more than 24

19  hours when the following day a correctional officer came to get him for a court hearing.  (Id. at ¶

20  148(h).)

21  On March 23, 2019, an inmate housed in the main jail hung herself in her cell.  The

22  housing officer failed to conduct a cell check for 1 hour, 23 minutes, and 33 seconds because he

23  became distracted while having a conversation with another correctional officer.  An internal

24  investigation against the correctional officer sustained violations of policy, but the only

25  discipline imposed was a written reprimand issued September 23, 2019.  (Id. at ¶ 148(f).)

26  On January 9, 2021, six inmates escaped from the main jail and their escape was not

27  discovered until the following day, more than eight hours after the escape.  An internal

28  investigation found a multitude of correctional officers contributed to the escape where head

counts, security checks and daily tasks were not being completed.  The escape occurred while correctional staff were present in the control room playing a game and correctional staff were frequently in the control room playing cards, playing corn hole, betting on games, exchanging money, removing their uniforms, and watching movies rather than carrying out their duties, including monitoring inmates.  County Defendants failed to adequately discipline or terminate any of the involved staff.  (Id. at ¶ 148(e).)

On October 19, 2022, an inmate housed at the main jail was attacked and killed over the course of 10 minutes.  The entire attack was video recorded on the surveillance system, but no jail staff were monitoring the video feed or detected the attack while it was in progress.  Jail staff were attending a jail sanctioned briefing for jail personnel.  Forty-six minutes after the attack ended, the inmate's body was discovered during a routine cell-check by jail staff.  An internal investigation was unable to determine any violations of policy or procedure by jail staff.[3]  (Id. at ¶ 148(d).)

It is unclear the number of prior incidents required to allege a persistent and widespread custom in order to survive a motion to dismiss.  Gonzalez, 289 F.Supp.3d at 1099.  Several vague incidents have been found to be insufficient to deny a motion to dismiss while multiple specific incidents have been found to be sufficient at the pleading stage to survive.  Bagley v. City of Sunnyvale, No. 16-CV-02250-JSC, 2017 WL 5068567, at *5 (N.D. Cal. Nov. 3, 2017) (citing Motley v. Smith, 2016 WL 3407658, at *9 (E.D. Cal. June 20, 2016) (multiple incidents sufficient) and Nelson v. City of Los Angeles, 2015 WL 1931714, at *10-11, 18 (C.D. Cal. Apr. 28, 2015) (more than 8 specific incidents sufficient).

Here, Plaintiffs point to six incidents in the eight years prior to Decedent's death during which time Defendant Warnke was sheriff.  Although the facts are distinguishable, all support the allegation that the same conduct contributed to the incidents: inadequate monitoring and

---

[3] Plaintiffs also allege that a month after Decedent's overdose, on May 25, 2023, an inmate hung herself in her jail cell and jail staff failed to monitor, detect or prevent her suicide attempt.  (Id. at ¶ 148(c).)  However, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the [municipality] and the opportunity to conform to constitutional dictates ....'"  Gonzalez, 289 F.Supp.3d at 1099 (quoting Connick, 563 U.S. at 63 n.7).  Therefore, this incident which occurred after Decedent's death is not considered as contributing to any pattern or practice.

1  observation within the County's jail facilities.   At the pleading stage, the Court finds that
2  Plaintiffs have alleged a sufficient number of prior incidents to place Defendants County of
3  Merced, Merced County Sheriff's Department, and Warnke on notice that there was inadequate
4  observation and monitoring in the jail facilities.

5      In Estate of Johnson, the plaintiff alleged that Johnson was booked on a charge of murder
6  and the seriousness of the charge warranted isolated and frequently supervised housed based on
7  the risk of self-harm or suicide.  2024 WL 279137, at *5.  Johnson was placed in a holding cell
8  with other inmates and was inadequately monitored.  Johnson smuggled lethal quantities of illicit
9  substances into the jail due to the defendants inadequate booking and processing.  He distributed
10 the illicit substances to other inmates and ingested lethal quantities of the substance himself.  The
11 day after being booked, he experienced a medical emergency and was pronounced dead.  Id. at
12 *1.

13     Johnson's holding cell had audio/video surveillance capabilities which allowed the
14 defendants to adequately monitor inmates.  However, the defendants inadequately monitored,
15 checked and supervised Johnson's holding cell.   Although Johnson was visible on the
16 surveillance video distributing and ingesting something from a small bag, the defendants failed
17 to observe those actions and failed to intervene or prevent him from ingesting the illicit
18 substances.  The court found that the defendants could have responded to the emergency more
19 quickly and administered emergency measures, however they failed to timely observe Johnson
20 experiencing a medical emergency.  Id.  The court held that plaintiffs had plausibly alleged the
21 existence of a policy for inadequate supervision, monitoring, and observation at the jail.   In
22 determining that the plaintiff had adequately stated a Monell claim, the court considered that in
23 addition to sufficiently alleging a policy of inadequate observation and monitoring, the plaintiffs
24 also alleged that defendants failed to adequately monitor and observe Johnson despite having the
25 ability to do so, they did not see Johnson ingest the illicit substances, and due to the lack of
26 adequate monitoring and observation, defendants did not timely provide medical care to prevent
27 or treat the overdose.  Johnson, 2024 WL 279137 at *5.

28     Similarly here, Plaintiffs allege that Decedent was visible on the closed-circuit television

1   surveillance camera which monitored the dorm from 8:23 through 9:35 p.m. rummaging through

2   an upper bunk, orally ingesting drugs, cutting a line of powdered drugs and ingesting it through

3   his nose, and orally ingesting more drugs.  (FAC at ¶¶ 70-73.)  Plaintiff was then visible on the

4   video feed from 9:47 to 9:48 p.m. exhibiting seizure like behavior and was unconscious lying in

5   an abnormal position on his mattress.  (Id. at ¶¶ 75-78.)  As in Johnson, the Court finds that

6   despite having the ability to do so on the video surveillance system, the correctional officers did

7   not see Decedent ingest the controlled substances, and due to the lack of adequate monitoring,

8   medical care to treat the overdose was delayed.  Accordingly, the Court finds that Plaintiffs'

9   have stated a claim against Defendants County of Merced and Merced County Sheriff's Office

10  for an unwritten custom of inadequate observation and monitoring of inmates at the Correctional

11  Facility.  The Court recommends that County Defendants' motion to dismiss the Monell claim

12  based on a custom or practice of inadequate observation and monitoring be denied.

13          iv.     Failure to adequately search for drugs entering the jail facilities

14          Plaintiffs make conclusory allegations regarding the jail facilities being overrun with

15  drugs, contraband being smuggled into the facilities, inadequate searches for contraband, and

16  deficient policies.  Plaintiffs assert that Defendants County of Merced, Merced County Sheriff's

17  Office, and Warnke were aware of the presence and availability of drugs.  For example, about a

18  week prior to April 20, 2023, an inmate at the jail overdosed on fentanyl.  On April 20, 2024,

19  Decedent overdosed on fentanyl, and at least one additional inmate overdosed on fentanyl after

20  April 20, 2024.  (FAC at ¶ 58.)  Defendants County of Merced, Merced County Sheriff's Office,

21  and Warnke maintained deficient policies and customs related to overdoses in the jail facilities,

22  including staff were insufficiently trained concerning care and treatment for persons suspected or

23  known to be overdosing including how often and how much Narcan to administer.  (Id. at ¶ 59.)

24          While Plaintiffs make conclusory allegations that the jail facilities were overrun with

25  drugs, and that drugs enter the jail facilities by way of inmates, jail employees, and/or jail

26  contractors who smuggled contraband into the facilities, there are no factual allegations in the

27  complaint to support a practice or custom of allowing drugs inside the jail facilities by the

28  County that is so widespread as to have the force of law.  Brown, 520 U.S. at 404.

1   Plaintiffs have alleged a single drug related incident one week prior to Decedent
2   overdosing on April 20, 2023.  (FAC at ¶ 58.)  Plaintiffs also argue that there was at least one
3   other overdose after Decedent.  "A few 'isolated or sporadic incidents' are not enough to prove a
4   city has an unconstitutional custom or practice."  Garcia v. Yuba Cnty. Sheriff's Dep't, 559
5   F.Supp.3d 1122, 1127 (E.D. Cal. 2021) (quoting Trevino, 99 F.3d at 918).  "A practice or custom
6   must have 'sufficient duration, frequency and consistency' that it has 'become a traditional
7   method of carrying out policy.' "  Garcia, 559 F.Supp.3d at 1127 (quoting Trevino, 99 F.3d at
8   918.)

9   Plaintiffs further assert that they can supplement their complaint to allege that a
10  contracted employee with the County of Merced, an incarcerated individual, and the wife of the
11  individual were arrested on suspicion of conspiracy, smuggling, and possession of narcotics
12  within the jail, citing a July 8, 2024, news article.  (Opp. at 9 fn.2.)  However, other than the
13  overdose one week prior to Decedent overdosing on April 20, 2023, all the allegations are
14  contemporaneous or subsequent to Decedent's incident.  Therefore, none of the alleged incidents
15  show a long-standing pattern or practice which would provide Defendants with notice prior to
16  Decedent obtaining and overdosing on drugs.  Gonzalez, 289 F.Supp.3d at 1099.  The Court
17  finds that Plaintiffs have failed to allege a long-standing custom or practice of failing to
18  adequately search for drugs entering the jail facilities.[4]

19  The Court recommends that County Defendants' motion to dismiss the Monell claim
20  based on a custom or practice of failing to adequately search for drugs entering the jail facilities
21  be granted.

22  v.   Appropriate medical and mental health care for inmates

23  Defendants argue that Plaintiffs have failed to identify a specific policy regarding
24  medical or mental health care that they failed to promulgate.  Defendants contend that Plaintiffs
25  assert vague conclusory allegations and there are no facts establishing any policy that was not
26  implemented that was the cause of the constitutional violation.  Additionally, Defendants argue

27

28  [4] The parties argue whether a single incident is sufficient in addressing the failure to train claim.  Accordingly, the
    Court shall address the issue below, however, finds that analysis would apply equaling to the current issue.

1    that there are no facts alleged to connect the lack of any policy to Decedents incarceration and

2    death due to his ingestion of fentanyl.  (Mot. at 16.)

3         Plaintiffs counter that they have alleged that County Defendants employment of

4    Defendant CFMG with knowledge that the services provided were inadequate and non-complaint

5    with the contractually bargained for services.  (Opp. at 15.)

6         Defendants generally reply that it is Plaintiffs' burden to show a custom and widespread

7    practice and they cannot do so here.  (Reply at 4.)

8         Plaintiffs alleged that Defendants County of Merced, Merced County Sheriff's Office,

9    and Warnke employ Defendants CFMG to deliver constitutionally mandated medical services to

10   inmates with the knowledge that the services provided are inadequate and noncompliant with the

11   bargained for services.  (FAC at ¶ 149.)  The FAC cites as examples, possible misconduct in

12   awarding contracts including four FBI investigations of which three involve health care delivery,

13   quality control and billing issues in Florida, a higher death rate than jails with public health,

14   delays in treatment, and failure to staff in compliance with a settlement agreement.  (Id. at ¶

15   149(a).)  Plaintiffs allege that CFMG has been sued across the country over 500 times in the last

16   five years.  (Id. at 149(b).)  Defendant CFMG was investigated by the Civil Rights Division and

17   United States Attorney's Office for the Central District of California concluding, as relevant

18   here, that Wellpath failed to provide adequate staffing to prevent delays in medical care and does

19   not routinely analyze the quality of care it provides.  (Id. at ¶ 149(c).)  Defendant CFMG has

20   paid out millions of dollars in settlements from incarcerated people who allege negligence in the

21   care the company has provided.  (Id. at ¶ 149(e).)   Analysis of California Department of Justice

22   data show that 200 inmates died between 2004 and 2014 in jails in which CFMG provided

23   healthcare.  (Id. at ¶ 149(f).)  In 2015, Defendant CFMG entered into class action settlement

24   which required it to address issues of inadequate medical care and mental health care, inadequate

25   staffing, and accommodations for disabled prisoners at the Monterey Jail.  Defendant CFMG

26   failed to comply with the terms of the settlement and the court issued an order compelling its

27   compliance.  (Id. at ¶ 149(g).)  In 2013-14, the Santa Cruz County Grand Jury addressed multiple

28   deaths in the County Jail where Defendant CFMG provided services, reviewing five in-custody

deaths between August 2012 and July 2013 which included two suicides by hanging.  (Id. at ¶ 149(h).)

Plaintiffs allege that Defendants County of Merced, Merced County Sheriff's Office and Warnke were aware of the violations and policies and customs, including repeated incidents at jail facilities due to the custody and medical staff's indifference and deficiencies in the delivery of heathcare/medical services which were in violation of national and local standards, such as the NCCHC, IMW, and ACA.  (Id. at ¶ 150.)

While Plaintiffs allege that Defendants Caughell and Reyes exhibited deliberate indifference to Decedent's serious medical need, the FAC the facts relied upon to show that Defendant CFMG provided inadequate medical care are not sufficiently similar to the facts of this action to establish a long-standing practice of inadequate medical care at the Merced County jail facilities.  The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  Castro, 833 F.3d at 1075 (quoting City of Canton, 489 U.S. at 385).  Plaintiffs have set forth allegations of a history of inadequate medical care provided by CFMG and its employees in detention facilities.  However, none of the cases identify the Merced County Jail or deal with inadequate treatment of an inmate overdosing.  Here, the evidence before the Court demonstrates that prior to his overdose, Decedent was evaluated upon admission and received COWs monitoring.  He was seen after injuring his back and received treatment.  Further, none of the cases related to the Merced County jail facilities allege a failure to provide medical treatment.  The Court finds that Plaintiffs have failed to allege a plausible claim of a custom or policy of inadequate medical care.[5]

Accordingly, the Court recommends that County Defendants' motion to dismiss the Monell claim against them based on a custom or practice of inadequate medical care by Defendant CFMG should be granted.

---

[5] The Court makes no finding as to whether the medical care provided by Defendants Caughell or Reyes was inadequate or deliberately indifferent to Decedent as that issue was not raised in the current motion.

**b.      Failure to train, supervise, or discipline[6]**

County Defendants argue that Plaintiffs have vaguely asserted that they failed to promulgate specific policies and train personnel.  Plaintiffs also allege that they "maintained policies or customs of action and inaction and knew or should have known that officials under their command were inadequately trained, supervised, or disciplined resulting from either the lack of proper training, pursuant to policy, or the result of the lack of policy, in violation of the Fourteenth Amendment to the U.S. Constitution." (Mot. at 17.)  County Defendants contend that in a conclusory fashion, Plaintiffs suggest that <u>Monell</u> liability can be based on a failure to train.  County Defendants argue that the standard for a failure to train claim is even more stringent and there are no facts alleged that the Sheriff's Office failed to train it correctional officers or that a failure to train was the cause of a constitutional violation.  Defendants assert that no facts are alleged to show that the Sheriff's Office knew or should have known there was a problem with training, nor is there a pattern of similar violations alleged or any factual allegations suggesting deliberate indifference.  (<u>Id.</u>)

County Defendants assert that to the extent that the FAC alleges that Defendant Gutierrez was not trained in Narcan and Fire & Line Safety, there are no allegations that this was issue among the entire Sheriff's Office or that his lack of training was the moving force behind a constitutional violation for failing to provide medical care.  County Defendants argue that despite conclusory allegations that they were or should have been on notice of the inadequacy of their policies or training because "the inadequacies constituted life-threatening decision and were so obvious and likely to result in violations of the rights of inmates" there are no underlying factual allegations to support this conclusion.  (<u>Id.</u> at 18.)

Plaintiffs counter that while County Defendants argue that there are no facts alleged that they knew or should have known there was a problem with training, Plaintiffs do not need to prove a prior instance of harm.  Plaintiffs argue that the allegation that the deficient policies or

---

[6] County Defendants argue that Plaintiffs have failed to allege facts to state a claim based on a ratification theory of liability.  (Mot. at. 18-19.)  Plaintiffs respond that they did not allege a ratification theory in the pleading and any argument that the pleading is insufficient is superfluous.  (Opp. at 10, n.3.)  Accordingly, the Court does not address a ratification theory of liability.

1   customs gave rise to life threatening decisions that were so obvious and likely to result in

2   violations of the rights of inmates is sufficient. Further, Plaintiffs argue factual allegations of a

3   pattern of similar violations is not necessary where the consequences of poor policies is

4   obviously dire. (Opp. at 16.) Plaintiffs argue that the inadequate policies or customs allowed the

5   jail facilities to be overrun with drugs which are readily available to inmates and created such an

6   obvious risk that liability may be imposed. (Id. at 17.)

7        County Defendants reply that it is not enough for Plaintiffs to show that more or better

8   training could have avoided harm, especially where the deficiency did not represent a conscious

9   choice by a defendant to expose Decedent to injury. County Defendants argue that Plaintiffs

10  have failed to advance any argument to support their claim of deliberate indifference which is

11  critical to a failure to train and custom of tolerance. County Defendants contend that Plaintiffs

12  simply make legal conclusions, that there were deficient policies, which are not supported by the

13  pleadings. (Reply at 5.)

14       **c.      Legal Standard**

15       "[A] municipality's failure to train its employees in a relevant respect must amount to

16  "deliberate indifference to the rights of persons with whom the [untrained employees] come into

17  contact." Connick, 563 U.S. at 61 (quoting City of Canton, 489 U.S. at 388. The plaintiff "must

18  demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail

19  on a failure to train claim." Arceo v. City of Roseville, No. 2:20-CV-02334-DAD-DB, 2023 WL

20  5417210, at *7 (E.D. Cal. Aug. 22, 2023) (quoting Price v. Sery, 513 F.3d 962, 973 (9th Cir.

21  2008)). To state a claim for failure to train, a plaintiff must include sufficient facts to support a

22  reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that

23  amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury

24  would not have resulted if the municipality properly trained their employees. Benavidez, 993

25  F.3d at 1153-54.

26       In the context of a failure to train claim, the Supreme Court has found that to show

27  deliberate indifference the municipal actor must disregard a known or obvious consequence of

28  his action, which ordinarily requires that there be a pattern of similar constitutional violations by

untrained employees.  Connick, 563 U.S. at 61-62 (quoting Brown, 520 U.S. at 409).  However, "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference."  Connick, 563 U.S. at 63 (citation and quotation marks omitted). Since a municipalities culpability for a deprivation of constitutional rights is at its most tenuous where the claim asserted is a failure to train, id. at 61, in most cases, the plaintiff must show that the municipalities poorly trained employees repeatedly violated the constitutional rights of its citizens.  Brown, 520 U.S. at 409.  To state a claim based on a single incident, municipal liability will only be triggered where "fault and causation" are clearly traceable to the municipality's legislative body or some other authorized decisionmaker.  Benevidez, 993 F.3d at 1154.

"[T]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  Benavidez, 993 F.3d at 1154 (quoting City of Canton, 489 U.S. at 390–91).  Further, while similar violations are not always necessary to support a Monell claim, this is only applicable in a narrow range of circumstances where the consequences of inaction are highly predictable and obvious.  Garcia, 559 F.Supp.3d. at 1129 (citing Brown, 520 U.S. at 409). The failure must also have led to the very consequence that was so predictable and the Ninth Circuit has suggested that the consequences of the poor choices must be obviously dire, for example where employees are making life threatening decisions.  Garcia, 559 F.Supp.3d. at 1129 (citing Brown, 520 U.S. at 409 and Benevidez, 993 F.3d at 1155).

### d.    Analysis

Plaintiffs argue that they do not need to show a pattern of violations to state a failure to train claim since they have alleged that the deficient policies or customs gave rise to life-threatening decisions and were so obvious and likely to result in violations of the rights of inmates.  (Opp. at 16.)  Plaintiffs FAC alleges that Defendants County of Merced, Merced County Sheriff's Department, and Wanke 1) failed to adequately train staff to screen, detect, and search for drugs and prevent drugs from entering the jail facilities (FAC at ¶ 57); 2) jail staff were insufficiently trained concerning care and treatment of persons suspected or known to be overdosing, including how often and how much Narcan to administer (id. at ¶ 59); 3) Defendant

1   Gutierrez was not trained in relevant medical topic including "Fire and Life Safety," "Crisis

2   Intervention," and "Narcan" (id. at ¶ 94); and 4) custodial and medical employees were not

3   trained in providing appropriate medical care for inmates (id. at ¶¶ 147(b)(g).

4          The Court finds that Plaintiffs have failed to plausibly allege that the incident at issue

5   here qualifies as the rare situation in which a single incident was a highly predictable

6   consequence of the failure to equip law enforcement officers with the tools to handle recurring

7   situation.  Est. of Temple v. Placer Cnty. Sheriff's Off., No. 2:23-CV-01713-DAD-CKD, 2024

8   WL 3742920, at *5 (E.D. Cal. Aug. 9, 2024) (quoting Long, 442 F.3d at 1186).

9          In Canton, the Supreme Court gave the example that where a city arms its police officers

10  with firearms, the need to train officers on the constitutional limitations on use of deadly force

11  can be said to be so obvious that the failure to do so would be properly characterized as

12  deliberate indifference to constitutional rights.   Benevidez, 993 F.3d at 1154 (citing City of

13  Canton, 489 U.S. at 390 fn.10).  While Plaintiffs allege that no such pattern is needed here

14  because the failure to train gave rise to life threatening decisions and were so obvious and likely

15  to result in constitutional violations of the rights of inmates, the Court finds that Plaintiffs

16  allegations of failure to train is not the type of obvious case contemplated by the Supreme Court

17  such as where the department arms officers and then fails to train them on the use of deadly

18  force.

19          Where a claim of municipal liability rests on a single decision, not itself
            representing a violation of federal law and not directing such a violation, the
20          danger that a municipality will be held liable without fault is high.  Because the
            decision necessarily governs a single case, there can be no notice to the municipal
21          decisionmaker, based on previous violations of federally protected rights, that his
            approach is inadequate.  Nor will it be readily apparent that the municipality's
22          action caused the injury in question, because the plaintiff can point to no other
            incident tending to make it more likely that the plaintiff's own injury flows from
23          the municipality's action, rather than from some other intervening cause.

24  Brown, 520 U.S. at 408–09.

25          Here, Plaintiffs allege a series of "failure to train" that allegedly gave rise to the violation

26  of Decedent's rights.  First, they allege a failure to train on keeping drugs out of the jail facilities

27  subjecting detainees to the risk of overdose.  Unlike a situation where the municipality provided

28  law enforcement with firearms that could reasonably be found to require the need for training in

50

the use of deadly force, the County Defendants did not take affirmative action to provide drugs to the inmates.  In the context here, the Court does not find that Plaintiffs assertion that failing to train on keeping drugs out of jail facilities would create the dire risk of inmates overdosing such that it would subject the municipality to liability based on a single inmate overdosing.

Next, Plaintiffs allege a failure to train in how to treat suspected or known overdoses, including how much and how often to administer Narcan and failure to train in the use of Narcan.  Plaintiffs have alleged that Defendant Gutierrez was not trained on using Narcan. [T]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton, 489 U.S. at 390–91.  Finally, Plaintiffs generally allege that custodial and medical staff were not trained in providing appropriate medical care to inmates, but the complaint fails to allege what appropriate medical care Decedent failed to receive for his overdose or how the failure to train would have avoided Decedent's death from his overdose.

Similar to here, in Hyde, the plaintiffs alleged that the defendants had failed to train their officers in crisis intervention training that would have better prepared them to deal with detainees suffering from mental illness and that lack of training had led to the detainee being denied his medication without any factual support for the allegations. 24 F.4th at 874.  The Ninth Circuit rejected the argument that the "events giving rise to the excessive force and inadequate medical care claims" supported the allegations of defective training. Id.  "While deliberate indifference can be inferred from a single incident when 'the unconstitutional consequences of failing to train' are 'patently obvious,' an inadequate training policy itself cannot be inferred from a single incident.  Otherwise, a plaintiff could effectively shoehorn any single incident with no other facts into a failure-to-train claim against the supervisors and the municipality." Id. at 874-75 (citations omitted). The court found the plaintiffs did not plead facts even suggesting that the training was defective, and they failed to state a claim of failure to train. Id. at 875.

While Plaintiffs seek to hold Defendants County of Merced, Merced County Sheriff's Department, and Wanke liable for a series of failures to train that they allege created an obvious and dire risk of death to inmates at the Correctional Center, the Court finds that the allegations

1    here do not create the type of obvious risk that would be cognizable without showing that the

2    municipalities poorly trained employees repeatedly violated the constitutional rights of its

3    citizens. Brown, 520 U.S. at 409.

4         Plaintiffs have alleged a single incident of an inmate overdosing one week prior to

5    Decedent's death and the instant case, in which Decedent received medical care for his drug

6    overdose within minutes of being found unresponsive, which is insufficient to support a claim

7    for unconstitutional failure to train. Cf. Est. of Miller v. Cnty. of Sutter, No. 2:20-CV-00577-

8    KJM-DMC, 2022 WL 493077, at *4 (E.D. Cal. Feb. 17, 2022) (three cases alleging drug over

9    dose and similar violations support failure to train claim); Coe v. Schaeffer, No. 2:13-CV-00432-

10   KJM-CK, 2014 WL 1513305, at *4 (E.D. Cal. Apr. 11, 2014) (allegations of prior citizen

11   complaints against officer and failure to train were sufficient to state a claim). The Court finds

12   that Plaintiffs have failed to allege a cognizable claim for failure to train and recommends that

13   County Defendants' motion to dismiss the failure to train claim be granted.

14         **D.**     **Interference with Familial Association**

15         County Defendants move to dismiss the second and third claims for unwarranted

16   interference with familial association brought against them under the First and Fourteenth

17   Amendments arguing that they fail as a matter of law. County Defendants argue that the FAC

18   does not contain any facts to show an intimate or daily association, but just broadly states that all

19   six Plaintiffs shared a close relationship and special bond with Decedent, their biological family

20   member, which included deep attachments, commitments, and distinctly personal aspects of their

21   lives and was typical of a close familial relationship. (Mot. at 24.) However, County Defendants

22   contend that Plaintiffs have merely recited the elements of the claim without even attempting to

23   allege facts to describe the individual nature of the relationship they claim has been lost. County

24   Defendants further argue that even if they had alleged facts to show an intimate relationship, the

25   FAC fails to provide any facts to show egregious conduct on the part of Defendants, especially

26   Defendant Warnke, and the claims should be dismissed. (Id.)

27         Plaintiffs respond that the allegations in the FAC are sufficient to state a claim that they

28   had a close and personal relationship with Decedent. (Opp. at 19-20.)

1   County Defendants reply that Plaintiffs have not alleged a single fact to support their

2   interference with familial association claim.   County Defendants contend that Plaintiffs have

3   made one assertion that the requisite relationship exists without anything more to support the

4   claims.   (Reply at 7.)   Further, County Defendants argue that the claim fails against any

5   defendant that is dismissed for a lack of deliberate indifference.  (Id. at 8.)

6       1.   Legal standard

7   "There are two distinct forms of freedom of association: (1) freedom of intimate

8   association, protected under the Substantive Due Process Clause of the Fourteenth Amendment;

9   and (2) freedom of expressive association, protected under the Freedom of Speech Clause of the

10  First Amendment." Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon, 880 F.3d 450,

11  458 (9th Cir.), amended, 881 F.3d 792 (9th Cir. 2018).  Parents and children generally have the

12  right to assert substantive due process claims under the Fourteenth Amendment for being

13  deprived of their liberty interest in the companionship and society of their parent or child through

14  official conduct.  Wheeler v. City of Santa Clara, 894 F.3d 1046, 1057 (9th Cir. 2018); Lemire v.

15  California Dep't of Corr. & Rehab., 726 F.3d 1062, 1075 (9th Cir. 2013).  "[T]he majority of the

16  district courts in this circuit to tackle the question have found that spouses have a right to familial

17  association." Hanington v. Multnomah Cnty., 593 F.Supp.3d 1022, 1043 (D. Or. 2022), appeal

18  dismissed sub nom. Hanington v. Cnty. of Multnomah, No. 22-35282, 2023 WL 6585898 (9th

19  Cir. June 2, 2023); see also Byrd v. Guess, 137 F.3d 1126, 1134 (9th Cir. 1998) superseded by

20  statute on other grounds as recognized by Little v. City of Manhattan Beach, 21 F.App'x 651,

21  653 (9th Cir. 2001) (assuming without deciding that spouse could bring familial association

22  claim).

23      The Ninth Circuit has recognized that the First Amendment also protects the right to

24  familial association.  Lee v. City of Los Angeles, 250 F.3d 668, 682–83 (9th Cir. 2001).  A claim

25  for familial association under the First Amendment is measured by the same standard applied to

26  the claim under the Fourteenth Amendment.   Kaur v. City of Lodi, 263 F.Supp.3d 947, 973-74

27  (E.D. Cal. 2017).  Specifically, in the context of parent-child relationships, "the Supreme Court

28  has emphasized that the rights of parents are a counterpart of the responsibilities they have

53

assumed: 'the mere existence of a biological link does not merit equivalent constitutional protection.' " Wheeler, 894 F.3d at 1058 (quoting Lehr v. Robertson, 463 U.S. 248, 261 (1983)). The interests protected under the Fourteenth Amendment require an enduring relationship that reflects an assumption of parental responsibility and "stem[ ] from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." Wheeler, 894 F.3d at 1058 (quoting Lehr, 463 U.S. at 256-61). A child's right to companionship with his parents is reciprocal to the parent's rights. Wheeler, 894 F.3d at 1058.

To prevail on a claim for loss of familial association, a plaintiff must show that the defendant's behavior was "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." Hanington, 593 F.Supp.3d at 1043 (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 & n.8 (1998) and Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010)). Where officials have ample time to consider their actions, the decedent's family members need only plead deliberate indifference to state a claim under the due process right to familial association. Porter v. Osborn, 546 F.3d 1131, 1139 (9th Cir. 2008).

2.    Analysis

County Defendants move to dismiss the interference with familial association claims arguing that Plaintiffs have not alleged any facts to support the existence of an intimate family association.

The FAC alleges that Plaintiff Araceli Sanchez is the legal spouse of Decedent. (FAC at ¶ 7.) Plaintiffs L.V., C.V., and M.V. are the biological children of Decedent. (Id. at ¶¶ 9-11.) Plaintiffs Ruth Ramirez and Albert Valentine are the biological parents of Decedent. (Id. at ¶¶ 12-13.) Prior to his death, Decedent cohabitated and shared a close relationship with Plaintiff Sanchez and their three minor children and a close relationship and special bond with his parents Plaintiffs Ramirez and Valentine. (Id. at ¶¶ 28, 161, 167.) These close relationships included deep attachments, commitments, and distinctively personal aspects of their lives and was typical of a close familial relationship. Plaintiffs Sanchez, L.V., C.V., M.V., Ramirez, and Valentine frequently visited or spoke with Decedent. (Id. at ¶ 161, 167.)

1      The Supreme Court has "emphasized that the First Amendment protects those

2 relationships, including family relationships, that presuppose 'deep attachments and

3 commitments to the necessarily few other individuals with whom one shares not only a special

4 community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's

5 life.' " Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte ("Rotary Club"), 481 U.S. 537,

6 545 (1987) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 619–620 (1984)).   In

7 addressing the constitutional protection to relationships, the Ninth Circuit found that

8 "relationships involving marriage, child-rearing, or cohabitation are protected by the First

9 Amendment, and other relationships, 'including family relationships,' may also be protected to

10 the extent that the 'objective characteristics' of the relationship (i.e. 'factors such as size,

11 purpose, selectivity, and ... exclu[sivity]') demonstrate that it is 'sufficiently personal or private

12 to warrant constitutional protection.' " Mann v. City of Sacramento, 748 F. App'x 112, 114–15

13 (9th Cir. 2018) (quoting Rotary Club, 481 U.S. at 545-46.  Therefore, conclusory and formulaic

14 citation to language from Rotary Club is not sufficient to plead a right to familial association.

15 Mann, 748 F.App'x at 115.

16      Although Plaintiffs Sanchez, L.V., C.V., and M.V. have alleged that they cohabitated

17 with Decedent prior to his death, the FAC alleges that Decedent was in the custody of the CDCR

18 prior to be transferred into the custody of the County of Merced on new charges on February 7,

19 2023.  (FAC at ¶ 47.)  Defendants Ramirez and Valentine, as Decedent's parents must allege

20 sufficient facts to show that they maintained consistent involvement in Decedent's life for their

21 relationship to be entitled to the Fourteenth Amendment protections for familial association.

22 Wheeler, 894 F.3d at 1058.

23      The FAC does allege more than just conclusory and formulaic citation to language from

24 Rotary Club which has been found to be insufficient to plead a right to familial association.

25 Mann, 748 F.App'x at 115.  In addition to setting forth the familial relationship to Decedent, the

26 FAC does allege that all plaintiffs frequently visited or spoke with Decedent.  (Id. at ¶ 161, 167.)

27 At the pleading stage, the Court finds that the allegations are sufficient to reasonably infer that

28 the objective characteristics of the relationships warrant constitutional protection.

1    However, to state a claim, Plaintiffs must also allege the defendant exhibited deliberate

2  indifference towards Decedent.  Porter, 546 F.3d at 1139.  Plaintiffs allege that all defendants

3  caused termination of or interference with Plaintiffs' familial relationship with Decedent by

4  exhibited deliberate indifference toward Decedent's need for medical care or treatment.  (FAC at

5  ¶¶ 162, 168.)  For the reasons discussed above, the Court has found that the FAC fails to allege

6  facts to state a claim that Defendants Pena, Gutierrez, Rentfrow, and Sziraki were deliberately

7  indifferent to Decedent and therefore, Plaintiffs have failed to state an interference with familial

8  association claim against these defendants.  The Court recommends that County Defendants'

9  motion to dismiss the interference with familial association claim against Defendants Pena,

10  Gutierrez, Rentfrow, and Sziraki be granted.

11    The FAC does sufficiently allege that Defendant Guzman was deliberately indifferent by

12  failing to monitor Decedent and Defendants Merced County, Merced County Sheriff's

13  Department, and Warnke were deliberately indifferent by failing to implement a policy of

14  adequately observing and monitoring detainees.  Accordingly, Plaintiffs have stated an

15  interference with familial association claim against these defendants.  The Court recommends

16  that County Defendants motion to dismiss the familial association claims against Defendants

17  Merced County, Merced County Sheriff's Department, and Warnke be denied.

18    **E.    Failure to Summon Medical Care**

19    Defendants move to dismiss the fourth claim for failure to summon medical care against

20  Defendants County of Merced, Merced County Sheriff's Office, Warnke, Pena, Gutierrez, and

21  Guzman.  County Defendants contend that Plaintiffs have not alleged any facts to show how they

22  knew that Decedent needed medical attention and that it was not summoned.  Defendants argue

23  that the allegations in the FAC establish that the County Defendants responded timely and

24  provided medical care and Plaintiffs have failed to allege facts to show that County Defendants

25  failed to summon medical care.  (Mot. at 25.)  Defendants further argue that to the extent that

26  any individual officers are potentially liable, Defendant Warnke must be dismissed because there

27  are no allegations that he was aware of, involved in medical treatment, or summoning care.  (Id.

28  at 26.)

1    Plaintiffs respond that the duty to summon medical care does not only arise where there

2  is actual knowledge but arises where there is a reason to know or constructive knowledge of the

3  need for medical care.  (Opp. at 20-21.)  Plaintiffs argue that Defendants Pena, Gutierrez, and

4  Guzman had constructive knowledge of Decedent's need for medical care through the video feed

5  which showed him ingesting drugs and unconscious and twitching and shaking as if having a

6  seizure.  (Id. at 21.)  Plaintiffs also contend that since they have stated a claim against Defendant

7  Warnke for deliberate indifference, he is also liable for the failure to summon medical care.  (Id.

8  at 22.)

9    Defendants reply that Plaintiffs have not alleged facts to show that they had any reason to

10  know of Decedents need for immediate medical care.  Defendants contend that the allegations

11  are conclusory and fail to state a claim for failure to summon medical care.  (Reply at 9.)

12  Defendants argue that Plaintiffs seek to impose liability on them for Wellpath's medical care and

13  actions.  Defendants assert that Plaintiffs' argument that they should have interpreted Decedent's

14  actions of holding his arms up in the air with bent elbows before his arms fell limp at his sides as

15  a need to summon medical care does not withstand judicial scrutiny and fails to state a claim.

16  Furthermore, Defendants argue that they responded immediately once being notified of

17  Decedent's need for medical care and there are no allegations that any County Defendant was

18  aware of Decedent's need for medical care prior to being alerted by inmates.  (Id.)  Defendants

19  also argue that there are no allegations that Defendant Warnke was aware or at all involved and

20  the claim against him should be dismissed.  (Id. at 9.)

21    1.    Legal standard

22    Under the California Government Code, public entities and public employees are

23  generally not "liable for injury proximately caused by the failure of the employee to furnish or

24  obtain medical care for a prisoner in his [or her] custody."  Cal. Gov't Code § 845.6.  However,

25  "a public employee, and the public entity where the employee is acting within the scope of his

26  employment, is liable if the employee knows or has reason to know that the prisoner is in need of

27  immediate medical care and he fails to take reasonable action to summon such medical care."

28  Cal. Gov't Code § 845.6.  "Liability under section 845.6 is limited to serious and obvious

medical conditions requiring immediate care." Horton, 915 F.3d at 608 (quoting Watson v. State of California, 21 Cal.App.4th 836, 841 (1993)).  The duty to provide medical care arises where there is actual or constructive knowledge that the prisoner is in need of immediate medical care. Watson, 21 Cal.App.4th at 841.

"[O]nce an inmate is receiving medical care, § 845.6 does not create a duty to provide adequate or appropriate care."  Resendiz v. Cnty. of Monterey, No. 14-CV-05495-LHK, 2015 WL 7075694, at *8 (N.D. Cal. Nov. 13, 2015).  Section 845.6 does not provide an obligation to provide necessary medication or treatment or to follow up on an inmate's progress.  Resendiz, 2015 WL 7075694, at *8; Watson, 21 Cal.App.4th at 845; Nelson v. State of California, 139 Cal.App.3d 72, 81 (1982).  Thus, once a medical practitioner has been summoned to provide medical care, the practitioner's failure to provide adequate care may constitute malpractice, but it cannot amount to a failure to summon medical care in violation of § 845.6.  Nelson, 139 Cal.App.3d at 81.

2. Analysis

Plaintiffs argue that Decedent was visible on the video feed orally ingesting drugs, receiving drugs from another inmate, and cutting a line of drugs and ingesting it through his nose, and then was twitching and shaking as if having a seizure, which creates a triable issue of fact with respect to the elements required for a section 845.6 claim.  However, the issue here is whether the factual allegations in the complaint plausibly allege a claim.  While Plaintiffs allege that Defendants Pena, Gutierrez, and Guzman should have known of Decedent's need for medical care if they had adequately monitored Decedent,[7] for the reasons discussed above, there are no allegations in the FAC by which a reasonable officer would have been placed on notice that Decedent was using illicit drugs prior to the day that he overdosed.  Further, while Plaintiffs allege that there was inadequate monitoring, there are no allegations in the FAC to demonstrate any County Defendant had reason to be aware of Decedent's need for more frequent monitoring or the need for medical care until shortly before the "man down" announcement.

---

[7] While Plaintiffs argue that the complaint alleges that Defendants Pena, Gutierrez, and Guzman were responsible for monitoring the video feed, the FAC only alleges that Defendant Guzman was responsible for monitoring the video. (See FAC at ¶ 65.)

1    Plaintiffs rely on <u>Medina v. Cnty. of Los Angeles</u>, No. CV 19-3808-GW-EX, 2020 WL
2   3964793 (C.D. Cal. Mar. 9, 2020) to argue that Defendants did not need to have actual
3   knowledge of Decedent's need for medical care.  In <u>Medina</u>, the defendants were aware that the
4   detainee had psychiatric issues and was on medication at the time of booking on April 15, 2020,
5   WL 3967793, at 2-3.  However, he was never prescribed psychiatric medication or provided with
6   psychiatric care despite an order that such care be provided.  The County's policy required that
7   he be seen by a psychiatrist within two weeks of incarceration.  <u>Id.</u> at 3.  The inmate had been
8   incarcerated a year earlier and diagnosed with schizophrenia.  During the prior incarceration he
9   had been placed on the "psych line" and an order was entered in his record, but it took three
10  weeks to see a psychiatrist and have his medication ordered.  <u>Id.</u>

11   Ten days after booking, the detainee was evaluated by a psychiatric technician for
12  possible psychiatric treatment and the detainee requested that he resume his psychiatric
13  medications.  After evaluation, the psychiatric technician did not indicate that the detainee
14  needed immediate mental healthcare and placed him in line to see a psychiatrist based on the
15  request for antipsychotic medication.  <u>Medina</u>, 2020 WL 3964793, at *3.  Despite a policy the
16  detainees were to be seen within five days of being placed on the psych line, the inmate was
17  never seen during his incarceration.  <u>Id.</u> at *4.

18   On May 9, a number of incidents occurred that caused the deputies to leave the floor, and
19  while deputies scanned the floor, they did not do required safety checks.  The detainee had been
20  snorting medication on a nightly basis and on this night his cellmate saw him crush up two pills
21  and snort them with the intent to get high.  <u>Medina</u>, 2020 WL 3964793, at *6.  Sometime later,
22  the cellmate woke up and tried to wake up the detainee, but he could not get a response.  The
23  cellmate said that the detainee seemed to be choking and was making a funny sound.  The
24  intercom button to call for help was covered up, but at some point, the cellmate notified deputies
25  that the detainee was not responsive and was having trouble breathing.  <u>Id.</u> at *7.  The deputy
26  scanned the barcode for the cell and walked toward the next cell.  The cellmate told the deputy
27  that the detainee was having trouble breathing and deputies returned to the cell.  The deputies
28  were not able to tell that detainee was in medical distress standing at the door of the cell.  When

1   they entered the cell, they did not see any signs that the detainee was breathing.  A deputy

2   checked for a pulse and did not find any.  The deputy called for paramedics and medical staff

3   and the detainee was moved to the floor and CPR was started.  Id.  The court found that there

4   was no need to show that the defendants had obtained actual knowledge of the need for medical

5   care to prevail on their failure to summon medical care claim.  Construing the timing in

6   plaintiff's favor, the defendants had reason to know of the medical condition due to their

7   obligation to perform timely safety checks.  Id. at 14.

8         Similarly, in Horton, an officer was told by the detainee's mother that he was suffering

9   from mental health issues and was suicidal after which the officer left the detainee alone in a

10   holding cell for twenty-five minutes while the officer completed paperwork and during this time

11   the detainee attempted suicide.  915 F.3d at 597-98.  The appellate court found there was

12   "considerably more than 'a scintilla of evidence' that Horton required immediate medical

13   attention: Officer Brice knew from his conversation with Horton's girlfriend that Horton had

14   chased his girlfriend with a knife, stabbed a friend in the leg and sympathized with the suspects

15   in mass homicides, and, on the facts most favorable to Horton, had been told that Horton was

16   suicidal, had put cigarettes out on his face, had recently been hospitalized after threatening to kill

17   himself, and would benefit from 'access to mental health.' "  Id. at 608.  The obligation to

18   summon immediate medical care does not only apply in urgent situations, but "requires that the

19   public employee act in a 'timely' manner, so as to prevent further injury."  Id.

20         **a.    Defendants Pena and Gutierrez**

21         Specifically, Plaintiffs allege that Defendant Pena was responsible for monitoring and

22   supervising inmates in the dorm and at around 8:59 p.m. Defendant Pena walked halfway into

23   the dorm, turned around, and exited.  (FAC at ¶¶ 65, 67.)  However, as addressed above in

24   discussing the deliberate indifference claim, there are no facts alleged to suggest that Decedent

25   was in need of immediate medical care when Defendant Pena did his security check.  Nor are

26   there any allegations that Decedent was in the dorm or exhibiting any behavior that would have

27   put Defendant Pena on notice that Decedent was having any medical issue.  Rather, the FAC

28   alleges that it was not until almost an hour after the safety check by Defendant Pena that

1   Decedent ingested the drugs causing the overdose.  Once Defendant Pena responded to the "man

2   down" announcement and discovered Decedent's need for medical care, he radioed for medical

3   to report with a medical supply bag.

4          Similarly, there are no allegations in the FAC to suggest that Defendant Gutierrez should

5   have known that Decedent was in need of medical care prior to the "man down" announcement.

6   The FAC alleges that Defendant Gutierrez was responsible for monitoring and supervising the

7   inmates in the dorm.  (FAC ¶ 65.)  After he heard the "man down" call, he entered the dorm,

8   ordered all inmates to be removed from the dorm, and began administering medical care to

9   Decedent.  (Id. at ¶¶ 87, 88.)

10         While the detainee in Medina was known to currently have a mental health issue that

11  required treatment which was not provided, that is not the case here.  In this instance, as

12  discussed previously, there are no allegations that would indicate that any County Defendant was

13  aware of any medical or mental health issue for Decedent that required medical care prior to his

14  overdose.  To the extent that Plaintiffs rely on Medina for the proposition that the failure to do

15  timely safety checks would constitute a violation of section 845.6, the factual allegations in the

16  complaint do not plausibly allege that medical monitoring would be required or that jail staff

17  failed to conduct timely safety checks on the date Decedent ingested the fentanyl.  The Court

18  finds that Plaintiffs have failed to state a claim against Defendants Pena and Gutierrez for failure

19  to summon medical care.

20         **b.     Defendant Guzman**

21         Plaintiffs contend that Defendant Guzman was responsible for monitoring the video feed

22  for the unit and should have more actively monitored Decedent.  During the period between 9:30

23  to 9:48 p.m., Plaintiffs allege that Decedent was visible on the video feed orally ingesting drugs,

24  snorting a line of powder, lying in an abnormal position, and twitching and shaking as if he was

25  having a seizure until he was discovered by another inmate at 9:49 p.m.

26         Crediting the allegations in the complaint as true, Defendant Guzman had reason to know

27  that Decedent was in need of medical care as early as between 9:35 to 9:45 p.m. based on his

28  consumption of drugs, and by 9:45 to 9:47 p.m. at the latest when he was unconscious and

1 | suffering from seizure like activity.  Watson, 21 Cal.App.4th at 841.  Defendant Guzman did not
2 | radio man down until 9:50 p.m., and therefore the Court finds that Plaintiffs have stated a
3 | plausible claim against Defendants County of Merced, Merced County Sheriff's Office, and
4 | Guzman for failure to summon medical care in violation of section 845.6 of the California
5 | Government Code.

6 |      **c.**    **Defendant Warnke**

7 |      Defendants argue that Plaintiffs seek to hold Defendant Warnke liable solely because he
8 | is the top official at the Sheriff's Office, and this is insufficient to base a claim under section
9 | 845.6.  (Mot. at 26.)  Plaintiffs respond that section 845.6 permits claims against officials for
10 | negligent supervision and failure to train as to when to summon medical care.  Plaintiffs argue
11 | they have stated a deliberate indifference claim against Defendant Warnke, so they have also
12 | stated a claim under section 845.6.   (Opp. at 22.)  Defendants argue that Defendant Warnke
13 | cannot be held liable because there are no allegations that Defendant Warnke was aware or at all
14 | involved in any medical treatment or summoning care.  (Reply at 9.)

15 |      There are no allegations in the complaint that Defendant Warnke was aware or should
16 | have been aware that Decedent was in need of medical care on April 20, 2023.  Rather, Plaintiffs
17 | seek to hold him liable because he was the Sheriff of Merced County.  Courts have held that
18 | prison officials can be held liable under "section 845.6 for negligent supervision and training as
19 | to when to summon medical care." Est. of Wilson by & through Jackson v. Cnty. of San Diego,
20 | No. 20-cv-457-BAS-DEB, 2020 WL 3893046, at *6 (S.D. Cal. July 10, 2020) (quoting Villarreal
21 | v. County of Monterey, 254 F.Supp.3d 1168, 1187 (N.D. Cal. 2017); see also Resendiz, 2015
22 | WL 3988495, at *8 ("[T]he Court concludes that Plaintiffs may state claims for negligent
23 | supervision and wrongful death pursuant to Cal. Gov't Code § 845.6.").  However, Plaintiffs
24 | have not alleged that Defendant Warnke failed to supervise or train employees as to when to
25 | summon medical care nor are there any facts alleged in the complaint that would support a policy
26 | or custom for failure to summon medical care.  Accordingly, the Court finds that Plaintiffs have
27 | failed to state a claim against Defendant Warnke for failure to summon medical care pursuant to
28 | Cal. Gov't Code § 845.6.

1        **F.      Failure to Produce Patient Records**

2        Defendants move to dismiss the fifth claim for failure to produce patient records claim

3   brought against the County of Merced and Merced County Sheriff's Office on the ground that

4   the claim fails as a matter of law.  Defendants argue that they are not medical providers within

5   the definition of the statute.  (Mot. at 26.)  Specifically, the only entities covered by the statute

6   are a pharmacy and a licensed hospital.  (Id. at 26-7.)  Defendants argue that the County and its

7   jail are neither and there are no allegations in the complaint to the contrary.   Additionally,

8   Defendants contend that they contract with Defendant CFMG to provide medical services and

9   care to inmates, and Decedent's medical records are under control of his medical provider at the

10  jail, not the County.  Defendants assert that Plaintiffs have failed to state an articulable claim

11  against the County.  (Id. at 27.)

12       Plaintiffs counter that the fact that the jail is neither a pharmacy nor a licensed hospital

13  does not preclude the County's liability for violations of section 1158 citing Brownlee v. Cnty.

14  of Los Angeles, No. LA CV21-01118 JAK (JPRX), 2022 WL 3574702 (C.D. Cal. July 14,

15  2022).  (Opp. at 22-3.)  Further, Plaintiffs rely on California Government Code section 815.4 to

16  argue that the County is liable for the acts of independent contractors.  Plaintiffs also contend

17  that the County's duty to provide medical care is nondelegable and the County cannot contract

18  away its legal duties.  (Id. at 23.)

19       Defendants reply that the complaint does not and cannot allege that the County

20  Defendants are medical providers subject to section 1158 as none of the County Defendants fall

21  into this category.   Defendants further asserts that Brownlee does not support Plaintiffs'

22  argument because in that case the attorney erroneously alleged a cause of action under California

23  Health and Safety Code § 123110, which the court denied because this section of the Code does

24  not allow records to be requested by an attorney.   The court then went on to *sua sponte* apply

25  Evidence Code section 1158.  Defendants argue that critically, the entity in Brownlee from

26  which the records were requested was the "LAC-USC Medical Center" which was a hospital.

27  (Reply at 9.)

28       Plaintiffs rely on Brownlee to argue that the County Defendants are liable under section

1158 for the failure to provide medical records.  In <u>Brownlee</u>, the plaintiff filed a complaint against the County, the director of the County Department of Health Services, two custodians of medical records, the CEO of the medical center, physicians, and medical staff alleging that he had been denied adequate medical care while he was a detainee.  2022 WL 3574702, *1-2.  The defendants argued that they were not health care providers under California Health & Safety Code section 123110 which provides that individuals are entitled to inspect their medical records and that the County had statutory immunity.  <u>Id.</u> at *13.  In addressing the claim under section 123110, the court found that the custodians of records were not health care providers under the statute and plaintiff had named officials in their individual capacity rather than as an official at the health center that they operate so there was no basis to conclude that they were health care providers under the statute.  <u>Id.</u>  The court then concluded,

> although the requests for medical records submitted by Plaintiff's attorneys are insufficient to state a claim under Cal. Health & Safety Code § 123110, the allegations are sufficient to state a claim under Cal. Evid. Code § 1158(d).  As to section 123110, Defendants correctly argue that California courts have interpreted the statute to exclude requests from a patient's attorney.
>
> In contrast, relying on Cal. Evid. Code § 1158(d), Plaintiff alleges that his counsel requested Plaintiff's records from LAC+USC Medical Center on November 6, 2020, but did not receive them until February 22, 2021, approximately two weeks after Plaintiff filed the Complaint. Thus, Plaintiff has alleged that the County failed to make the records available "within five days after the presentation of the written authorization." Cal. Evid. Code § 1158(d). The County may be subject to liability "for all reasonable expenses, including attorney's fees, incurred in any proceeding to enforce this section." <u>Id.</u>

<u>Brownlee</u>, 2022 WL 3574702, *14 (internal citations omitted).

However, contrary to Plaintiffs' argument, the <u>Brownlee</u> court did not find that the County was liable because they cannot delegate their duty to provide medical care or contract away its duties.  Rather, the plaintiff had alleged that "LAC+USC Medical Center, the Correctional Facility, the Central Jail and the Los Angeles County Department of Health Services Integrated Correctional Health Services ("ICHS") are public agencies that "operate under the auspices of Defendant County." <u>Brownlee</u>, 2022 WL 3574702, at *1.  The plaintiff's attorney had requested medical records from the LAC+USC Medical Center and they were not received until two weeks after plaintiff filed his complaint.  <u>Id.</u> at *14.  The County was not

1   liable because they provided medical services in the jail, rather they were liable because they the

2   medical center from which the records were requested operates under the auspices of the County.

3   Id.

4        Plaintiffs FAC alleges that on May 31, 2023, Plaintiffs presented a written authorization

5   to Defendants County of Merced, Merced County Sheriff's Office, and CFMG (hereafter "entity

6   Defendants") requesting prompt production of Decedent's medical records pursuant to California

7   Evidence Code section 1158 but no records were produced within five days as required by the

8   statute.  (FAC at ¶¶ 134-35.)  On June 22, 2023, Defendant CFMG produced some of Decedent's

9   records, but other records were withheld, such as the coroner's report and mortality and

10  morbidity report.  (Id. at ¶ 136.)  On September 5, 2023, Defendant County of Merced produced

11  the coroner's report but withheld other records.  (Id. at ¶ 137.)  Entity Defendants failed to

12  produce Decedent's medical records in violation of section 1158.  (Id. at ¶ 180.)

13       Section 1158 provides that "[b]efore the filing of any action[,] . . . if an attorney at law or

14  his or her representative presents a [signed] written authorization . . . to a medical provider, the

15  medical provider shall promptly make all of the patient's records under the medical provider's

16  custody or control available for inspection and copying by the attorney at law or his or her

17  representative."  Cal. Evid. Code § 1158 (b).  The statute defines a medical provider as a

18  "physician and surgeon, dentist, registered nurse, dispensing optician, registered physical

19  therapist, podiatrist, licensed psychologist, osteopathic physician and surgeon, chiropractor,

20  clinical laboratory bioanalyst, clinical laboratory technologist, or pharmacist or pharmacy, duly

21  licensed as such under the laws of the state, or a licensed hospital."  Cal. Evid. Code § 1158(a).

22  The language of section 1158 is clear and unambiguous.

23       Plaintiffs' complaint fails to allege that any County Defendant is a "physician and

24  surgeon, dentist, registered nurse, dispensing optician, registered physical therapist, podiatrist,

25  licensed psychologist, osteopathic physician and surgeon, chiropractor, clinical laboratory

26  bioanalyst, clinical laboratory technologist, or pharmacist or a pharmacy, duly licensed under the

27  laws of the state, or a state hospital" such that they would be a medical provider under the

28  statute.  Rather, Plaintiffs hinge their section 1158 claim on the allegations that the County

Defendants contracted with Defendant CFMG to provide medical care.  This is insufficient to state a claim against the County Defendants under section 1158.  <u>See</u> <u>Oddei v. Optum, Inc.</u>, 2:21-cv-03974-SB-MRW, 2021 WL 4734642, *2-3 (finding affiliate of health care provider not within the reach of section 1158.)  The Court recommends that County Defendants' motion to dismiss the failure to produce patient records claim be granted.

### G.     Bane Act

Defendants move to dismiss the sixth claim against all County Defendants for violation of California Government Code section 845.6 (Tom Bane Civil Rights Act (hereafter "the Bane Act")).  Defendants argue that Plaintiffs Sanchez, L.V., C.V., M.V., Ramirez, and Valentine do not have standing to bring a claim under the Bane Act.  Defendants argue that there is no derivative liability under the Bane Act for persons who were not present and did not witness violence or threats.  Since the individual plaintiffs have not alleged that they were present and witnessed the incident against Decedent, Defendants contend they do not have standing to assert a claim.  (Mot. at 27.)

Additionally, Defendants argue that Plaintiffs cannot show any specific intent to violate Decedent's rights in order to state a claim.  Specifically, Defendants contend that there are no allegations that any individual Defendant knew or had reason to know that Decedent was going to consume an illegal substance within the jail.  Further, Defendants assert that the conduct alleged does not rise to the recklessness or deliberate indifference required under the Bane Act.  (<u>Id.</u> at 28.)

Defendants also assert that courts do not apply supervisory liability to claims under the Bane Act.  Since the claims against Defendant Warnke are based on his position as the Sheriff of the County, Defendants argue that supervisory liability should not be extended for a Bane Act claim.  (<u>Id.</u> at 29.)

Plaintiffs respond that the arguments for dismissal based on lack of standing are untimely because they were not raised in response to the original complaint and Defendants raised different arguments in the prior motion to dismiss.  (Opp. at 23-4.)  Further, Plaintiffs assert that there is no requirement that they be present to bring a claim under the Bane Act.  Plaintiffs argue

that the elements of a Bane Act claim are essentially identical to the deliberate indifferent claim with the additional requirement that the official had the specific intent to violate a constitutional right and this specific intent can be shown by recklessness or deliberate indifference.  (Id. at 24.) Plaintiffs contend that since they stated a deliberate indifference claim, they have stated a claim under the Bane Act predicated on familial association.  (Id. at 25.)

Plaintiffs respond that the cases Defendants rely on do not support the argument that liability under the Bane Act cannot be based on supervisory liability.  (Reply at 25-26.)  Further, Plaintiffs contend that there have been subsequent developments in the law and the Ninth Circuit has applied supervisory liability to Bane Act claims.  (Reply at 26.)  Plaintiffs contend that they have adequately alleged a deliberate indifference claim and therefore their Bane Act claim is sufficient.  (Id. at 27.)

Defendants reply that the amended complaint supersedes the original complaint, and while Rule 12(g)(2) of the Federal Rules of Civil Procedure does prohibit successive motions to dismiss that raise new arguments, the Ninth Circuit has developed a flexible approach to Rule 12(g) that focuses on judicial efficiency.  (Reply at 9-10.)  Further, Defendants argue that this flexible approach has been adopted in the Eastern District.  (Id. at 10.)

Defendants contend that Plaintiffs' reliance on Rodriguez, in arguing standing is misplaced as the case does not discuss the Bane Act or whether Plaintiffs are permitted to proceed with a claim.  The issue in Rodriguez was whether a defendant who had not seen the incident could be held liable under the Bane Act which is separate from whether a plaintiff has standing.  (Id. at 10.)  Defendants also contend that Plaintiffs have failed to state a claim against Defendant Warnke or to show how he was deliberately indifferent to Plaintiff's rights. Defendants argue that Plaintiffs have failed to raise the requisite elements for Bane Act violations against any Defendant.  (Id. at 11.)

      1.    Legal standard

The Bane Act provides a civil penalty for any "person or persons, whether or not acting under color of law, [who] interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or

individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal Civ. Code § 52.1(b).  The Bane Act also provides a cause of action for anyone whose rights are harmed in this way.  Cal. Civ. Code § 52.1(c).

"There are two distinct elements for a section 52.1 cause of action. A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." Rodriguez, 891 F.3d at 800.  "The Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." Reese v. Cnty. of Sacramento, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing Cornell v. City and County of San Francisco, 17 Cal.App.5th 766, 799-800 (2019)).

### 2.   Analysis

Initially, the Court addresses the parties' arguments regarding standing and whether Defendants have waived the issue by failing to bring it in the first motion to dismiss.  First, the Court considers Plaintiffs' argument that the motion to dismiss for lack of standing is untimely because it could have been brought in response to the original complaint.

### a.   Whether Rule 12(g) precludes consideration of standing

The Federal Rules of Civil Procedure provide that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2).  In In re Apple iPhone Antitrust Litig. ("In re Apple"), 846 F.3d 313, 317 (9th Cir. 2017), aff'd sub nom. Apple Inc. v. Pepper, 587 U.S. 273 (2019), the Ninth Circuit specifically considered the argument that lack of standing had been waived by failing to be raised in a prior motion to dismiss.

> The consequence of omitting a defense from an earlier motion under Rule 12 depends on type of defense omitted.  A defendant who omits a defense under Rules 12(b)(2)–(5)—lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process—entirely waives that defense. Fed. R. Civ. P. 12(h)(1)(A).  A defendant who omits a defense under Rule 12(b)(6)— failure to state a claim upon which relief can be granted—does not waive that defense.  Rule 12(g)(2) provides that a defendant who fails to assert a failure-to-

> state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6), but the defense may be asserted in other ways.  Fed. R. Civ. P. 12(h)(2).

In re Apple, 846 F.3d at 317.  "If a failure-to-state-a-claim defense under Rule 12(b)(6) was not asserted in the first motion to dismiss under Rule 12, Rule 12(h)(2) tells us that it can be raised, but only in a pleading under Rule 7, in a post-answer motion under Rule 12(c), or at trial."  Id. The Ninth Circuit held,

> We read Rule 12(g)(2) in light of the general policy of the Federal Rules of Civil Procedure, expressed in Rule 1.  That rule directs that the Federal Rules "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.  Denying late-filed Rule 12(b)(6) motions and relegating defendants to the three procedural avenues specified in Rule 12(h)(2) can produce unnecessary and costly delays, contrary to the direction of Rule 1.

Id. at 318.

While under a strict application of Rule 12(g)(2) "a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6)[,]" the Court is not precluded from considering the arguments.  United States v. Somnia, Inc., 339 F.Supp.3d 947, 952 (E.D. Cal. 2018).  "[T]he Ninth Circuit has acknowledged and approved of the 'practical wisdom' employed by multiple district courts that have ruled on the merits of late-filed Rule 12(b)(6) motions despite the language of Rule 12(g)(2) seemingly precluding consideration of those arguments."  Somnia, 339 F.Supp.3d at 952 (collecting cases); see also Wagnon v. Rocklin Unified Sch. Dist., No. 2:17-CV-01666-TLN-KJN, 2021 WL 1214571, at *5 (E.D. Cal. Mar. 31, 2021) (declining to find that defense was waived by failing to raise it in first 12(b)(6) motion).

Here, the Court finds nothing to suggest that Defendants have raised the issue of lack of standing in an attempt to delay or impede the proceedings.  While the motion to dismiss the original complaint was pending, the parties stipulated to the filing of an amended complaint. The filing of the amended complaint supersedes the original complaint, and the original complaint is now considered non-existent.  Lacey v. Maricopa Cnty., 693 F.3d 896, 927 (9th Cir. 2012); Forsyth v. Humana, Inc., 114 F.3d 1467, 1474 (9th Cir. 1997).  Given the circumstances presented here, the Court finds that Defendants' arguments are presented in good faith, and the

1 Court will join other courts in this district that have fully considered late filed motions to

2 dismiss.  See Somnia, 399 F.Supp.3d at 953 (collecting cases).

3         **b.**    **Individual Plaintiffs' standing to assert a claim under the Bane Act**

4      Initially, the Court finds L.F. by & through Brown v. City of Stockton, No. 2:17-CV-

5 01648-KJM-DB, 2020 WL 4043017, at *23 (E.D. Cal. July 17, 2020), is not persuasive.

6 Although the court noted that the minor plaintiffs brought the claim, the issue of standing was

7 not raised and was not considered.

8      The Bane Act provides that any individual may bring an action "in their own name and

9 on their own behalf" against anyone who "interferes by threat, intimidation, or coercion, or

10 attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any

11 individual or individuals of rights secured by the Constitution or laws of the United States, or of

12 the rights secured by the Constitution or laws of this state."  Cal. Civ. Code § 52(b)(c).

13 California courts have held that the Bane Act is not a wrongful death statute and "clearly

14 provides a *personal* cause of action for the victim of a hate crime" and is limited to those who

15 have been the subject of violence or threats or those who were present and witnessed the

16 actionable conduct.  Bay Area Rapid Transit Dist. v. Superior Ct., 38 Cal.App.4th 141, 144

17 (1995) (emphasis in original); City of Simi Valley v. Superior Ct., 111 Cal.App.4th 1077, 1085

18 (2003).  The rational interpretation of the Bane Act is that it is limited to plaintiffs who

19 themselves have been the subject of violence and threats.  Bay Area Rapid Transit Dist., 38

20 Cal.App.4th at 144.  "The essence of a Bane Act claim is that the defendant, by the specified

21 improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from

22 doing something he or she had the right to do under the law or to force the plaintiff to do

23 something that he or she was not required to do under the law."  Cornell, 17 Cal.App.5th at 792;

24 Austin B. v. Escondido Union Sch. Dist., 149 Cal.App.4th 860, 883 (2007).

25      In situations similar to that here, federal courts have found that family members lack

26 standing to bring claims under the Bane Act on their own behalf.  See Medrano v. Kern Cnty.

27 Sheriff's Officer, 921 F.Supp.2d 1009, 1016 (E.D. Cal. 2013) (brothers of deceased had no

28 standing to bring claims under Bane Act); Cooke v. Liles, No. C 12-1844 SBA, 2013 WL

1196990, at *8 (N.D. Cal. Mar. 25, 2013) (survival standing is a prerequisite for a claim under the Bane Act); Est. of Cruz-Sanchez by & through Rivera v. United States, No. 17-CV-569-AJB-NLS, 2019 WL 4508571, at *2 (S.D. Cal. Sept. 17, 2019) (mother of deceased does not have standing to bring a Bane Act claim on her own behalf); Lopez v. Cnty. of Los Angeles, No. CV 15-01745 MMM MANX, 2015 WL 3913263, at *9 (C.D. Cal. June 25, 2015) (parents lack standing to bring Bane Act claims on their own behalf); compare Banks v. Mortimer, 620 F.Supp.3d 902, 934 (N.D. Cal. 2022) (parents, as decedent's successor in interest, have standing to assert a Bane Act claim on decedent's behalf); Est. of Chivrell v. City of Arcata ("Est. of Chivrell II"), 694 F.Supp.3d 1218, 1229 (N.D. Cal. 2023) (estate of decedent has standing to assert a claim under the Bane Act on decedent's behalf); J.G. v. City of Colton, No. 5:18-CV-02386-RGK-SP, 2019 WL 4233582, at *3 (C.D. Cal. July 1, 2019) (success-in-interest has standing to assert a claim on the decedent's behalf).

In arguing that the FAC asserts a claim based on interference with familial association, Plaintiffs rely on Est. of Sanchez, 2023 WL 7612399, at *31, which addressed whether the plaintiff's claim based on right to familial association would fail because she was not present at the time of the incident.  The court found the question of whether the defendants had a specific intent to violate her right to familial association was a disputed fact.  Id. at *31.  However, federal courts find that "the Bane Act provides no derivative liability for persons who were not present and did not witness the violence or threats[.]"  Est. of Chivrell v. City of Arcata (Estate of Chivrell I"), 623 F.Supp.3d 1032, 1045 (N.D. Cal. 2022) (quoting Dela Torre v. City of Salinas, No. 09-CV-00626 RMW, 2010 WL 3743762, at *6 (N.D. Cal. Sept. 17, 2010)); see also Kreitenberg v. Los Alamitos Unified Sch. Dist., No. G043933, 2012 WL 1374694, at *9 (2012) (unpublished) (finding parents did not have standing under the Bane Act as they had "not demonstrated how defendants' alleged conduct interfered with their own rights."); see also Bay Area Rapid Transit Dist., 38 Cal.App.4th at 144 (Bane Act is limited to plaintiffs who themselves have been the subject of violence and threats).  The Court finds that the individual plaintiffs do not have standing to assert a claim under the Bane Act and recommends the claim brought by Plaintiffs Sanchez, L.V., C.V., M.V., Ramirez, and Valentine be dismissed.

1       **c.**       **Whether the FAC alleges a Bane Act claim**

2       Defendants argue that the FAC does not allege sufficient facts to state a claim under the

3 Bane Act as no facts have been alleged to show a specific intent to violate Decedent's rights.

4       In <u>Shoyoye v. Cnty. of Los Angeles</u>, 203 Cal.App.4th 947, 958 (2012), the court

5 considered as a matter of first impression "if the circumstances of [an] overdetention are

6 coextensive with those that would support a tort claim for negligent false imprisonment, and do

7 not involve any additional showing of ill will or blameworthy conduct, is section 52.1

8 applicable?"  In doing so, the court considered the statutory framework which indicated that "the

9 Legislature meant the statute to address interference with constitutional rights involving more

10 egregious conduct than mere negligence."  <u>Shoyoye</u>, 203 Cal.App.4th at 958.  The court held that

11 a review of the legislative history supported the conclusion that "the statute was intended to

12 address only egregious interferences with constitutional rights, not just any tort. The act of

13 interference with a constitutional right must itself be deliberate or spiteful."  <u>Id.</u> at 959.  The

14 court held that "where coercion is inherent in the constitutional violation alleged, i.e., an

15 overdetention in County jail, the statutory requirement of "threats, intimidation, or coercion" is

16 not met.  The statute requires a showing of coercion independent from the coercion inherent in

17 the wrongful detention itself."  <u>Id.</u>

18       In <u>Cornell</u>, the appellate court noted that "in federal court, where Section 52.1 claims are

19 frequently brought along with Section 1983 claims under federal pendent jurisdiction, the Bane

20 Act's requirement that interference with rights must be accomplished by threats, intimidation or

21 coercion has been the source of much debate and confusion."  17 Cal.App.5th 766, 801 (2017),

22 as modified (Nov. 17, 2017) (internal punctuation and quotations omitted).  The court sought to

23 provide clarity, holding that "where, as here, an unlawful arrest is properly pleaded and proved,

24 the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the

25 arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable

26 seizure, not by whether the evidence shows something beyond the coercion 'inherent' in the

27 wrongful detention."  <u>Id.</u> at 801-02.

28       The Ninth Circuit noted that <u>Cornell</u> limited the holding in <u>Shoyoye</u> that coercion was

1   required apart from the coercion inherent in a wrongful detention to cases involving mere
2   negligence.  Reese, 888 F.3d at 1043.  Cornell held that nothing in the text of section 51.2
3   requires the offending "threat, intimidation or coercion" to be independent of the alleged
4   constitutional violation.  However, Cornell also made clear that the Bane Act imposes an
5   additional requirement beyond a constitutional violation.  Id.

6        Further, courts find that deliberate indifference to serious medical needs is sufficient to
7   state a claim under the Bane Act.  Cravotta v. Cnty. of Sacramento, No. 2:22-CV-00167-DJC-
8   AC, 2024 WL 645705, at *13 (E.D. Cal. Feb. 15, 2024) (collecting cases).

9          i.       Defendants Pena, Gutierrez, Guzman, Rentfrow and Sziraki

10        Here, the Court has found that the FAC states a claim against Defendant Guzman for
11   deliberate indifference to Decedent's serious medical needs.  Accordingly, Plaintiffs have stated
12   a cognizable claim against Defendant Guzman for violation of the Bane Act.

13        However, the FAC fails to state a cognizable deliberate indifference claim against
14   Defendants Pena, Gutierrez, Rentfrow and Sziraki and the Bane Act claim and recommends that
15   Defendants' motion to dismiss the Bane Act claim against these defendants be granted.

16          ii.      Defendant Warnke

17        As discussed above, Plaintiffs seek to hold Defendant Warnke liable under a theory of
18   supervisory liability.  Defendants rely on Ochoa v. City of San Jose, No. 21-CV-02456-BLF,
19   2021 WL 7627630, at *9 (N.D. Cal. Nov. 17, 2021), and Sanchez v. City of Fresno, 914
20   F.Supp.2d 1079, 1119 (E.D. Cal. 2012), to argue that courts have not applied supervisory
21   liability under the Bane Act.  (Mot. at 33.)  In Ochoa, the court found no basis for supervisory
22   liability under the section 1983 and agreed with the defendants that courts have not applied
23   supervisory liability to a Bane Act claim.  2021 WL 7627630, at *15.  Similarly, in Sanchez, the
24   court, in a footnote, stated that "no case has actually applied supervisor liability to a Bane Act
25   claim and this federal Court is loathe to expand the reach of Bane Act liability." 914 F.2d at 1118
26   n.19.

27        However, courts in this circuit are divided as to whether a supervisor may be held liable
28   under the Bane Act.  Est. of Chivrell II, 694 F.Supp.3d at 1231 (comparing San Diego Branch of

1 | Nat'l Assoc. for Advancement of Colored People v. Cnty. of San Diego, No. 16-CV-2575-JLS,
2 | 2018 WL 1382807, at *30 (S.D. Cal. March 19, 2018) ("Various courts have held that supervisor
3 | liability does not apply to Bane Act claims ... The Court agrees, and Plaintiffs have not cited to
4 | any contradictory authority or reason why the Court should depart from this precedent.") with
5 | Shirazi v. Oweis, No. 5:21-cv-00136-EJD, 2022 WL 445763, at *7 (N.D. Cal. February 14,
6 | 2022) ("A Bane Act claim can be asserted against a supervisor in the same way as for a § 1983
7 | claim").)  However, the significant weight of authority found by the court holds that there is no
8 | supervisory liability for Bane Act claims.  Est. of Chivrell II, 694 F.Supp.3d at 1231 (collecting
9 | cases).

10 | Plaintiffs argue that there has been significant development of the law and since the Ninth
11 | Circuit decided Rodriguez, courts have found claims under the Bane Act can be based on
12 | supervisory liability.  In Rodriguez, the Court did not specifically address whether a supervisor
13 | could be held liable under the Bane Act.  The supervisory defendants had planned a series of cell
14 | extractions and under the plan, those inmates who refused to "cuff up" would be forcibly
15 | extracted from their cells.  Rodriguez, 891 F.3d at 784.  Several inmates who had been extracted
16 | from their cells brought an action alleging violation of their rights under the Eighth and
17 | Fourteenth Amendments.  Id.  On appeal after trial, the Court held that the appellees had
18 | provided sufficient evidence that they had been subjected to excessive force to support a finding
19 | for violation of their rights under the Bane Act.  Id. at 802.

20 | However, in Greer v. Cnty. of San Diego, No. 19-CV-378-JO-DEB, 2023 WL 2316203,
21 | at *15 (S.D. Cal. Mar. 1, 2023), the court did specifically consider the issue, noting the
22 | defendants had not identified any binding case law to support the argument that a claim under the
23 | Bane Act could not be premised on supervisory liability.  The Court found that the California
24 | Supreme Court had implicitly held that a Bane Act claim could be brought against the County,
25 | it's sheriff's department, and the sheriff in Venegas v. County of Los Angeles, 87 P.3d 1, 14
26 | (Cal. 2004).  Greer, 2023 WL 2316203, at *15.

27 | Similarly, in Johnson v. Baca, No. CV 13–04496 MMM (AJWX), 2014 WL 12588641,
28 | at *15 (C.D. Cal. Mar. 3, 2014), the court considered "whether an individual can be liable on a

1 supervisory liability theory for a Ralph Act violation in the same manner than a supervisor can

2 be held liable under § 1983." The Court found that while it does not appear that any California

3 court has explicitly addressed the issue, several courts, including the California Supreme Court

4 have impliedly held that a Ralph or Bane Act claim can be asserted against a sheriff based on his

5 conduct as a supervisor. Johnson, 2014 WL 12588641, at *16 (citing Venegas, 32 Cal.4th at

6 831; Arellano v. County of Los Angeles, No. B213224, 2010 WL 2905954, *4–5 (July 27,

7 2010); J.T., 2024 WL 3012791, at *17).

8      In Black Lives Matter-Stockton Chapter, the court relied on Johnson's finding that "a

9 Ralph or Bane Act claim can be asserted against a sheriff based on his or her conduct as a

10 supervisor rather than on personal involvement in violence or a threat of violence against a

11 plaintiff" in the same way as for a § 1983 claim. Black Lives Matter-Stockton Chapter v. San

12 Joaquin Cnty. Sheriff's Off., 398 F.Supp.3d 660, 679 (E.D. Cal. 2019). The court held that the

13 claim against the Sheriff survives, but only for prospective injunctive relief. Id., 2023 WL

14 4534205, at *681; see also Galley v. Cnty. of Sacramento, No. 2:23-CV-00325 WBS AC, 2023

15 WL 4534205, *3 (E.D. Cal. July 13, 2023), (Bane Act claim could be brought against the

16 municipality); Shirazi, 2022 WL 445763, at *7 (a Bane Act claim can be asserted against a

17 supervisor; Neuroth v. Mendocino Cnty., No. 15-CV-03226-NJV, 2016 WL 379806, at *7 (N.D.

18 Cal. Jan. 29, 2016) (same).

19      Defendants have cited no persuasive authority to support their argument that a Bane Act

20 claim cannot be premised on supervisory liability. Accordingly, the Court recommends that

21 Defendants' motion to dismiss on this ground be denied.

22      Defendants also argue that the FAC does not allege any facts that rise to the level of

23 having an intent to violate Decedent's rights and fails to allege more than conclusory allegations

24 to state a claim under the Bane Act. Plaintiffs have alleged sufficient prior incidents to state a

25 claim for a custom or practice of the County of Merced of inadequate observation and

26 monitoring. Further, Plaintiffs have alleged that despite being visible on the video monitor in the

27 dorm, Defendant Guzman failed to adequately monitor Decedent and was deliberately indifferent

28 to his need for medical care. The Court finds that the FAC states a Bane Act claim against

1  Defendant Warnke based on the custom or policy of inadequate observation and monitoring.

2  The Court recommends that Defendants' motion to dismiss the Bane Act claims against

3  Defendant Warnke be denied.

4              iii.     Defendants County of Merced and Merced County Sheriff's Office

5          The parties do not specifically address municipal liability under the Bane Act, but courts

6  find that it is clear that a municipality can be vicariously liable under the Bane Act.  Est. of

7  Chivrell II, 694 F.Supp.3d at 1232; San Diego Branch of Nat'l Ass'n for Advancement of

8  Colored People, 2018 WL 1382807, at *7; see also Cameron v. Craig, 713 F.3d 1012, 1023 (9th

9  Cir. 2013 (Cal. Gov't Code § 815.2 imposes liability on counties under the doctrine of

10  *respondeat superior* for the acts of county employees).

11          Accordingly, the Court recommends Defendants motion to dismiss the Bane Act claim

12  against Defendants County of Merced and Merced County Sheriff's Office be denied.

13          **H.     Intentional Infliction of Emotional Distress**

14          Defendants contend that they were not deliberately indifferent because they provided

15  timely medical care to Decedent.  Defendants argue that none of the conduct alleged in the

16  complaint rises to the level of intentional infliction of emotional distress.   (Mot. 30-31.)

17  Plaintiffs respond that since they state a deliberate indifference claim, they also state a claim for

18  intentional infliction of emotional distress.  (Opp. at 27-28.)  Defendants reply that none of the

19  allegations in the FAC rise to the level of outrageous conduct.  (Reply at 11.)

20          1.     Legal Standard

21          Under California law, the elements for a claim of intentional infliction of emotional

22  distress are "(1) extreme and outrageous conduct by the defendant with the intention of causing,

23  or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering

24  severe or extreme emotional distress; and (3) actual and proximate causation of the emotional

25  distress by the defendant's outrageous conduct."  Hughes v. Pair, 46 Cal.4th 1035, 1050 (2009)

26  (quoting Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 1001 (1993)).  For conduct to be

27  "outrageous" it must be so "extreme as to exceed all bounds of that usually tolerated in a

28  civilized community."  Hughes, 46 Cal.4th at 1051 (quoting Potter, 6 Cal.4th at 1001).

1    For a claim of intentional infliction of emotional distress, the defendant's conduct must

2    be "directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is

3    aware." Christensen v. Superior Ct., 54 Cal.3d 868, 903 (1991).  "The only exception to this rule

4    is that recognized when the defendant is aware, but acts with reckless disregard, of the plaintiff

5    and the probability that his or her conduct will cause severe emotional distress to that plaintiff."

6    Christensen, 54 Cal.3d at 905.

7    2.    Analysis

8    Plaintiffs allege that Defendants Pena, Gutierrez, Guzman, Rentfrow, County of Merced,

9    Merced County Sheriff's Office, and Warnke engaged in outrageous conduct with intent or

10   reckless disregard of the probability that Decedent would suffer emotional distress and he did

11   suffer emotional distress.  (FAC ¶¶ 197, 198.)   The actions and inactions of all defendants

12   constituted oppression, fraud, and/or malice resulting in great harm.  (Id. at ¶ 200.)

13   Plaintiffs do not allege any facts pleading the elements of an intentional infliction of

14   emotional distress claim. First, they allege in conclusory fashion that defendants engaged in

15   outrageous conduct with intent or reckless disregard of the probability that Decedent would

16   suffer emotional distress, but this is not sufficient under Iqbal and Twombly.  Lopez, 2015 WL

17   3913263, at *11.

18   Plaintiffs have failed to allege more than the elements of an intentional infliction of

19   emotional distress claim.  There are no factual allegations to plausibly suggest that Decedent

20   suffered severe emotional distress. "Severe emotional distress means emotional distress of such

21   substantial quality or enduring quality that no reasonable [person] in civilized society should be

22   expected to endure it."  Hughes, 46 Cal.4th at 1051 (holding that "discomfort, worry, anxiety,

23   upset stomach, concern, and agitation" did not rise to this level).  Plaintiffs have not alleged any

24   facts that satisfy this demanding standard; they simply assert, again in conclusory fashion, that

25   Decedent did suffer severe emotional distress.  This is insufficient to plead severe emotional

26   distress.  Lopez, 2015 WL 3913263, at *11; Cabral v. Cnty. of Glenn, 624 F.Supp.2d 1184, 1195

27   (E.D. Cal. 2009) (conclusory allegations as to the severe emotional distress suffered are

28   insufficient to state a claim).

77

1    The Court finds that Plaintiffs have failed to state a claim for intentional infliction of

2   emotional distress, and recommends that Defendants' motion to dismiss the intentional infliction

3   of emotional distress claim be granted.

4       **I.      Negligence**

5       Defendants assert that the eighth and ninth claims for negligence and wrongful death fail

6   to state a claim.  Defendants argue that the FAC does not contain any allegations that Defendants

7   Pena, Gutierrez, Guzman, Rentfrow, or Sziraki acted negligently.   Defendants contend that

8   Plaintiffs rely on the same three claims of deliberate indifference to Decedent's medical care or

9   treatment; failing to summon medical care, and failing to comply with the California Code of

10  Regulations title 15 § 1027 et seq.  Defendants assert that these claims fail as well as the claims

11  against County and Sheriff's Office for the same reasons the Monell allegations fail to state a

12  claim. (Mot. at 31.)

13      Defendants also argue that Defendant Warnke must be dismissed because there are no

14  allegations that he was personally responsible for Decedent's detention or decisions made within

15  the jail.  (Id. at 31-32.)  Further, Defendants assert that Plaintiffs cannot maintain claims against

16  Defendant Warnke for discretionary decisions he made as head of the Merced County Sheriff's

17  Department pursuant to California Government Code section 820.8 and he is immune from

18  liability for the actions of his subordinates.   Defendants state that Plaintiffs fail to allege

19  sufficient facts to support their negligence or wrongful death claim.  (Id. at 32.)

20      Plaintiffs respond that Defendants only address the wrongful death claim to the extent

21  that it is based on the negligence theory and respond in the same manner, but do not concede that

22  the wrongful death claim is based solely on the negligence theory.  (Opp. at 28.)  Plaintiffs

23  contend that they have alleged that Defendants Pena, Gutierrez, Guzman, Rentfrow, and Sziraki

24  acted negligently.  Given the low threshold for negligence, Plaintiffs assert a reasonable jury

25  could find that Defendants Pena, Gutierrez, Guzman, Rentfrow, and Sziraki should have foreseen

26  some risk to Decedent.  Similarly, Plaintiffs argue that the Monell allegations do not fail, and the

27  negligence standard requires a much lower level of culpability than deliberate indifference. (Id.

28  at 29.)

1   Plaintiffs also state that they have alleged that Defendant Warnke was personally

2   responsible for Decedent's detention and decisions within the jail because he was the Sheriff and

3   is required by statute to take charge of and keep the county jail and prisoners in it and is

4   answerable for the prisoner's safekeeping.  (Id. at 29.)  Plaintiffs assert that since they have

5   stated a deliberate indifference claim against Defendant Warnke they have stated a claim for

6   negligence.  Plaintiffs further argue that even if they did not establish deliberate indifference

7   given the low standard for negligence a reasonable jury could find Defendant Warnke should

8   have foreseen some risk based on Decedent's incarceration.  Finally, Plaintiffs argue that

9   discretionary immunity does not apply to all discretionary decision.  Plaintiffs contend that

10  Defendants have not explained or analyzed Defendant Warnke's entitlement to immunity.

11  Plaintiffs contend that Defendants have the burden to demonstrate that discretionary immunity

12  under section 820.2 applies and they have not done so here.  (Id. at 30.)  Further, Plaintiffs assert

13  that they are not attempting to hold Defendant Warnke liable for the acts of his subordinates, but

14  for his own conduct in supervising his subordinates.  (Id. at 31.)

15       1.   Legal standard

16  Under California law, the elements for a claim of negligence are that "(1) the defendant

17  owed the plaintiff a legal duty, (2) the defendant breached the duty, and (3) the breach

18  proximately or legally caused (4) the plaintiff's damages or injuries."  Thomas v. Stenberg, 206

19  Cal.App.4th 654, 662 (2012).  "In California, prison officials owe detainees a duty to protect

20  them from foreseeable harm."  Cotta v. Cnty. of Kings, 686 F.App'x 467, 469 (9th Cir. 2017);

21  Giraldo v. Dep't of Corr. & Rehab., 168 Cal.App.4th 231 (2008).

22       2.   Analysis

23  The FAC alleges that Defendants Warnke, Pena, Gutierrez, Guzman, Rentfrow, Sziraki,

24  Caughell, and Reyes owned Decedent a duty of care and breached that duty by exhibiting

25  deliberate indifference to his need for medical care or treatment, failed to timely summon

26  medical care in violation of California Government Code section 845.6, and failing to comply

27  with the California Code of Regulations title 15 § 1027 et seq.  (FAC at ¶ 204.)  Defendants

28  County of Merced and Merced County Sheriff's Office owed Decedent a duty of care and

breached that duty by maintaining policies or customs of action and inaction which resulted in harm to Decedent in violation of California Government Code section 845.6 and the California Code of Regulations title 15 § 1027 et seq.  (Id. at ¶ 205.)  Defendants County of Merced and Merced County Sheriff's Office are vicariously liable for the injuries proximately caused by the acts and omissions of the agents and employees working within the scope of their employment.  (Id. at ¶ 206.)  Defendants' actions and inactions constituted oppression, fraud, and/or malice resulting in great harm and Decedent's injuries were a direct and proximate result of all defendants' actions and inactions.  (Id. at ¶¶ 207, 208.)

### a.   Defendants Pena, Gutierrez, Rentfrow, and Sziraki

For the reasons discussed above, Plaintiffs have failed to allege facts to show that Defendants Pena, Gutierrez, Rentfrow and Sziraki breached any duty owed to Decedent.  While Plaintiffs allege that security checks were not adequate, there are no plausible allegations that Defendants Pena or Gutierrez failed to conduct direct view security checks.  Further, at the time that Defendant Pena conducted the security check, there are no allegations to demonstrate that Decedent was in need of medical care.  Rather, Decedent ingested the drugs causing his overdose almost an hour later.  Further, upon being discovered unresponsive, Defendant Gutierrez administered medical care, and Defendants Rentfrow and Sziraki were present and obtained additional Narcan to be administered if necessary.  While Plaintiffs allege that Defendants Rentfrow and Sziraki should have ordered the medical providers to take over lifesaving efforts from Defendant Gutierrez, there are no factual allegations in the complaint that Defendant Gutierrez was negligent in providing care or that having the medical providers administer the Narcan would have produced a different outcome.  The Court recommends that Defendants' motion to dismiss the negligence claims against Defendants Pena, Gutierrez, Rentfrow and Sziraki be granted.

### b.   Defendant Guzman

As with all the defendants, Defendants argue that there are no facts to allege that Defendant Guzman acted negligently.  However, the Court has found that the FAC contains factual allegations to support the inference that an objective officer in Defendant Guzman's

1  position would have appreciated the high degree of risk that Decedent was using drugs, that a

2  substantial risk of serious harm existed, and taken reasonable measures to abate the risk.

3  Plaintiffs have alleged that Defendant Guzman owed Decedent a duty of care and breached that

4  duty by being deliberately indifferent to Decedent's serious medical need and failing to timely

5  summon medical care in violation of section 845.6.  (FAC at ¶ 204.)  Decedent was injured as

6  direct and proximate result of Defendant Guzman's failure to actions or inaction.  (Id. at ¶ 208.)

7  While the allegations are brief and conclusory, based upon the other allegations in the complaint,

8  they are sufficient to plausibly allege that Defendant Guzman was negligent by failing to

9  adequately monitor Decedent on the video feed and thereby failed to discover his need for

10  medical care and promptly summon such care.  The Court finds that the FAC states a cognizable

11  negligence claim against Defendant Guzman and recommends that Defendants' motion to

12  dismiss the negligence claim against her be denied.

13          **c.      Defendant Warnke**

14          Plaintiffs allege that Defendant Warnke is liable for breaching a duty of care including

15  exhibiting deliberate indifference to Decedent's need for medical care or treatment, failing to

16  timely summon medical care, and failing to comply with California Code of Regulations title 15

17  § 1027 et seq.  Defendant Warnke was not present during on the date of this incident and there

18  are no allegations that he was aware that Decedent had a serious medical need and failed to

19  respond or summon medical care.  Plaintiffs seek to hold Defendant Warnke liable solely based

20  on his position as Sheriff of the County of Merced.

21          While Defendants argue that Defendant Warnke cannot be held liable solely because he

22  is the Sheriff of the County of Merced, California courts hold there is a special relationship

23  between a jailor and a prisoner which imposes a duty of care on the jailer to the prisoner.

24  Giraldo, 168 Cal.App.4th at 253; see also Frausto v. Dep't of California Highway Patrol, 53

25  Cal.App.5th 973, 993 (2020) (finding a reasonable duty of care exists between a police officer

26  and an arrestee); Doe v. San Joaquin Cnty., No. 2:18-CV-00667-TLN-AC, 2019 WL 2106228, at

27  *5 (E.D. Cal. May 14, 2019) (quoting Lum v. Cty. of San Joaquin, 756 F.Supp.2d 1243, 1254

28  (E.D. Cal. 2010) ("Courts within the district have determined that 'there is a well-established

1   special relationship between jailers and prisoners.' ").  "Prison officials therefore owe a duty of

2   reasonable care to protect prisoners and detainees from foreseeable harm."  Miles v. Cnty. of

3   Alameda, No. 22-CV-06707-WHO, 2023 WL 2766663, at *21 (N.D. Cal. Apr. 3, 2023) (quoting

4   Weaver v. City & Cnty. of San Francisco, No. 14-cv-03654-LB, 2016 WL 913372, at *11 (N.D.

5   Cal. Mar. 10, 2016)).

6        While Defendant Warnke may owe detainees a duty to protect them from foreseeable

7   harm, Plaintiffs have failed to allege how Defendant Warnke breached that duty here, or how

8   that breach caused Plaintiff injury.  The FAC fails to allege facts to demonstrate a failure to

9   conduct direct-view safety checks, that any jail official failed to administer life saving measures

10  they were medically trained to administer, or that Defendant Warnke was aware of Decedent's

11  need for medical care and failed to summon medical care.  While Plaintiffs allege that Defendant

12  Guzman should have been aware that Plaintiff was using drugs, had overdosed, and needed

13  medical care by watching the video feed, there are no allegations that would have placed

14  Defendant Warnke on such notice.  Plaintiffs have also not alleged how any additional measures

15  taken by Defendant Warnke could have produced a different outcome.  See Cravotta, 2024 WL

16  645705, at *16.

17       Defendants also argue that Defendant Warnke is entitled to immunity under California

18  Government Code section 820.8.  Section 820.8 provides: "Except as otherwise provided by

19  statute, a public employee is not liable for an injury caused by the act or omission of another

20  person. Nothing in this section exonerates a public employee from liability for injury

21  proximately caused by his own negligent or wrongful act or omission."  Cal. Gov't Code §

22  820.8.  "[T]he Ninth Circuit has explained, 'supervisory personnel whose personal involvement

23  is not alleged may not be held responsible for the acts of their subordinates under California

24  law.' "  Cravotta, 2024 WL 645705, at *12 (quoting Milton v. Nelson, 527 F.2d 1158, 1159 (9th

25  Cir. 1975)).  Here, Plaintiffs seek to hold Defendant Warnke liable for exhibiting deliberate

26  indifference to Decedent's need for medical care or treatment, failing to timely summon medical

27  care, and failing to comply with California Code of Regulations title 15 § 1027 et seq., however,

28  there are no factual allegations in the complaint to allege that Defendant Warnke was

deliberately indifferent to Decedent's serious medical need, knew of Decedent's need for medical care and failed to summon such care, or was aware of and participated in violations of section 1027, et seq.   Accordingly, the Court finds that Defendant Warnke is entitled to immunity under section 820.8 and recommends that Defendants' motion to dismiss the negligence claim against him be granted.

### d.   County of Merced and Merced County Sheriff's Office

Under California law, "a public employee is liable for injury caused by his act or omission to the same extent as a private person."  Cal. Gov. Code § 820(a).  "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee or his personal representative."  Cal. Gov. Code § 815.2(a).  The County may be held vicariously liable for the negligence of the deputies as long as the plaintiffs properly plead a negligence claim.  Lopez v. Cnty. of Los Angeles, No. ED 21-cv-290-JGB-SHKX, 2021 WL 6752171, at *10 (C.D. Cal. Nov. 12, 2021).

Accordingly, the Court recommends denying Defendants' motion to dismiss the negligence claim against Defendants County of Merced and Merced County Sheriff's Department.

### J.   Wrongful Death

Defendants set forth the same argument as the negligence claims in addressing the wrongful death claim.  Defendants contend that Plaintiffs have failed to set forth any factual allegations to support their wrongful death claim.  (Mot. at 31-2.) Defendants also assert that Plaintiffs Sanchez, L.V., C.V., and M.V. lack standing to bring a wrongful death claim because they have not adequately alleged the existence of a parent-child relationship with Decedent.  (Id. at 32.)

Plaintiffs counter that Defendants analyze the negligence and wrongful death claims as if they are governed by the same standard, but they are not.  Plaintiffs contend that while a duty of care is necessary for a negligence claim is not necessary for a wrongful death claim unless the wrongful death claim is predicated on a negligence theory.  (Opp. at 28.)  Plaintiffs argue that to

1  the extent the wrongful death claim is not based on negligence, Defendants have not moved to

2  dismiss, and the claim should survive Defendants' motion.  (Id. at 29.)  Plaintiffs again argue that

3  the issue of standing is untimely and should not be considered and that the allegations in the

4  complaint are sufficient to allege the requisite relationship.  (Id. at 29-30.)

5      Defendants reply that Plaintiffs wrongful death claim is based on the identical allegations

6  pertaining to their deliberate indifference and negligence claims and fail for the same reasons

7  those claims fail.  (Reply at 13.)

8      1.   Legal standard

9      Under California law, "[t]he elements of a wrongful death claim are: (1) a wrongful act or

10 neglect that (2) causes (3) the death of another person."  Est. of Vela v. Cnty. of Monterey, No.

11 16-CV-02375-BLF, 2018 WL 4076317, at *13 (N.D. Cal. Aug. 27, 2018) (quoting Norgart v.

12 Upjohn Co., 21 Cal. 4th 383, 390 (1999)); Cal. Civ. Proc. Code § 377.60.  "A wrongful death

13 claim may be predicated on negligence or other tortious conduct."  Est. of Prasad ex rel. Prasad

14 v. Cnty. of Sutter, 958 F.Supp.2d 1101, 1118 (E.D. Cal. 2013).  A wrongful death claim fails if it

15 does not allege the "manner in which [the defendant] was negligent, or how any such negligence

16 caused or contributed in any manner to any specified injury."  Est. of Chivrell II, 694 F.Supp.3d

17 at 1240 (quoting Bem v. Stryker Corp., No. C 15-2485 MMC, 2015 WL 4573204, at *1 (N.D.

18 Cal. July 29, 2015)).

19     2.   Analysis

20     First, Plaintiffs assert that Defendants challenge to standing is untimely, however, for the

21 reasons discussed at III.F.2.a., the Court will join other courts that have fully considered late

22 filed motions to dismiss.

23     **a.  Standing to bring wrongful death claim**

24     Defendants contend that the allegations in the FAC are not sufficient to allege that

25 Plaintiffs Sanchez, L.V., C.V., and M.V. have the requisite relationship to bring a wrongful death

26 claim.  Section 377.60 of the California Code of Civil Procedure provides that "[a] cause of

27 action for the death of a person caused by the wrongful act or neglect of another may be asserted

28 "by the decedent's personal representative on their behalf" or the decedent's surviving spouse or

children.  Cal. Civ. Proc. Code § 377.60(a).  Here, the FAC alleges that Plaintiff Sanchez is the legal spouse of Decedent, and Plaintiffs L.V., C.V., and M.V. are his biological children.  The plain reading of the statute supports a finding that Plaintiffs Sanchez, L.V., C.V., and M.V. have standing to bring a wrongful death claim.

Defendants rely on Stennett v. Miller, 34 Cal.App.5th 284 (2019), to argue that more is required.  However, in Stennett the plaintiff was the nonmarital child of an absentee father who had never held her out as his own.  34 Cal.App.5th at 287.  Here, Plaintiffs allege that they were the spouse and biological children of the Decedent, lived with him prior to his death, and frequently visited and spoke with him.  The Court recommends denying Defendants motion to dismiss the wrongful death claim on the basis of standing.

**b.  Whether the allegations are sufficient to state a claim**

Plaintiffs' allegations for the wrongful death claim are identical to those for the negligence claim.  (FAC ¶¶ 209-215.)  Accordingly for the reasons discussed above, Plaintiffs have failed to state a claim that a wrongful act or neglect by deliberate indifference to Decedent's need for medical care or treatment, failure to timely summon medical care in violation of California Government Code section 845.6, or failing to comply with the California Code of Regulations title 15 § 1027 et seq. against Defendants Warnke, Pena, Gutierrez, Rentfrow, or Sziraki caused the death of Decedent.  Accordingly, the Court finds that Plaintiffs have failed to state a wrongful death claim and recommends that Defendants motion to dismiss the wrongful death claim against Defendants Warnke, Pena, Gutierrez, Rentfrow, or Sziraki be granted.

However, for the reasons discussed above, the Court has found that Plaintiffs have stated a claim against Defendant Guzman for negligence and recommends that Defendants motion to dismiss the wrongful death claim against Defendants County of Merced, Merced County Sheriff's Department, and Guzman be denied.

**IV.**

**CONCLUSION AND RECOMMENDATION**

Based on the foregoing, the Court finds that Defendants motion to dismiss should be granted in part and denied in part.  Further, Plaintiffs may be able to allege additional facts to

state cognizable claims against the County Defendants and the claims should be dismissed with leave to amend.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion to dismiss, filed August 6, 2024, be GRANTED IN PART AND DENIED IN PART with leave to amend as follows:

   a. The motion to dismiss the deliberate indifference claims against Defendants County of Merced, Merced County Sheriff's Department, Guzman, and Warnke be DENIED and be GRANTED as to Defendants Pena, Gutierrez, Rentfrow, and Sziraki;

   b. Defendants motion to dismiss the Monell claim based on inadequate observation and monitoring be DENIED and be GRANTED for all other Monell claims;

   c. Defendants motion to dismiss the interference with familial association claims under the First and Fourteenth Amendments be DENIED as to Defendants County of Merced, Merced County Sheriff's Department, and Warnke, and be GRANTED as to Defendants Pena, Gutierrez, Rentfrow, and Sziraki;

   d. Defendants' motion to dismiss the failure to summon medical care be DENIED as to Defendants County of Merced, Merced County Sheriff's Office, and Guzman, and be GRANTED as to Defendants Pena, Gutierrez, and Warnke;

   e. Defendants motion to dismiss the failure to produce medical records against the County of Merced and Merced County Sheriff's Department be GRANTED;

   f. Defendants' motion to dismiss the Bane Act claim brought by Plaintiffs Sanchez, L.V., C.V., M.V., Ramirez, and Valentine for lack of standing be GRANTED;

   g. Defendants motion to dismiss the Bane Act claim against Defendants Guzman, Warnke, County of Merced, and Merced County Sheriff's Department be DENIED, and be GRANTED as to Defendants Pena, Gutierrez, Rentfrow and Sziraki;

   h. Defendants' motion to dismiss the intentional infliction of emotional distress claim be GRANTED;

i.   Defendants' motion to dismiss the negligence claim against Defendants Guzman, County of Merced, and Merced County Sheriff's Office be DENIED and be GRANTED as to Defendants Pena, Gutierrez, Rentfrow, Sziraki, and Warnke; and

j.   Defendants' motion to dismiss the wrongful death claim against Defendants Guzman, County of Merced, and Merced County Sheriff's Office be DENIED and be GRANTED as to Defendants Pena, Gutierrez, Rentfrow, Sziraki, and Warnke.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __**October 2, 2024**__

_____
UNITED STATES MAGISTRATE JUDGE