# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF DEREK VALENTINE, et al.,<br>Plaintiffs,<br>v.<br>COUNTY OF MERCED, et al.,<br>Defendants. | Case No. 1:23-cv-01697-JLT-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANTS COUNTY OF MERCED, MERCED COUNTY SHERIFF'S OFFICE, VERNON WARNKE, JOEL PENA, EMANUEL GUTIERREZ, BIANCA GUZMAN, DIANE RENTFROW, AND GEORGE SZIRAKI'S MOTION TO DISMISS<br><br>(ECF No. 74)<br><br>**OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

Pending before the Court is a motion to dismiss filed by Defendants County of Merced, Merced County Sheriff's Office, Vernon Warnke, Joel Pena, Emanuel Gutierrez, Bianca Guzman, Diane Rentfrow, and George Sziraki (collectively "County Defendants"). The Court held a hearing on the matter on May 13, 2026. Counsel Paul Masuhara appeared on behalf of Plaintiffs and counsel Matthew Gross and Sarah Kilgore appeared on behalf of Defendants. Having considered the moving, opposition, and reply papers, as well as the Court's file, the Court issues the following findings and recommendations to grant County Defendants' motion to dismiss without further leave to amend.

/ / /

/ / /

## I.

## BACKGROUND

### A. Plaintiffs' Allegations

On February 7, 2023, Derek Valentine ("Decedent") was transferred from the custody of the California Department of Corrections and Rehabilitation ("CDCR") into the custody of Defendants County of Merced, Merced County Sheriff's Office, and Vernon Warnke at the John Latorraca Correctional Center ("the Correctional Center"). (ECF No. 66 "SAC", ¶ 55.) Decedent was a pretrial detainee and was classified as "Booked-Awaiting Trial" on a new arrest. (Id. at 56.) Upon intake, several issues were documented which included "other stimulate abuse" including methamphetamine and opioid abuse. (Id. at ¶ 57.) It was also recorded that Decedent smoked 1 gram of methamphetamine since the age of 19 and last used a year prior; used 1 gram of cocaine weekly since the age of 19 and last used three years prior; used 1 gram of heroin weekly since the age of 29 and last used a year prior; and drank three packs of beer daily since the age of 17 and last drank prior to incarceration. (Id.) From February 7, 2023, until February 12, 2023, medical staff ordered and implemented increased monitoring and testing of Decedent using the Clinical Opiate Withdrawal Scale ("COWS"). (Id. at ¶ 58.) On February 12, 2023, medical staff discontinued increased monitoring and testing of Decedent using COWS. (Id. at ¶ 59.)

On March 20, 2023, Decedent was evaluated during a sick call where he informed medical staff that he had been injured. (Id. at ¶ 61.) He was transported to an outside hospital for evaluation and returned later that same day. (Id.) Jail records reflect that he reported injuring his back while working in the kitchen on Sunday afternoon and denied any fall, stating that his lower back pain was 8/10. (Id.) He was prescribed 400 mg of Ibuprofen to be taken twice a day as needed for five days. (Id.)

Plaintiffs further allege that the jail facilities, including the Correctional Center, were and are overrun with drugs which are readily available to inmates, including fentanyl. (Id. at ¶¶ 48, 49.) Drugs arrive at the jail facilities by way of inmates, jail employees, and/or jail contractors who smuggle contraband into the facilities. (Id. at ¶ 49.) The county detention facility's policies

do not require jail employees or contractors to undergo thorough searches prior to entry, and inmates are inadequately searched, contributing to the risk of drugs entering the facility. (Id. at ¶¶ 49, 51.) Defendants County of Merced, Merced County Sheriff's Office, and Warnke were responsible for supervising the Correctional Center and were aware that drugs were routinely smuggled into the jail and that inmates were overdosing after obtaining drugs within the jail. (Id. at ¶¶ 50, 52.)

Despite the known presence and availability of drugs and the resulting risk of overdose, Defendants County of Merced, Merced County Sheriff's Office, Warnke, CFMG, Wellpath LLC, and Wellpath Management, Inc. maintained deficient policies and customs related to the treatment of overdoses in jail facilities. (Id. at ¶ 53.) Specifically, jail staff were insufficiently trained and unprepared to provide care and treatment to individuals suspected or known to be overdosing, including by maintaining an inadequate supply of Narcan and providing insufficient training regarding the frequency and dosage of Narcan administration. (Id.)

On April 20, 2023, Decedent had access to drugs, including fentanyl which was readily available at the jail. (Id. at ¶ 62.) Decedent was housed in dorm 607, a communal cell with at least seven two-bed bunks and at least five mattresses located on the floor of the dorm. (Id. at ¶ 63.) The dorm was overcrowded and occupied by at least 16 inmates, including Decedent. (Id.) Defendants County of Merced, Merced County Sheriff's Office, and Warnke accepted more inmates than the facilities were built and designed to accommodate, resulting in overcrowding, inadequate staffing, and insufficient supervision and monitoring of inmates and contraband within the overcrowded cells. (Id. at ¶ 64.)

Decedent occupied a mattress near the corner of dorm 607 within direct sight of a closed-circuit television surveillance camera that monitored the dorm and its occupants. (Id. at ¶ 65.) Decedent was clearly visible on the video feed of the dorm. (Id.) Despite Decedent's visibility on the surveillance system, jail staff did not monitor him while he was ingesting drugs and later experiencing a medical emergency. (Id. at ¶ 66.)

Defendants Pena and Gutierrez were correctional officers responsible for monitoring and supervising inmates housed in the dorm, and Defendant Guzman was the security systems

operator responsible for monitoring and supervising the dorm's video feed. (Id. at ¶ 67.) At approximately 8:23 p.m., Decedent was visible on the video feed rummaging through items on the top level of a bunk bed, removing an item from the bunk bed, and orally ingesting drugs. (Id. at ¶ 68.) At approximately 8:29 p.m., Decedent was visible on the video feed returning to the bunk bed, rummaging through items on the top level of the bunk bed, removing an item from the bunk and orally ingesting drugs. (Id. at ¶ 69.) At approximately 8:33 p.m., Decedent was visible on the video feed conversing with another inmate who handed him drugs. (Id. at ¶ 70.) At approximately 8:59 p.m., Defendant Pena entered the dorm to conduct a safety check; he walked about halfway into the dorm, turned around, and exited. (Id. at ¶ 71.) His safety check did not reach the area of the dorm where Decedent was located. (Id.)

From approximately 9:30 p.m. to 9:35 p.m., Decedent was visible on the video feed while seated on the mattress on the cell floor, cutting and ingesting lines of drugs through his nose and continuing to ingest substances orally. (Id. at ¶¶ 74-77.) Beginning at approximately 9:35 p.m., Decedent was visible on the video feed lying on his back on his mattress on the cell floor. (Id. at ¶ 78.) At approximately 9:45 p.m., Decedent was visible on the video feed holding both his arms up in the air, bent at the elbow, before his arms slowly fell limp at his sides. (Id. at ¶ 79.) Decedent was then visible on the feed unconscious and lying in an abnormal position on the mattress. (Id.) Decedent was severely ill and suffering from a medical emergency. (Id. at ¶ 80.)

From approximately 9:47 p.m. to 9:48 p.m., Decedent was visible on the video feed twitching and shaking as if he was experiencing a fit or seizure, with occasional full-body spasms. (Id. at ¶¶ 81-82.) At approximately 9:49 p.m., an inmate discovered that Decedent was non-responsive and experiencing a medical emergency, and alerted Defendant Guzman through the dorm's intercom system. (Id. at ¶¶ 84-85.) At approximately 9:50 p.m., Defendant Guzman radioed "man down" in dorm 607, alerting jail staff of the medical emergency. (Id. at ¶ 86.) At approximately 9:51 p.m., Defendants Pena and Gutierrez entered the dorm and walked toward the back of the cell where Decedent was located. (Id. at ¶ 87.) Defendant Pena reported that Decedent was "sweating, unresponsive, and had quick shallow breathing." (Id. at ¶ 88.) Defendant Gutierrez reported that Decedent was "non-responsive and sweating profusely" and

believed Decedent was experiencing a medical related emergency due to consumption of an unknown controlled substance. (Id.) Defendant Pena used his radio to request that medical staff report to dorm 607 with a medical supplies bag. (Id. at ¶ 89.) Defendants Caughell, a registered nurse, and Defendant Reyes, a licensed vocational nurse, received the call and walked to dorm 607 together. (Id. at ¶ 90.)

Defendant Gutierrez ordered that all inmates present in the dorm be removed to the yard, and Defendant Pena escorted the inmates outside. (Id. at ¶ 91.) Defendant Gutierrez rolled Plaintiff onto his right side into a "recovery position," and at approximately 9:52 p.m., administered a dose of Narcan to Decedent and began rubbing Decedent's chest. (Id. at ¶¶ 92-94.) At approximately 9:53 p.m., Defendant Gutierrez observed liquid coming out of Decedent's nose, and Decedent vomited. (Id. at ¶ 95.) Defendants Caughell and Reyes arrived at the scene but failed to take over and left Defendant Gutierrez in charge of administering aid to Decedent. (Id. at ¶¶ 96-97.) Defendant Gutierrez was not trained in relevant medical response topics, such as "Fire and Line Safety," "Crisis Intervention," and "Narcan." (Id. at ¶ 98.) Defendants Rentfrow and Sziraki, supervisors to Gutierrez, were also present at the scene and did not take over Decedent's care or instruct Defendants Caughell or Reyes to do so. (Id. at ¶ 99.)

At approximately 9:55 p.m., Defendant Gutierrez obtained a second Narcan nasal spray from Defendant Rentfrow's equipment bag and administered a second dose of Narcan to Decedent. (Id. at ¶ 100.) At approximately 9:56 p.m., Defendant Caughell asked custody staff whether they could use an ambu-bag (a bag valve mask) on Decedent to provide respiratory support. (Id. at ¶ 101.) Defendant Reyes retrieved the ambu-bag from the medical supply bag and gave it to Defendant Gutierrez, and Decedent was lifted from the mattress and placed on the floor. (Id. at ¶¶ 102-103.) At approximately 9:57 p.m., Defendant Gutierrez applied the ambu-bag to Decedent's face and began manually squeezing the bag's valve. (Id. at ¶ 104.)

At approximately 9:58 p.m., Defendant Caughell checked Decedent's pulse and stated, "He's still got a pulse. How long has it been since his last Narcan? Can we give him another one?" (Id. at ¶ 106.) Defendant Rentfrow asked whether any other correctional officer at the

scene had any Narcan, and the other correctional officers responded that they did not. (Id. at ¶ 107.) Defendant Sziraki returned after speaking with inmates in the yard and, when asked whether he had any Narcan, removed a Narcan nasal spray from his equipment bag and handed it to Defendant Caughell. (Id. at ¶ 106.) Decedent continued vomiting. (Id. at ¶ 109.)

At approximately 9:59 p.m. Defendant Caughell handed Narcan to Defendant Gutierrez, who administered a third dose. (Id. at ¶ 110.) At approximately 10:00 p.m., Defendant Sziraki asked correctional officers immediately outside the dorm whether they had Narcan and obtained two additional Narcan nasal sprays, which he handed to Defendant Caughell. (Id. at ¶ 111.) Defendants Caughell and Reyes never administered the additional Narcan to Decedent. (Id. at ¶ 112.) At approximately 10:01 p.m., Decedent continued vomiting. (Id. at ¶ 113.) Defendant Gutierrez pressed Decedent's chest with his hands before reapplying the ambu-bag mask to Decedent's face. (Id. at ¶ 114.) At approximately 10:03 p.m., Defendant Caughell stated, "No pulse. CPR," and began CPR chest compressions. (Id. at ¶¶ 116-117.) At approximately 10:04 p.m., Decedent continued vomiting. (Id. at ¶ 118.) A correctional officer reapplied the ambu-bag to Decedent's face while Defendant Caughell resumed CPR. (Id. at ¶ 119.) Defendant Reyes then took over administering the ambu-bag so the correctional officers could hold the mask against Decedent's face to ensure airflow. (Id. at ¶ 120.)

At approximately 10:05 p.m., Defendant Sziraki stepped outside the dorm and spoke with other correctional officers stating, "That's bad medical. . . . He's fucking turning grey!" (Id. at ¶ 121.) Defendant Sziraki then deactivated his body camera. (Id.) Shortly thereafter, he reactivated his body camera and reentered the dorm. (Id.) Around the same time, Defendant Caughell requested an automated external defibrillator ("AED"), and Defendant Reyes indicated that it was in the equipment bag. (Id. at ¶¶ 122-123.) Defendant Caughell retrieved the AED and attached the pads to Decedent's chest around 10:07 p.m. (Id. at ¶¶ 124-125.) The AED machine stated, "No shock advised. Start CPR." (Id. at ¶ 126.) From approximately 10:07 p.m. to 10:10 p.m., staff continued CPR. (Id. at ¶ 127.) The fire department arrived around 10:13 p.m., and continued CPR. (Id. at ¶ 128.) An ambulance arrived at approximately 10:16 p.m., and around 10:18 p.m., emergency personnel had taken over Decedent's care. (Id. at ¶¶ 129-

130.)

At approximately 10:26 p.m., Decedent was pronounced dead at the scene. (Id. at ¶ 131.) At 11:08 p.m., Defendant Reyes documented that Decedent had received several medications, including Paroxetine 40 mg tablet, Prazosin 1 mg capsule, Alvesco 60 inhalations 160 mcg 6.1 gm, Hydroxyzine Hcl 50 mg tablet, Albuterol HFA 6.7 gm, Melatonin 3 mg tablet and Lisinopril 20mg tablet. (Id. at ¶ 132.) On May 22, 2023, the coroner reported that Decedent's cause of death was "[a]cute combined fentanyl, paroxetine and hydroxyzine toxicity." (Id. at ¶ 134.)

During post-incident interviews, Detective Goins reported that an inmate housed in dorm 607 acknowledged that fentanyl was present in the dorm. (Id. at ¶ 139.) On January 24, 2024, Lieutenant Thomas issued an "In-Custody Death Review" report finding that Defendant Reyes "did not appear to take many measures to assist for several minutes until taking over the bag valve aside from attempting to check [Decedent's] pulse via his wrist and placing what is believed to be an oxygen monitor on his left hand," that Defendant Caughell began CPR but did not request an AED until several minutes after compressions began, and that Wellpath staff did not attempt to "clear [Decedent's] airway" beyond the efforts already being undertaken by correctional officers. (Id. at ¶ 140.)

**B. Procedural History**

Previously, this Court issued findings and recommendations recommending that County Defendants' motion to dismiss be granted in part and denied in part. (ECF No. 51.) The District Judge adopted the undersigned's recommendations and granted Plaintiffs leave to file a second amended complaint. (ECF No. 65.) Plaintiffs filed their second amended complaint—the operative complaint—on January 16, 2026. (ECF No. 66.) Estate of Derek Valentine, Araceli Sanchez; minors L.V., C.V, and M.V, Ruth Ramirez, and Albert Valentine (collectively "Plaintiffs") filed the complaint in this civil rights action pursuant to 42 U.S.C. § 1983 against the County of Merced, Merced County Sheriff's Office, Vernon Warnke, Joel Pena, Emanuel Gutierrez, Bianca Guzman, Diane Rentfrow, and George Sziraki (collectively "County Defendants"); California Forensic Medical Group ("CFMG"), Christopher Caughell, Alexandrea Reyes (collectively "CFMG Defendants"); and Wellpath LLC, Wellpath Management, Inc., and

Does 1 to 20. (Id.) Plaintiffs bring the following claims: 1) deliberate indifference in violation of the Fourteenth Amendment; 2) unwarranted interference with familial association in violation of the Fourteenth Amendment; 3) unwarranted interference with familial association in violation of the First Amendment; 4) failure to summon medical care in violation of Cal. Gov. Code § 845.6; 5) Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1; 7) intentional infliction of emotional distress; 8) negligence; and 9) wrongful death pursuant to Cal. Code Civ. Proc. § 377.60. (SAC pp. 39-54.)

On January 30, 2026, CFMG Defendants filed its answer. (ECF No. 72.) On March 3, 2026, County Defendants filed the instant motion to dismiss Plaintiffs' second amended complaint. (ECF No. 74.) The motion was referred to the undersigned for the preparation of findings and recommendations on March 19, 2026. (ECF No. 83.) The motion was fully briefed (ECF Nos. 81, 85), and the Court held a hearing on May 13, 2026. (ECF No. 86.)

## II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted." A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). In deciding a motion to dismiss, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996). The pleading standard under Rule 8 does not require "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true. Id. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. To avoid a dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. The claims in the complaint are plausible when the pleaded facts

"allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Hyde v. City of Willcox, 23 F.4th 863, 869 (9th Cir. 2022) (quoting Iqbal, 556 U.S. at 678).

In deciding whether a complaint states a claim, the Ninth Circuit has discussed that two principles apply. First, to be entitled to the presumption of truth the allegations in the complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). Second, so that it is not unfair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, must plausibly suggest an entitlement to relief. Id. "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Navarro, 250 F.3d at 732 (citing Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988)).

**III.**

**DISCUSSION**

The Court finds that Plaintiffs have not cured the deficiencies previously identified by this Court. (See ECF Nos. 51, 65.) Indeed, the second amended complaint is, in all material respects, substantially similar to the first amended complaint. Nevertheless, the Court will reanalyze each of Plaintiffs' claims.

**A. Deliberate Indifference**

County Defendants move to dismiss Plaintiffs' first claim for deliberate indifference against Defendants Pena and Gutierrez. (ECF No. 74, pp. 5-8.) County Defendants argue that Plaintiffs do not plead non-conclusory facts demonstrating that there was an objectively obvious and substantial risk of imminent overdose that a reasonable officer would have appreciated and been required to abate. (Id.) Plaintiffs respond that both Defendants were aware that the jail facilities were, and are, overrun with drugs that are readily available to inmates, and that each Defendant was deliberately indifferent to the Decedent's personal safety and serious medical needs. (ECF No. 85, pp. 1-5.)

Claims by pretrial detainees against individual defendants under Fourteenth Amendment deliberate indifference are evaluated under an objective standard. Gordon v. Cnty. of Orange, 888 F.3d 1118, 1124-35 (9th Cir. 2018). Objective deliberate indifference is "more than negligence but less than subjective intent—something akin to reckless disregard." Id. at 1125 (quoting Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016)). Plaintiff may claim deliberate indifference under the Fourteenth Amendment by alleging: (i) defendant made an intentional decision with respect to the condition of plaintiff's confinement; (ii) those conditions exposed plaintiff to a "substantial risk of suffering serious harm"; (iii) defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking those measures, defendant caused plaintiff's injuries. Sandoval v. Cnty. of San Diego, 985 F.3d 657, 667 (9th Cir. 2021) (citing Gordon, 888 F.3d at 1125)).

The Court considers the allegations against each named Defendant to determine whether Plaintiffs have alleged a cognizable claim under the Fourteenth Amendment deliberate indifference standard.

**a. Defendant Pena**

Plaintiffs allege that the jail facilities, including the Correctional Center, are overrun with drugs that are readily available to inmates, including fentanyl, and that personnel were aware of the drug problem. (SAC ¶ 48.) Decedent orally ingested drugs at approximately 8:23 p.m. and 8:29 p.m., and at around 8:33 p.m., he received drugs from another inmate. (Id. at ¶¶ 68-70.) At approximately 8:59 p.m., Defendant Pena entered dorm 607 to conduct a safety check. (Id. at ¶ 71.) He walked about halfway into the dorm, turned around, and exited the dorm without reaching the area where Decedent was located. (Id.) Plaintiffs claim that Pena did not conduct an adequate safety check-in violation of California Code of Regulations which requires that safety checks "be conducted at least hourly through direct visual observation of all people held and housed in the facility." Cal. Code Regs. tit. 15, § 1027.5(a). (Id. at ¶¶ 72, 83.) Plaintiffs further contend that Pena could and should have conducted an adequate direct visual check of

dorm 607 and, in doing so, would have discovered that Decedent was in possession of a fatal quantity of drugs. (Id. at ¶ 72.)

The Court again finds that Plaintiffs' allegations are insufficient to satisfy the objective deliberate indifference standard. First, Plaintiffs do not plead facts showing that Pena made an intentional decision to disregard a known, substantial risk to Decedent's safety. At most, Plaintiffs allege that Pena conducted an incomplete or cursory welfare check of dorm 607. However, allegations that Pena failed to conduct adequate checks, without more, do not plausibly establish that Pena was deliberately indifferent to Decedent's personal safety. See Cavanaugh v. Cnty. of San Diego, No. 3:18-cv-02557-BEN-LL, 2020 WL 6703592, at *12-13 (S.D. Cal. Nov. 12, 2020) (finding plaintiff failed to state a deliberate indifference claim where conclusory allegations that defendants "failed to properly conduct cell checks required to verify an inmate's safety and welfare" were insufficient to show defendants intentionally chose the conditions of confinement and were not merely negligent). Further, while Plaintiffs rely on generalized allegations that drugs were prevalent within the facility and that staff were aware of this issue, they do not allege that Decedent faced a specific or particularized risk that was known to Pena.

Second, Plaintiffs do not plead facts showing that Pena made an intentional decision to disregard a known, substantial risk to Decedent's serious medical needs. The SAC alleges that Decedent ingested drugs approximately thirty minutes before Defendant Pena conducted his safety check and that, approximately thirty minutes later, Decedent orally ingested additional drugs, cut "lines" of drugs in powder form, and ingested them through his nose. (SAC ¶¶ 68-69, 74-77.) These allegations do not demonstrate that, at the time Pena conducted the safety check, Decedent was displaying signs of an overdose or that a reasonable officer in Pena's position would have understood that Decedent was suffering from, or was at imminent risk of suffering from, a serious medical condition. Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). A detainee's right to medical care depends on the officer being "aware that an inmate is suffering from a serious acute medical condition." Hyde, 23 F.4th at 873 (quoting Sandoval, 985 F.3d at 680). Plaintiffs do not allege facts showing that Pena had such awareness at the time of the safety check. Once Decedent was discovered to be

unresponsive and experiencing a medical emergency, however, the SAC alleges that Pena promptly radioed for medical assistance.

Accordingly, the Court finds that Plaintiffs have failed to state a plausible deliberate indifference claim against Defendant Pena and recommends that County Defendants' motion to dismiss the deliberate indifference claim against Defendant Pena be granted.

**b. Defendant Gutierrez**

Defendant Gutierrez was also a correctional officer responsible for monitoring and supervising inmates in dorm 607. (SAC ¶ 67.) Plaintiffs allege that, Gutierrez was aware of the drug issues at the facility, yet Decedent remained confined in a jail where drugs were readily available, inmates were inadequately monitored and supervised, and inmates were not adequately treated for serious medical needs. (Id. at ¶¶ 48, 73, 83.) Plaintiffs contend that Gutierrez could and should have, among other actions, required that dorm 607 be frequently, timely, and actively monitored and supervised for contraband, and summoned medical care for Decedent when his serious medical needs became visible and obvious. (Id. at ¶ 73.) Plaintiffs further allege that after the "man down" call, Gutierrez entered dorm 607, walked toward the back of the cell where Decedent was located, and observed that Decedent was sweating, unresponsive, and had quick shallow breathing. (Id. at ¶¶ 87-88.) Gutierrez believed Decedent was experiencing a medical emergency due to the consumption of an unknown controlled substance. (Id. at ¶ 88.) After ordering that all inmates present in dorm 607 be removed to the yard, Gutierrez rolled Decedent onto his right side into a "recovery position" and began administering medical aid. (Id. at ¶¶ 91-92.)

The Court again finds that Plaintiffs' allegations are insufficient to satisfy the objective deliberate indifference standard. Although Plaintiffs allege that Gutierrez was responsible for monitoring and supervising inmates in dorm 607, and that he was aware of the general drug problem within the facility, the SAC still fails to allege facts demonstrating that Gutierrez was confronted with an objectively obvious and substantial risk that Decedent was suffering from, or was at imminent risk of suffering from, a serious medical condition before Decedent was found unresponsive. General allegations regarding the presence of drugs within the facility and

insufficient inmate monitoring do not establish that Gutierrez should have appreciated that Decedent specifically faced a substantial risk of overdose or serious harm. To the contrary, the SAC alleges that Gutierrez immediately provided medical care once Decedent's medical emergency became apparent.

The Court finds that Plaintiffs have failed to state a cognizable deliberate indifference claim against Defendant Gutierrez and recommends that County Defendants' motion to dismiss the deliberate indifference claim against Defendant Gutierrez be granted.

**B. Monell**

The Court next addresses County Defendants' argument that the SAC fails to plead any facts identifying a specific County policy, custom, or omission that was the moving force behind Decedent's death. (ECF No. 74, pp. 12-14.)

Municipalities and local governments may be sued under section 1983 for violating an individual's constitutional rights. Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 694 (1978). To establish a section 1983 claim for municipal liability, a plaintiff must allege unconstitutional conduct attributable to: "(1) an official policy; (2) a pervasive practice or custom; (3) failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." Horton v. City of Santa Maria, 915 F.3d 592, 602-03 (9th Cir. 2019). In other words, the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Id.

A municipality can only be held liable for injuries caused by the execution of its policy or custom or by those whose edicts or acts may fairly be said to represent official policy. Monell, 436 U.S. at 694. "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Bd. of the Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown ("Brown"), 520 U.S. 397, 404 (1997). A plaintiff seeking to impose liability upon a municipality is required to identify the policy or custom that caused the constitutional injury. Id. at 403. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient

duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).

Plaintiff realleges unconstitutional conduct based on both customs or practices and failure to train, supervise, or discipline. (See SAC ¶¶ 147-148.) The Court addresses each theory below.

a. Custom or Practice

i. *Understaffing*

Plaintiffs reallege that the jail facilities were understaffed, resulting in inadequate supervision and monitoring of inmates and contraband located in the overcrowded cells. (SAC ¶ 64.) Plaintiffs cite several incidents that allegedly demonstrate that this policy resulted in violations of constitutional rights of persons held in their jail facilities. (See ECF No. ¶¶ 148(c), (d), (f), (g), (l), (m), (n)). However, the Court finds that these allegations do not establish a longstanding practice that was of sufficient duration, frequency, and consistency to have become a traditional method of carrying out policy.

For example, Plaintiffs rely on statements made by Defendant Warnke regarding understaffing at the jail *prior* to Decedent's overdose in April 2023. On June 11, 2017, after an inmate was attacked and killed in the main jail, Defendant Warnke stated that the County was down 10 to 12 correctional officers and inmates were aware of the low staffing levels. (Id. at ¶ 148(n).) On August 14, 2018, Defendant Warnke stated that, despite inadequate staffing, the jail facilities would make room to house whoever needed to be housed. (Id. at ¶ 148(l).) Plaintiffs also cite to an incident that occurred on June 17, 2018, where an inmate was killed in the shower; although Defendant Warnke declined to answer reporters' questions, he reportedly attributed jail violence to low staffing levels. (Id. at ¶ 148(m).)

Plaintiffs do not identify any additional statements by Defendant Warnke regarding understaffing until after Decedent's overdose—five years later. On August 30, 2023, a statement was made that acknowledged that out of 108 allotted positions for custodial staff, 33 were vacant, and 10 correctional staff were still in training and unable to work as a solo officer. (Id. at ¶ 148(g).) Correctional staff were also working 16-hour days, three and four days per week.

(Id.) On November 28, 2023, Defendant Warnke informed the Board of Supervisors that the jail facilities were down thirty positions and 28% in staffing, and two dormitories were closed due to lack of staffing. (Id. at ¶ 148(f).) He further reported that officers were working three 16-hour shifts per week. (Id.)

Plaintiffs also rely on reports issued by the Merced County Civil Grand Jury following site inspections and review of a Board of State and Community Corrections report. (Id. at ¶¶ 148(c), (d).) On June 30, 2024, the issued 2023-2024 Grand Jury Report noted that several staff members identified understaffing as one of their major concerns. (Id. at ¶ 148(d).) On June 30, 2025, the issued 2024-2025 Grand Jury Report similarly identified insufficient staffing levels as a major concern. (ECF No. 148(c).) However, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the [municipality] and the opportunity to conform to constitutional dictates. . . ." Gonzalez v. Cnty. of Merced, 289 F. Supp. 3d 1094, 1099 (E.D. Cal. 2017) (quoting Connick v. Thompson, 563 U.S. 51, 63 n.7 (2011)). Therefore, these statements made after Decedent's death do not support the existence of a pattern or practice affecting Decedent.

In light of the five-year gap between the 2018 statements and the statements after Decedent's death, the Court finds that Plaintiffs have failed to allege a long-standing practice that was of sufficient duration, frequency, and consistency as to have become a traditional method of carrying out policy. Accordingly, the Court recommends that County Defendants' motion to dismiss the Monell claim based on a custom or practice of understaffing the County jail facilities be granted.

ii. *Overcrowding*

Plaintiffs allege that Decedent was housed in dorm 607 which was a communal cell with at least seven two-bed bunks and at least five mattresses located on the floor of the dorm which was overcrowded and occupied by at least 16 inmates, including Decedent. (Id. at ¶ 63.) Plaintiffs further allege that Defendants County of Merced, Merced County Sheriff's Office, and Warnke accepted more inmates than the facilities were built and designed to accommodate, and the jails were overcrowded with an inadequate amount of staff, resulting in inadequate

supervision and monitoring of inmates and contraband located in overcrowded cells. (Id. at ¶ 64.)

In support of an overcrowding policy, Plaintiffs allege the August 14, 2018 statement by Defendant Warnke that, despite inadequate staffing at the jail facilities, the County would make room to house whoever needed to be housed. (SAC at ¶ 148(l).) Plaintiffs also rely on a November 20, 2024 incident in which an inmate was housed in an overcrowded four-man holding cell with at least seven other inmates and was subsequently attacked and killed by other inmates inside the cell. (Id. at ¶ 148(b).) The passage of five years between Defendant Warnke's 2018 statement, the circumstances under which Decedent was housed, and one other incident in 2024 does not plausibly establish a longstanding and widespread practice of overcrowding. Absent allegations showing a pattern of similar incidents with sufficient frequency and consistency, Plaintiffs have failed to allege factual allegations to support a plausible claim of a practice or custom of overcrowding by the County that is so widespread as to have the force of law. Brown, 520 U.S. at 404. Accordingly, the Court recommends that County Defendants' motion to dismiss the Monell claim based on a custom or practice of overcrowding at the County jail facilities be granted.

iii. *Failure to Adequately Search for Drugs Entering the Jail Facilities*

Plaintiffs make conclusory allegations that the jail facilities were overrun with drugs, that contraband was routinely smuggled into the facilities, that searches for contraband were inadequate, and that the jail maintained deficient polices. (SAC ¶¶ 48-51.) Plaintiffs assert that Defendants County of Merced, Merced County Sheriff's Office, Warnke, CMG, Wellpath LLC, and Wellpath Management, Inc. were aware of the presence and availability of drugs. (Id. at ¶ 52.) For example, on June 11, 2017, an inmate was murdered after refusing to smuggle drugs into the jail. (Id. at ¶ 52(a).) On April 18, 2022, it was reported that five people were charged for their alleged involvement in smuggling drugs into the jail. (Id. at ¶ 52(b).) About one week prior to Decedent's death, an inmate overdosed on fentanyl. (Id. at ¶ 52(c).) On April 20, 2024, Decedent overdosed on fentanyl, and at least one additional inmate overdosed on fentanyl after April 20, 2024. (Id. at ¶¶ 52 (d),(e).) On July 8, 2024, it was reported that an inmate and his

wife had smuggled narcotics into the jail. (Id. at ¶ 52(f).)

The Court finds that there are not factual allegations in the complaint to support a practice or custom of allowing drugs inside the jail facilities by the County that is so widespread as to have the force of law. Brown, 520 U.S. at 404. "A few 'isolated or sporadic incidents' are not enough to prove a city has an unconstitutional custom or practice." Garcia v. Yuba Cnty. Sheriff's Dep't, 559 F.Supp.3d 1122, 1127 (E.D. Cal. 2021) (quoting Trevino, 99 F.3d at 918). "A practice or custom must have 'sufficient duration, frequency and consistency' that it has 'become a traditional method of carrying out policy.'" Id. (quoting Trevino, 99 F.3d at 918.) Additionally, as the Court mentioned previously, allegations that are contemporaneous or subsequent to Decedent's incident, does not establish a long-standing pattern or practice that would have provided Defendants with notice prior to Decedent obtaining and overdosing on drugs. See Gonzalez, 289 F. Supp. 3d at 1099.

Accordingly, the Court recommends that County Defendants' motion to dismiss the Monell claim based on a custom or practice of failing to adequately search for drugs entering the jail facilities be granted.

iv. *Appropriate Medical and Mental Health Care for Inmates*

Plaintiffs allege that that Defendants County of Merced, Merced County Sheriff's Office, and Warnke employ Defendants CFMG, Wellpath LLC, and Wellpath Management, Inc. to deliver constitutionally mandated medical services to inmates, with the knowledge that the services provided are inadequate and noncompliant with the bargained for services. (SAC at ¶ 149.)

In support, Plaintiffs cite several examples, including suicide rates at the facilities where Defendants CFMG, Wellpath LLC, and Wellpath Management, Inc. were provided healthcare services, contractual arrangements for hospital care, the frequency of lawsuits against these entities, the seriousness of prisoner grievances, the quality of care provided to incarcerated individuals, and settlements paid to families alleging negligence. (See id. at ¶ 149(a)-(k).) Plaintiffs further allege that Defendants were aware of the violations and deficient policies and customs, including repeated incidents at jail facilities arising from alleged indifference by

custody and medical staff and deficiencies in the delivery of heathcare services in violation of national and local standards, such as the NCCHC, IMQ, and ACA. (Id. at ¶ 150.) Plaintiffs also assert that said Defendants "were or should have been on notice regarding the need to discontinue, modify, or implement new and different versions of deficient policies or customs because the inadequacies constituted life-threatening decisions and were so obvious and likely to result in violations of the rights of inmates, including [Decedent]." (Id. at ¶ 151.)

Notwithstanding these allegations, the SAC relies primarily on incidents that are not sufficiently similar to the facts at issue here to plausibly establish a long-standing practice of inadequate medical care at the Merced County jail facilities. The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Castro, 833 F.3d at 1075 (quoting City of Canton, 489 U.S. at 385). While Plaintiffs allege a broader history of inadequate care provided by CFMG, Wellpath LLC, and Wellpath Management, Inc. in other detention facilities, they fail to allege facts involving Merced County Jail or circumstances involving inadequate treatment of an inmate experiencing an overdose.

Further, the allegations specific to Decedent indicate that he was evaluated upon intake, monitored using the COWS protocol, and received treatment following a reported back injury. These allegations do not plausibly support the existence of a County custom or practice that was the moving force behind the alleged constitutional violation.

Accordingly, the Court recommends that County Defendants' motion to dismiss the Monell claim against them based on a custom or practice of inadequate medical care should be granted.

b. Failure to Train, Supervise, or Discipline

Plaintiffs allege that Defendants County of Merced, Merced County Sheriff's Department, and Warnke 1) failed to adequately train staff to screen, detect, and search for drugs and prevent drugs from entering the jail facilities (SAC at ¶ 51); 2) jail staff were insufficiently trained concerning care and treatment of persons suspected or known to be overdosing, including how often and how much Narcan to administer (id. at ¶ 53); 3) Defendant Gutierrez was not

trained in relevant medical topic including "Fire and Life Safety," "Crisis Intervention," and "Narcan" (id. at ¶ 98); and 4) custodial and medical employees were not trained in providing, supervising, or training appropriate medical care for inmates (id. at ¶¶ 147(b)(g).)

In the context of a failure to train claim, the Supreme Court has held that to show deliberate indifference the municipal actor must disregard a known or obvious consequence of his action, which ordinarily requires that there be a pattern of similar constitutional violations by untrained employees. Connick, 563 U.S. at 61-62 (quoting Brown, 520 U.S. at 409). To state a claim based on a single incident, municipal liability will only be triggered where "fault and causation" are clearly traceable to the municipality's legislative body or some other authorized decisionmaker. Benevidez v. Cnty. of San Diego, 993 F.3d 1134, 1154 (9th Cir. 2021).

Here, Plaintiffs contend that Defendants failed to train staff regarding overdose response and Narcan administration, but they do not allege facts showing that the alleged deficiencies reflect an obvious, systemic risk of constitutional harm, as opposed to isolated training shortcomings. See City of Canton, 489 U.S. at 390-91 ("that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."). Additionally, although Plaintiffs broadly allege that custodial and medical staff were not trained to provide appropriate medical care, the SAC does not allege what appropriate medical care Decedent failed to receive or how additional training would have prevented his death.

As courts have cautioned, "an inadequate training policy itself cannot be inferred from a single incident," as doing so would allow plaintiffs to "shoehorn any single incident with no other facts into a failure-to-train claim." Hyde, 24 F.4th at 874-75. Plaintiffs only allege one prior overdose occurring approximately one year prior to Decedent's death, along with one subsequent overdose, in addition to the incident at issue—during which Decedent received medical care within minutes of being found unresponsive. These allegations are insufficient to establish a pattern of similar constitutional violations or to show that the need for training was so obvious that failure to provide it constituted deliberate indifference. Brown, 520 U.S. at 409.

Accordingly, the Court finds that Plaintiffs have failed to allege a cognizable claim for

failure to train and recommends that County Defendants' motion to dismiss the failure to train claim be granted.

**C. Interference with Familial Association**

County Defendants move to dismiss Plaintiffs' second and third claims for interference with familial association brought against Defendants Pena and Gutierrez under the First and Fourteenth Amendments. (ECF No. 74, pp. 14-15.) Plaintiffs base these claims on allegations that County Defendants were deliberately indifferent to Decedent's personal safety and serious medical needs. (SAC ¶¶ 162, 168.) County Defendants argue that because Plaintiffs failed to state a deliberate indifference claim, Plaintiffs likewise failed to state a claim for interference with familial association. (ECF No. 74, p. 14.) Plaintiffs generally disagree. (ECF No. 81, p. 16.)

"Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." Lemire v. Cal. Dep't of Corr. & Rehab., 726 F.3d 1062, 1075 (9th Cir. 2013). District courts within the Ninth Circuit have likewise recognized that spouses have a right to familial association. See Hanington v. Multnomah Cnty., 593 F. Supp. 3d 1022, 1043 (D. Or. 2022) (collecting cases). However, only official conduct that "shocks the conscience" is cognizable as a due process violation. Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008). Deliberate indifference may, in some circumstances, rise to the level of conduct that shocks the conscience. Lemire, 726 F.3d at 1075.

The Ninth Circuit has also recognized that the First Amendment protects the right to familial association. Lee v. City of Los Angeles, 250 F.3d 668, 682-83 (9th Cir. 2001). A claim for familial association under the First Amendment is measured by the same standard applied to the claim under the Fourteenth Amendment. Kaur v. City of Lodi, 263 F. Supp. 3d 947, 973-74 (E.D. Cal. 2017).

As discussed above, the Court previously found that Plaintiffs failed to state a claim that Defendants Pena and Gutierrez were deliberately indifferent to Decedent. Because Plaintiffs' familial association claims are based on Defendants' alleged deliberate indifference to Decedent,

the Court finds that Plaintiffs have likewise failed to state a claim for interference with familial association against these defendants. See Schwarz v. Lassen Cnty. ex. rel. Lassen Cnty. Jail, 628 F. Appx 527, 528 (9th Cir. 2016) (holding that where there was no deliberate indifference, the claim for loss of familial association failed as a matter of law). Accordingly, the Court recommends that County Defendants' motion to dismiss the interference with familial association claims against Defendants Pena and Gutierrez be granted.

**D. Failure to Summon Medical Care**

County Defendants move to dismiss Plaintiffs' fourth claim for failure to summon medical care against Defendants Pena, Gutierrez, and Warnke. (ECF No. 74, pp. 15-16.) They argue that Plaintiffs have not pled facts showing that Pena or Guiterrez knew, or had reason to know, that Decedent was in need of immediate medical care and failed to summon such medical care, and that Plaintiffs have not alleged facts sufficient to state a supervisory failure to summon theory under the statute as to Warnke. (Id.; ECF No. 85, pp. 6-8.) In response, Plaintiffs contend that Pena and Gutierrez had reason to know that Decedent required immediate medical care based on constructive knowledge, and that Warnke maintained policies or customs of action and inaction that resulted in harm to Decedent. (ECF No. 81, pp. 16-18.) Plaintiffs further argue that their deliberate indifference claim against Warnke establishes a basis for liability for negligent supervision and training in connection with the failure to summon medical care. (Id. at 11-12.)

A public entity or public employee is generally not "liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his [or her] custody." Cal. Gov. Code § 845.6. However, "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." Id. "Liability under section 845.6 is limited to serious and obvious medical conditions requiring immediate care." Horton, 915 F.3d at 608 (quoting Watson v. State of California, 21 Cal. App. 4th 836, 841 (1993)). "[O]nce an inmate is receiving medical care, § 845.6 does not create a duty to provide adequate or appropriate care."

Resendiz v. Cnty. of Monterey, No. 14-CV-05495-LHK, 2015 WL 7075694, at *8 (N.D. Cal. Nov. 13, 2015). In other words, liability under section 845.6 is triggered only by a failure to summon medical care; it does not extend to failures to provide further treatment, or to ensure further diagnosis or treatment, or to follow up on an inmate's progress. Watson, 21 Cal. App. 4th at 845; Nelson v. State of California, 139 Cal. App. 3d 72, 81 (1982); Castaneda v. Dep't of Corr. & Rehab., 212 Cal. App. 4th 1051, 1072 (2013).

Here, Plaintiffs contend that their claim for failure to summon medical care is based on Decedent's "need for immediate medical care during a period of about 50 minutes when he continuously ingested drugs, became unconscious, and experienced a fit or seizure." (ECF No. 81, p. 10; SAC ¶¶ 69-70, 74-82.) Plaintiffs allege that, during that period, Pena and Gutierrez were responsible for monitoring and supervising inmates in the dorm, and that Decedent "remained confined in jail where inmates were inadequately monitored, supervised, and treated for serious medical needs, including overdose." (SAC ¶¶ 67, 83(b).) Plaintiffs further allege that Pena and Gutierrez "could and should have" ensured that the dorm and Decedent were "frequently, timely, and actively monitored and supervised for serious medical needs, including overdose," and that medical care should have been summoned when Decedent's serious medical needs were visible and obvious. (SAC ¶ 83(c).) Absent, however, are facts showing that Pena and Gutierrez knew, or had reason to know, that Decedent was in immediate need of medical care before the medical emergency was discovered; allegations that Defendants "could and should have" acted is not the standard. Indeed, Plaintiffs allege that once Decedent was discovered to be non-responsive and experiencing a medical emergency, Pena radioed for medical staff within two minutes, and Gutierrez began administering medical care three minutes later. (SAC ¶¶ 89, 93, 100.)

Additionally, Plaintiffs argue that Warnke is liable for his employees' failure to summon medical care. (ECF No. 81, p. 17.) Courts have held that prison officials can be held liable under section 845.6 for "negligent supervision and training as to when to summon medical care." Est. of Wilson by & through Jackson v. Cnty. of San Diego, No. 20-cv-457-BAS-DEB, 2020 WL 3893046, at *6 (S.D. Cal. July 10, 2020) (quoting Villarreal v. Cnty. of Monterey, 254 F.

Supp. 3d 1168, 1187 (N.D. Cal. 2017). Plaintiffs allege that Warnke maintained policies or customs of action and inaction that resulted in harm to Decedent. (SAC ¶¶ 33, 174.) However, Plaintiffs have not plausibly alleged facts showing that Warnke failed to supervise or train employees as to when to summon medical care, nor do they allege facts supporting the existence of a policy or custom of failing to summon medical care. Instead, the policies and customs identified by Plaintiffs are largely conclusory and/or fall outside the limited scope of liability under section 845.6. For example, allegations concerning the administration of Narcan and the adequacy of medical treatment implicate the quality of care provided, rather than the duty to summon care. (See SAC ¶¶ 53, 147, 149(g)). Similarly, generalized failures in supervision, monitoring, training, and staffing do not identify how Warnke failed to supervise or train employees with respect to summoning medical care.

**E. Government Code § 52.1 (Bane Act)**

Defendants move to dismiss Plaintiffs' fifth claim for relief under California Civil Code section 52.1 (Tom Bane Civil Rights Act (hereafter "the Bane Act")) against Defendants Pena and Gutierrez. (ECF No. 74, pp. 16-17.) County Defendants argue that because Plaintiffs fail to state a cognizable deliberate indifference claim against Defendants Pena and Gutierrez, they likewise fail to state a Bane Act claim against them. (Id.) In response, Plaintiffs contend that they have alleged multiple theories of liability, including violations of Article I, Section 7(a) of the California Constitution and California Government Code § 845.6, and argue that because they have stated a claim for deliberate indifference, they have stated a claim under the Bane Act. (ECF No. 81, p. 18.) In reply, County Defendants argue that Plaintiffs' California constitutional claim is duplicative of their federal deliberate indifference claim and that Government Code section 845.6 does not salvage their Bane Act claim because Plaintiffs do not state a viable section 845.6 claim against Defendants Pena or Gutierrez. (ECF No. 85, p. 8.)

The Bane Act creates a cause of action against a person who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal

Civ. Code § 52.1(b). "A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." Rodriguez v. Cnty. of Los Angeles, 891 F.3d 776, 800 (9th Cir. 2018). "The Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged" so long as the claimant shows the defendant had a "specific intent" to commit the constitutional violation. Reese v. Cnty. of Sacramento, 888 F.3d 1030, 1043 (9th Cir. 2018) (citation omitted).

Here, the Court previously found that Plaintiffs failed to state a claim for deliberate indifference and failed to state a claim under California Government Code section 845.6 against Defendants Pena and Gutierrez. Although Plaintiffs also allege a violation of Article I, Section 7(a) of the California Constitution, they rely on the same conduct underlying their deliberate indifference claim and offer no additional support. (See SAC ¶ 180.) In other words, Plaintiffs do not allege any additional facts establishing a violation of the California Constitution. Therefore, the Court finds that Plaintiffs fail to state a claim under the Bane Act against Defendants Pena and Gutierrez. Accordingly, the Court recommends that County Defendants' motion to dismiss the Bane Act claim against Defendants Pena and Gutierrez be granted.

**F. Intentional Infliction of Emotional Distress**

County Defendants move to dismiss Plaintiffs' sixth claim for intentional infliction of emotional distress against Defendants Pena, Gutierrez, and Guzman. (ECF No. 74, pp. 17-18.) They argue that Plaintiffs fail to plausibly allege that Decedent suffered severe emotional distress because the SAC lacks facts showing that Decedent was conscious, aware, or experienced distress prior to his death. (Id.) Plaintiffs respond that the SAC includes allegations supporting Decedent's pre-death emotional distress, including his visible distress during his overdose. (ECF No. 81, p. 19.) In reply, County Defendants contend that these allegations describe the physical symptoms of overdose, not facts demonstrating emotional distress. (ECF No. 85, p. 9.)

To state a claim for intentional infliction of emotional distress under California law, a plaintiff must allege "(1) extreme and outrageous conduct by the defendants with the intention of

causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Delfino v. Agilent Techs., Inc., 145 Cal. App. 4th 790, 808 (2006). A defendant's conduct is "outrageous" when it is so "extreme as to exceed all bounds of that usually tolerated in a civilized community." Hughes v. Pair, 46 Cal. 4th 1038, 1051 (2009) (quoting Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1001). Additionally, the defendant's conduct must be "directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." Christensen v. Superior Ct., 54 Cal. 3d 868, 903 (1991).

The Court finds that Plaintiffs have failed to state a claim for intentional infliction of emotional distress, as the complaint contains no factual allegations that plausibly suggest Decedent suffered severe emotional distress as a result of Defendants' conduct. Plaintiffs allege that during Decedent's overdose, Decedent laid on his back, "[held] both his arms up in the air, bent at the elbow, before his arms slowly fell limp at his sides," was severely ill, twitched his left hand as if he was experiencing a fit or seizure, spasmed and shook, vomited, had liquid coming from his nose, and was sweaty, unresponsive, and breathing shallowly. (SAC ¶¶ 78-82, 88, 95, 109, 113.) However, these allegations describe the physical symptoms of Decedent's overdose, not allegations that Decedent suffered severe and emotional distress, or that his emotional distress was so severe that they manifested into physical symptoms.

Accordingly, the Court recommends that County Defendants' motion to dismiss the intentional infliction of emotional distress against Defendants Pena, Gutierrez, and Guzman be granted.

**G. Negligence**

County Defendants argue that Plaintiffs' seventh claim for negligence against Defendants Pena, Gutierrez, Warnke, Rentfrow, and Sziraki fails to state a claim. (ECF No. 74, pp. 18-19.) They contend that the SAC does not allege sufficient facts to show that these Defendants breached any duty owed to the Decedent. (Id.) Plaintiffs respond that they have alleged negligence because they have stated a claim for deliberate indifference, which is a higher

standard of culpability. (ECF No. 81, p. 20.) Plaintiffs further argue that, even if their allegations do not state a claim for deliberate indifference, they have alleged that Defendants "should have foreseen some risk." (Id. at p. 21.)

Under California law, the elements for a claim of negligence are that "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the duty, and (3) the breach proximately or legally caused (4) the plaintiff's damages or injuries." Thomas v. Stenberg, 206 Cal. App. 4th 654, 662 (2012). "In California, prison officials owe detainees a duty to protect them from foreseeable harm." Cotta v. Cnty. of Kings, 686 F. Appx 467, 469 (9th Cir. 2017) (citing Giraldo v. Dep't of Corr. & Rehab., 168 Cal. App. 4th 231 (2008)).

Plaintiffs allege that Defendants Pena, Gutierrez, Warnke, Rentfrow, and Sziraki owed Decedent a duty of care and breached that duty by exhibiting deliberate indifference to personal safety and need for medical care, failing to timely summon medical care in violation of California Government Code section 845.6, failing to comply with the California Code of Regulations title 15 § 1027 *et seq*., and violating the United States and California Constitutions, federal and state laws, regulations, policies, standards, general order, procedures, training, national and local standards, and/or California Civil Code § 1714(a). (SAC at ¶ 195.) Plaintiffs further allege that the above-named Defendants' actions and inactions constituted oppression, fraud, and/or malice resulting in great harm. (Id. at ¶ 199.)

The Court addresses the allegations against the County Defendants in turn. As a preliminary matter, the Court notes that Plaintiffs' allegations regarding various constitutional provisions, statutes, regulations, policies, standards, general orders, procedures, training requirements, and other standards are broad and conclusory. Although Plaintiffs incorporate prior allegations by reference, they do not identify which specific provisions form the basis of their negligence claim or allege facts showing how any such provision was violated by the individual Defendants. These generalized allegations are insufficient to establish a breach of duty.

**a. Defendants Pena and Gutierrez**

The Court previously found that neither Defendant Pena nor Gutierrez acted with

deliberate indifference to Decedent's personal safety or serious medical needs, and that neither Defendant failed to timely summon medical care in violation of California Government Code section 845.6. Plaintiffs' reliance on the same underlying allegations does not, in turn, establish a negligence claim. Although Plaintiffs allege that Defendant Pena failed to conduct an adequate direct visual check of dorm 607, they do not allege facts showing that Decedent was exhibiting signs of distress or required medical attention at the time that safety checks were performed. Rather, Plaintiffs allege that Decedent ingested drugs approximately thirty minutes before and again approximately thirty minutes after the safety check. Moreover, upon Decedent being discovered unresponsive, Plaintiffs allege that Defendant Gutierrez provided emergency medical assistance, including administering Narcan and participating in lifesaving efforts. Plaintiffs do not allege facts demonstrating how Gutierrez breached a duty of care in responding to the Decedent's medical emergency.

Accordingly, the Court recommends that Defendants' motion to dismiss the negligence claims against Defendants Pena and Gutierrez be granted.

**b. Defendants Rentfrow and Sziraki**

Plaintiffs' negligence claim against Defendants Rentfrow and Sziraki likewise fails. Plaintiffs allege generally that jail staff were inadequately trained in overdose response, including Narcan use, and maintaining an adequate supply of Narcan. Plaintiffs further allege that Defendants Rentfrow and Sziraki failed to ensure that higher-trained medical personnel assumed responsibility over Decedent's care from Defendant Gutierrez. However, Plaintiffs do not allege facts showing that Gutierrez was negligent in providing care or that having medical providers administer the Narcan or assume responsibility for Decedent's care would have produced a different outcome. Instead, Plaintiffs allege that medical personnel and custody staff were actively engaged in resuscitative efforts, including Narcan administration, CPR, and use of an ambu-bag and AED. Plaintiffs therefore fail to allege facts showing that Defendants Rentfrow and Sziraki breached a duty of care or that any alleged breach caused Decedent's death. Accordingly, the Court recommends that Defendants' motion to dismiss the negligence claims against Defendants Rentfrow and Sziraki be granted.

**c. Defendant Warnke**

Lastly, the Court finds that Plaintiffs' negligence claim against Defendant Warnke fails. Plaintiffs allege that Defendant Warnke breached a duty of care by creating or increasing an unreasonable risk of harm to Decedent; through his special relationship (employer-employee) with Defendants; and through his special relationship (jailer-prisoner) and affirmative duty to protect Decedent. (SAC ¶ 196.) However, Plaintiffs do not allege facts identifying any specific act or omission by Warnke that breached a duty owed to Decedent or caused Decedent's death. Plaintiffs do not allege that Warnke was aware that Decedent was experiencing a medical emergency, failed to summon medical care, or otherwise participated in or directed any conduct related to Decedent's overdose or emergency response. Nor do Plaintiffs allege facts showing that any additional action by Warnke could have produced a different outcome. Instead, Plaintiffs' allegations continue to rest on institutional and systemic conditions within the jail without connecting those conditions to any specific negligent act or omission by Warnke. Accordingly, the Court recommends that Defendants' motion to dismiss the negligence claim against Defendant Warnke be granted.

**H. Wrongful Death**

County Defendants advance the same argument as the negligence claim in addressing the wrongful death claim. (ECF No. 74, pp. 18-19.) Plaintiffs counter that County Defendants analyze the negligence and wrongful death claims as if they are governed by the same standard, but they are not. (ECF No. 81, p. 19.) Plaintiffs contend that while a duty of care is necessary for a negligence claim, it is not necessary for a wrongful death claim unless the wrongful death claim is predicated on a negligence theory. (Id. at p. 20.) Plaintiffs further assert that their wrongful death claim is based on multiple theories, including deliberate indifference, failure to summon medical care, and other alleged statutory and constitutional violations. (Id. at pp. 19-20; SAC ¶ 203.) In reply, County Defendants maintain that Plaintiffs' wrongful death claim is derivative of same alleged conduct underlying their negligence claim and therefore fails for the same reasons. (ECF No. 85, p. 10.)

Under California law, the elements of a wrongful death claim are: "(1) a 'wrongful act or

neglect' on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.'" Norgart v. Upjohn Co., 21 Cal. 4th 383, 390 (1999) (quoting Cal. Civ. Proc. Code § 377.60). "A wrongful death claim may be predicated on negligence or other tortious conduct." Est. of Prasad ex rel. Prasad v. Cnty. of Sutter, 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013). A wrongful death claim fails if it does not allege the "manner in which [the defendant] was negligent, or how any such negligence caused or contributed in any manner to any specified injury." Est. of Chivrell v. City of Arcata, 694 F. Supp. 3d 1218, 1240 (N.D. Cal. 2023) (quoting Bem v. Stryker Corp., No. C 15-2485 MMC, 2015 WL 4573204, at *1 (N.D. Cal. July 29, 2015)).

Although framed as a separate cause of action, Plaintiffs' wrongful death claim relies on the same underlying conduct and theories as their negligence claim. (See SAC ¶¶ 193-207.) Accordingly for the reasons discussed above, Plaintiffs have failed to allege that any wrongful act or neglect by deliberate indifference to Decedent's need for medical care or treatment, failure to timely summon medical care in violation of California Government Code section 845.6, or failure to comply with the California Code of Regulations title 15 § 1027 *et seq*. against Defendants Warnke, Pena, Gutierrez, Rentfrow, or Sziraki caused the death of Decedent. Further, Plaintiffs' broad, conclusory allegation that the above-named Defendants "violat[ed] the United States and California Constitutions, federal and state laws, regulations, policies, standards, general orders, procedures, training, national and local standards, and/or California Civil Code § 1714(a)" is insufficient to state a cognizable basis for liability. Accordingly, the Court finds that Plaintiffs have failed to state a wrongful death claim and recommends that Defendants' motion to dismiss the wrongful death claim against Defendants Pena, Gutierrez, Warnke, Rentfrow, or Sziraki be granted.

**I. Further Leave to Amend**

If the court finds that a complaint or claim should be dismissed for failure to state a claim, the court has discretion to dismiss with or without leave to amend. See Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000). Leave to amend should be freely granted when justice so requires, Fed. R. Civ. P. 15(a), and if it appears possible that the defects in the complaint

could be corrected. Cato v. United States, 70 F.3d 1103, 1106 (9th Cir. 1995). However, if after careful consideration, it is clear that a claim cannot be cured by amendment, the court may dismiss without leave to amend. Id.

Here, the Court will recommend that Plaintiffs' claims against County Defendants be dismissed without further leave to amend. Plaintiffs were previously advised of the deficiencies in their claims against these defendants and have failed to cure those deficiencies despite being afforded an opportunity to do so. Accordingly, the Court finds that further leave to amend would be futile.

## IV.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends that County Defendants' motion to dismiss (ECF No. 74) be granted. Further, because Plaintiffs were previously granted leave to amend but failed to cure the identified deficiencies, the Court recommends that the claims against County Defendants be dismissed without further leave to amend.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within **fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Absent leave of the Court, any objections shall not exceed fifteen (15) pages and, absent good cause and leave of the Court, shall be limited to arguments previously presented by the parties or ruled upon by the Court, and shall not cite any new authority which could have been cited at the time of the filing.

///

///

///

///

///

The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **August 6, 2026**

STANLEY A. BOONE
United States Magistrate Judge